Eric H. Gibbs (SBN 178658)
Dylan Hughes (SBN 209113)
Aaron Blumenthal (SBN 310605)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com
ab@classlawgroup.com

Robert T. Eglet (*pro hac vice*)
Robert M. Adams (*pro hac vice*)
Erica D. Entsminger (*pro hac vice*)
Artemus W. Ham (*pro hac vice*)
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegas, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

Andrew N. Friedman (*pro hac vice forthcoming*)
Geoffrey Graber (SBN 211547)
Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com

[Additional counsel on signature page]

*Counsel for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THOMAS LETIZIA, GREG AGUSTIN, JR., TYLER BARNETT PR, LLC, THE ABBI AGENCY, LLE ONE, LLC, d/b/a Crowd Siren and d/b/a Social Media Models, QUIRKY, INC., and WINK, INC. n/k/a Wink Dissolution Corp., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., <br><br> Defendant. | Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

1    Plaintiffs Thomas Letizia, Greg Agustin, Jr., Tyler Barnett PR, LLC, The Abbi Agency, LLE

2  One, LLC, d/b/a Crowd Siren and d/b/a Social Media Models, Quirky, Inc., and Wink, Inc. n/k/a

3  Wink Dissolution Corp., on behalf of themselves and all others similarly situated, hereby file suit

4  against Facebook, Inc. and allege the following:

5                                **INTRODUCTION**

6    1.    Facebook, Inc. ("Facebook") sells video advertising services. When Facebook sells

7  these services, Facebooks sells a package of both video advertisements for its website and metrics

8  that enable purchasers to monitor their video advertisements' performance.

9    2.    This case concerns two of the metrics, the "Average Duration of Video Viewed" and

10  the "Average Percentage of Video Viewed." Because of what it now calls a "miscalculation,"

11  Facebook dramatically inflated both metrics by an estimated 60 to 80%.  Consequently, Plaintiffs

12  and putative class members purchased more video advertisements and paid a higher price for video

13  advertisements than they otherwise would have. Plaintiffs and putative class members accordingly

14  seek compensation and injunctive relief for violations of California's Unfair Competition Law,

15  breach of Facebook's implied duty to perform with reasonable care, and unjust enrichment.

16                                **JURISDICTION**

17    3.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §

18  1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value

19  of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed

20  class, and at least one member of the class of Plaintiffs is a citizen of a state different from a

21  Defendant.

22    4.    This Court has personal jurisdiction over Defendant Facebook, Inc. because

23  Facebook, Inc. is headquartered in California, and conducts business in the state of California.

24    5.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial

25  part of the events or omissions giving rise to the claims occurred in, were directed to, and/or

26  emanated from this District. Venue is also proper because Facebook's terms of service require that

27  claims are resolved "exclusively in the U.S. District Court for the Northern District of California or a

28

1

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

1   state court located in San Mateo County….”[1]

2   **PARTIES**

3        6.     Plaintiff Thomas Letizia is a Nevada resident. He is an advertising, marketing, and

4   public relations professional, and has managed high-profile political campaigns. Between May 4,

5   2014 and September 23, 2016, Mr. Letizia purchased video advertising services from Facebook.

6        7.     Plaintiff Greg Agustin Jr. is a Nevada resident. Greg Agustin Jr. is a digital marketing

7   professional. Between May 4, 2014 and September 23, 2016, he purchased video advertising

8   services from Facebook.

9        8.     Plaintiff Tyler Barnett PR, LLC, is a California limited liability company.  Tyler

10   Barnett PR, LLC, is a public relations and marketing agency that focuses on targeting the millennial

11   generation. Tyler Barnett PR, LLC purchased video advertising services from Facebook between

12   May 4, 2014 and September 23, 2016.

13        9.     Plaintiff The Abbi Agency is a Nevada corporation. The Abbi Agency offers creative,

14   public relations, and digital services. The Abbi Agency purchased video advertising services from

15   Facebook between May 4, 2014 and September 23, 2016.

16        10.     Plaintiff LLE One, LLC, d/b/a Crowd Siren and d/b/a Social Media Models is a

17   Nevada limited liability company.  Crowd Siren is a social media marketing agency.  LLE One, LLC

18   purchased video advertising services from Facebook between May 4, 2014 and September 23, 2016.

19        11.     Plaintiff Quirky, Inc. was a community-led invention platform. Quirky raised about

20   $200 million from investors, had a partnership with General Electric, and sold its products through a

21   variety of retail channels, such as Target, Walgreens, and the Museum of Modern Art. Wink, Inc.,

22   n/k/a Wink Dissolution Corp. is a wholly-owned subsidiary of Quirky, Inc. Wink developed a

23   platform for wireless-enabled products that allowed consumers to control household appliances and

24   services through their connected devices and the internet. Through partnerships with General

25   Electric, Honeywell, Nest, Phillips and others, over 60 Wink-enabled products were available in the

26

27   _____

28   [1] Facebook, *Statement of Rights and Responsibilities*, https://www.facebook.com/terms (last accessed: Jan. 9, 2017).

2

marketplace. Wink enabled homeowners to wirelessly connect their lighting, power, and security systems through a single application. Quirky, Inc. and Wink (collectively, "Quirky") filed for bankruptcy in September 2015. During the relevant time period, Plaintiffs Quirky, Inc. and Wink were incorporated in Delaware and their principle place of business was New York. Therefore, Quirky, Inc. and Wink are citizens of both New York and Delaware. Between May 4, 2014 and September 23, 2016, Quirky purchased video advertising services from Facebook.

12.     Defendant Facebook, Inc. is incorporated in Delaware, and its principal place of business is 1 Hacker Way, Menlo Park, CA 94025. Facebook is, therefore, a citizen of both Delaware and California.

## FACTUAL ALLEGATIONS

13.     Facebook is a Fortune 500 company that operates social media services, including the www.facebook.com and www.instagram.com websites and the WhatsApp Messenger application.

14.     Facebook.com has 1.79 billion monthly active users.[2] Users do not pay Facebook to create a facebook.com account. Once a user opens a Facebook account, the account holder can, at no cost, create a profile page, post content (such as photographs, videos, and links to articles), make friends with other users, and view content posted by other users.

15.     Instead of charging account holders to access facebook.com, Facebook makes money by selling advertising services. Facebook earns most of its revenue from advertising. For example, in 2015, Facebook's advertising revenue was over $17.0 billion, more than 95% of its overall revenue.[3]

16.     One type of advertising service Facebook sells is video advertisements, where advertisers can pay money to have video displayed to Facebook users. "Facebook videos (including video ad products) autoplay by default . . . though the audio remains off unless users actively turn it on."[4]  Facebook allows users to scroll past autoplaying videos (including video advertisements) without ever turning on the sound or watching more than a few seconds of the video.

---

[2] Facebook, *Company Info*, http://newsroom.fb.com/company-info/ (last accessed: Jan. 9, 2017).

[3] Facebook, Inc., Annual Report (Form 10-K) at 42 (Jan. 28, 2016).

[4] Eric Blattberg, *Like it or not, autoplay video won* (Apr. 21, 2015), http://digiday.com/publishers/autoplay-video-beat-regular-video-sorry-guys/.

17.     As part of Facebook's video advertising services, advertisers can choose to purchase advertisements with specific objectives, including maximizing "Brand awareness," "Video views," or "Conversions." Facebook says that a "Brand awareness" campaign will "[i]ncrease awareness for your brand," whereas a "Video views" campaign will "[g]et more people to view your video content," and a "Conversions" campaign will "[d]rive valuable actions on your website or app."

18.     Facebook video advertising services include marketing analytics, which enable purchasers to monitor and evaluate their video advertisements' performance.  Marketing analytics refers to the practice of measuring and analyzing the performance of an advertising or marketing campaign using data from a variety of metrics. One of the main selling points of online advertising is that it offers more detailed and closer to real time marketing analytics than traditional media (such as television or radio), and online advertisement sellers such as Facebook have promoted their marketing analytics as a prime reason that advertisers should purchase advertisements on their platforms.[5] Online advertisers do so because advertisers use these analytics to determine where to spend advertising dollars and the effectiveness of the dollars spent. As an article in the Harvard Business Review explains, analytics allows companies to make informed decisions about how to allocate their limited marketing budgets across different mediums (such as television, YouTube, or Facebook), to determine which advertising campaigns to "expand" and which to "kill," and to "readily adjust or allocate advertising in different markets on a monthly, weekly, or daily basis— and, online, even from one fraction of a second to the next."[6]  Accordingly, it has become a standard practice in the industry for online advertisers like Facebook to include marketing analytics as part of their advertising services, and online advertising purchasers expect that any advertising they purchase will include marketing analytics to evaluate the advertising's performance.

19.     The importance of analytics is apparent in the competitive online video advertising market. YouTube, LinkedIn, Twitter, and Facebook all have online video advertising offerings and all emphasize the value of their analytics platforms. When Facebook was first entering the online

---

[5] *See, e.g.*, Yahoo, *Yahoo! Gemini*, https://gemini.yahoo.com/advertiser/home ("Measure the impact of your campaigns and drive better results by accessing actionable insights . . .").

[6] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

video advertising space, it knew that its analytics would be the key to its success. In a November 2013 private presentation to its advertising partners ("November 2013 Presentation"), Facebook provided talking points on how to convince potential customers to purchase Facebook video advertisements instead of other video advertisements, such as YouTube advertisements or television advertisements. The presentation acknowledged that one of the weaknesses of Facebook's video advertising platform was the relatively basic level of metrics it provided to video purchasers. The presentation stated, "Currently, we only report on video plays, which is a weakness compared to YouTube, which reports on video views, completed views, and average duration of view. We are working on building out our video insights to give advertisers a better sense for how videos are performing. New video insights target launch: Q1 2014."[7]

20.     In May 2014, Facebook began providing video advertising purchasers with more analytics, including video views, completed views, and average duration of view, as part of Facebook's video advertising services. Facebook told its users that the purpose of the new analytics was to help video advertising purchasers "learn what's resonating with people and determine how to more effectively create and promote your videos on Facebook."[8] Facebook said its Audience Retention analytics in particular, such as Average Duration of Video Viewed, would assist video advertising purchasers in identifying underperforming videos and finding "the precise moment when most people lost interest and stopped watching."[9] Facebook knew and admitted that "having access to reliable metrics is important to the millions of partners who use our services to grow their businesses."

21.     "Average Duration of Video Viewed," which is the average amount of time that users watched a video, is one of the most important analytics used in evaluating video advertisements' performance.  Average Duration of Video Viewed is a measure of "retention," which advertisers

---

[7] Josh Constine, *Leaked Facebook Video Ad Pitch Deck Reveals Plans To Steal TV and YouTube Dollars*, TechCrunch (Dec. 13, 2013), https://techcrunch.com/2013/12/13/facebook-vs-tv-and-youtube.

[8] Facebook, *Introducing Video Metrics* (May 5, 2014), https://www.facebook.com/business/news/Coming-Soon-Video-Metrics.

[9] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

care about because the longer people watch an advertisement, the greater the advertisement's impact on the viewer.[10] One study of video advertising campaigns on Facebook found that increasing retention of a viewer from the 3-second mark to the 10-second mark in a video resulted in a 57 percent increase in ad recall, a 103 percent increase in brand awareness, and a 64 percent increase in "purchase intent" (the intent to the purchase the advertised product).[11] And because advertisers place higher value upon video advertisements that are viewed for longer periods, they are willing to pay more for such advertisements.

22.     After Facebook announced and released its new video analytics platform in May 2014, Plaintiffs and putative class members purchased video advertising services from Facebook with the understanding that video advertising analytics were included in the purchased advertising services.

23.     Upon introducing the new video metrics in their analytics platform, Facebook didn't disclose that its new video metrics were not audited or accredited by the Media Rating Council, the marketing industry's standard-bearer for accurate measurements.

24.     As acknowledged by Facebook in its private November 2013 Presentation and public statements, Facebook created and disseminated the new video analytics platform and its video metrics to induce users to purchase Facebook's video advertising services.

25.     Among the new video metrics provided by Facebook were "Average Duration of Video Viewed" and the "Average Percentage of Video Viewed." Below is example of how these video advertising metrics would appear on a user's screen:

---

[10] Facebook Business, *The Value of Video for Brands* (Mar. 17, 2015), https://www.facebook.com/business/news/value-of-video.

[11] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

26.     Facebook told advertising purchasers that the "Average Duration of Video Viewed" was the "total time spent watching a video divided by the total number of people who have played the video"[12] (as a reasonable advertising purchaser would expect).  Figure 1, below, depicts how Facebook defined "Average Duration of Video Viewed."

**Figure 1: Formula for Facebook's "Definition" of "Average Duration of Video Viewed"**

$$\text{Average Duration of Video Viewed} = \frac{\text{Total time spent watching the video by all users combined}}{\text{Total number of users who spent any time watching the video}}$$

27.     In August 2016, Facebook disclosed in a post in its "Advertising Help Center" that its "Average Duration of Video Viewed" and "Average Percentage of Video Viewed" metrics had been improperly calculated. Facebook admitted that it had erroneously "*calculated* the Average Duration of Video Viewed as 'the total time spent watching a video divided by *only* the number of people who have viewed a video for three or more seconds'"[13]  The "Average % of Video Viewed" was also erroneous because Facebook calculated that metric by using the "Average Duration of Video Viewed" as a calculation input. Figure 2 below, depicts how Facebook erroneously calculated "Average Duration of Video Viewed."[14]

**Figure 2: Formula for How Facebook Actually Calculated "Average Duration of Video Viewed" from May 2014 to September 2016**

$$\text{Average Duration of Video Viewed} = \frac{\text{Total time spent watching the video by all users combined}}{\text{Total number of users who spent three or more seconds watching the video}}$$

28.     On or about September 23, 2016, David Fischer, Facebook's vice president of business and marketing partnerships, admitted that, due to Facebook's miscalculation, Facebook had

---

[12] Facebook, *How Is the "Average Duration of Video Viewed" Calculated?*, https://www.facebook.com/business/help/community/question/?id=10104227902985423 (late accessed: Jan. 9, 2017).

[13] *Id.*

[14] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

misrepresented its "Average Duration of Video Viewed" metric. He wrote that the "average duration of video viewed … metric should have reflected the total time spent watching a video divided by the total number of people who played the video. But it didn't – it reflected the total time spent watching a video divided by only the number of 'views' of a video (that is, when the video was watched for three or more seconds). And so the miscalculation overstated this metric."[15]

29.    Facebook's "Average Duration of Video Viewed" metric was inflated because when calculating the average, Facebook included the total time spent by under-3-second viewers in watching the video in the numerator of the fraction, but excluded these under-3-second views from the denominator of the fraction. Thus, Facebook's "Average Duration of Video Viewed" metric failed to align its criteria for eligible viewing time (the numerator) and its criteria for an eligible view (the denominator).

30.    The impact of the numerator-denominator mismatch can be seen through the following illustration.

**Figure 3: Example - How Duration Metric *Should Have Been Calculated*, According to Facebook's Definition, For Video Viewed By Four Users for 1, 2, 4, and 9 seconds respectively.**

$$Average\ Duration = \frac{1\ sec. + 2\ secs. + 4\ secs. + 9\ secs.}{4\ total\ users\ who\ watched\ the\ video} = \frac{16\ seconds}{4} = 4\ seconds$$

**Figure 4: Example - How Duration Metric *Was Actually Calculated*, From May 2014 to September 2016, For Video Viewed By Four Users for 1, 2, 4, and 9 seconds respectively.**

$$Average\ Duration = \frac{1\ sec. + 2\ secs. + 4\ secs. + 9\ secs.}{2\ users\ who\ watched\ your\ video\ for\ 3\ or\ more\ seconds} = \frac{16\ seconds}{2} = 8\ seconds$$

31.    Figure 3 demonstrates how Facebook should have measured average duration of video viewed according to its definition. By using the correct method, all four viewers are included in the denominator, yielding an average duration of video viewed of 4 seconds in this hypothetical. Figure 4 demonstrates what Facebook actually did by excluding the video-watches under 3 seconds

[15] David Fischer, *Facebook Video Metrics Update*, Facebook.com (Sept. 23, 2016) https://www.facebook.com/business/news/facebook-video-metrics-update.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

1    from the denominator. In this hypothetical, 2 of the 4 video-watches are dropped from the

2    denominator, causing the average duration of video viewed to incorrectly rise to 8 seconds.

3              32.    By including the time spent watching the videos by users who viewed the videos for

4    less than 3 seconds, while excluding those "under 3-second" users from the denominator, the

5    Average Duration of Video Viewed metric not only failed to reflect its stated definition, it also

6    created a highly misleading result that favored Facebook.

7              33.    Facebook informed some its advertisers that it inflated the "Average Duration of

8    Video Viewed" by between 60 and 80%.[16] The inflated metric thus made video advertisements

9    *appear* as if they were performing much better on Facebook than they actually were.

10             34.    The 60 to 80% inflation in the "Average Duration of Video Viewed" metric reveals

11   that many users watch Facebook video advertisements for less than 3 seconds. When users scroll

12   right past muted video advertisements, the users have, under Facebook's reported metric for

13   "Average Duration of Video Viewed," technically spent time watching the video advertisement.

14   Thus, many of the 1-2 second video-watches (that contributed to the numerator, but not the

15   denominator, of Average Duration of Video Viewed) reflect users quickly scrolling past muted auto-

16   playing video advertisements.

17             35.    Video advertising purchasers, including Plaintiffs, viewed the "Average Duration of

18   Video Viewed" and "Average % of Video Viewed" as important metrics because users are more

19   likely to remember a video advertisement and be affected by it if they watch a longer portion of the

20   advertisement.

21             36.    Facebook's misrepresentations induced video advertising purchasers, including

22   Plaintiffs, to purchase video advertisements because purchasers wanted accurate video advertising

23   metrics regarding "Average Duration of Video Viewed" and "Average % of Video Viewed" so that

24   they could monitor their video advertisements' performance.

25             37.    Facebook's misrepresentations induced video advertising purchasers, including

26

27   _____

     [16] Suzanne Vranica and Jack Marshall, *Facebook Overestimated Key Video Metric for Two Years*,
28   Wall Street Journal (Sept. 22, 2016, 7:29 PM), http://www.wsj.com/articles/facebook-overestimated-
     key-video-metric-for-two-years-1474586951

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

1    Plaintiffs, to continue purchasing video advertisements, and to purchase additional video

2    advertisements, because purchasers believed that users were watching their videos, on average, for

3    longer than users were actually watching their videos.

4           38.    Facebook's misrepresentations induced video advertising purchasers, including

5    Plaintiffs, to pay more for Facebook video advertising than they otherwise would have been willing

6    to pay.

7           39.    Facebook's misrepresentations thereby distorted the market price for its video

8    advertising by artificially increasing the price of Facebook video advertising, causing video

9    advertising purchasers, including Plaintiffs, to pay more than they otherwise would have paid.

10          40.    Facebook's misrepresentations provided Facebook with an unfair competitive

11   advantage over other online video advertising platforms, such as YouTube, LinkedIn, and Twitter.

12          41.    Facebook's misrepresentations interfered with Plaintiffs and other putative class

13   members' attempts to utilize Facebook's video advertising analytics, and to run effective video

14   advertising campaigns.

15   **CLASS ALLEGATIONS**

16          42.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained

17   above.

18          43.    Pursuant to the Federal Rule of Civil P. 23(b)(3), Plaintiffs assert claims on behalf of

19   the following "Class": All persons or entities who, from May 4, 2014 to September 23, 2016 ("Class

20   Period"), had an account with Facebook, Inc. and who paid for placement of video advertisements

21   on a Facebook-owned website.  Excluded from the Class are Defendant, any entity in which

22   Defendant has a controlling interest, and Defendant's officers, directors, legal representatives,

23   successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial

24   officer presiding over this matter and the members of their immediate families and judicial staff.

25          44.    This action has been brought and may properly be maintained as a class action as it

26   satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule

27   23(b)(3). Plaintiffs seek to represent an ascertainable Class, as determining inclusion in the class can

28   be done through Facebook's own records.

45.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

46.     Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiffs believe, and on that basis allege, that the proposed Class is so numerous that joinder of all members would be impracticable as Facebook sells millions of advertisements annually, and a significant portion of those advertisements are video advertisements.

47.     Questions of law and fact common to the putative Class exist that predominate over questions affecting only individual members, including *inter alia*:

a.     Whether Facebook made material misrepresentations about its video advertising services, including misrepresenting the "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics;

b.     Whether Facebook's use of inaccurate, unaudited, and unverified video metrics was likely to deceive members of the public and thus constituted a fraudulent business practice under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200);

c.     Whether Facebook's failure to properly audit and verify its video metrics was unethical, unscrupulous, or substantially injurious to video advertising purchasers and thus constituted an unfair business practice under California's Unfair Competition Law;

d.     Whether Facebook breached its contractual duty to perform competently and with reasonable care by reporting erroneous video metrics;

e.     Whether and in what amount Facebook acquired money by means of its dissemination of inflated and improperly verified video metrics; and

f.     Whether it would be equitable for Facebook to profit from its inaccurate reporting of video metrics.

48.     Plaintiffs are members of the putative Class. The claims asserted by the Plaintiffs in

12

1  this action are typical of the claims of the members of the putative Class, as the claims arise from the

2  same course of conduct by the Defendant and the relief sought is common.

3       49.    Plaintiffs will fairly and adequately represent and protect the interests of the members

4  of the putative Class, as their interests are coincident with, not antagonistic to, the other members of

5  the Class.

6       50.    Plaintiffs have retained counsel competent and experienced in both consumer

7  protection and class action litigation. Plaintiffs' counsel specifically has experience litigating some

8  of the largest and most complex consumer class actions, including numerous consumer class actions

9  in the Northern District of California.

10      51.    Certification of the Class is appropriate pursuant to Fed. R. C. P. 23(b)(3) because

11 questions of law or fact common to the respective members of the Class predominate over questions

12 of law or fact affecting only individual members. This predominance makes class litigation superior

13 to any other method available for the fair and efficient adjudication of these claims including

14 consistency of adjudications. Absent a class action it would be highly unlikely that the members of

15 the Class would be able to protect their own interests because the cost of litigation through

16 individual lawsuits might exceed the expected recovery.

17      52.    A class action is a superior method for the adjudication of the controversy in that it

18 will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and

19 without the unnecessary hardship that would result from the prosecution of numerous individual

20 actions and the duplication of discovery, effort, expense, and the burden of the courts that individual

21 actions would create.

22      53.    The benefits of proceeding as a class action, including providing a method for

23 obtaining redress for claims that would not be practical to pursue individually, outweigh any

24 difficulties that might be argued with regard to the management of the class action.

25 //

26 //

27 //

28 //

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

**FIRST CAUSE OF ACTION**
(On behalf of the Class)[17]
**CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200,** *et seq.*

54.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

55.     Facebook violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §17200 et seq., by engaging in the fraudulent and unfair business acts and practices alleged previously, and as further specified below.

56.     Facebook's dissemination of inaccurate and inflated video-advertising metrics constitutes a fraudulent practice under the UCL, as it is likely to deceive Class members into believing that their video advertisements were viewed, on an average, for a longer duration than they actually were viewed.

57.     Facebook's failure to properly audit and verify the accuracy of its video-advertising metrics before disseminating them to Class members is unethical, unscrupulous, and substantially injurious to video-advertising purchasers, and thus constitutes an unfair practice under the UCL. Facebook's practice was also contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by laws like the Federal Trade Commission Act (15 U.S.C. § 45), Consumers Legal Remedies Act (Cal. Civ. Code § 1750 et seq.), and California False Advertising Law (Cal Bus. & Prof. Code § 17500). The harm these practices caused to Plaintiffs and the Class members outweigh their utility, if any.

58.     Facebook should have known that its metrics for "Average Duration of Video Viewed" and "Average % of Video Viewed" were inaccurate and inflated, and had Facebook properly audited and verified its video-advertising metrics it would have known that those metrics were inaccurate and inflated.  The calculation errors that Facebook allowed to persist for over two years were obvious errors that would have been discovered by a reasonable auditing and verification

---

[17] Pursuant to Facebook's terms of service, the laws of the State of California govern "any claim" that arises between Facebook and its users, "without regard to conflict of law provisions." Facebook, *Statement of Rights and Responsibilities*, https://www.facebook.com/terms (last accessed: Jan. 9, 2017).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

1  process.

2      59.     Facebook's failure to employ reasonable auditing and verification procedures gave it

3  an unfair competitive advantage, as it allowed Facebook to provide video-advertising services at a

4  lower cost and made those advertising services appear to be more effective than they were.

5      60.     Plaintiffs have standing to bring these claims under the UCL because they were

6  injured and lost money or property, including but not limited to money paid for Facebook video

7  advertisements, as a result of Facebook's fraudulent and unfair business practices.  Among other

8  things, Plaintiffs would not have bought as much video-advertising services if Facebook had not

9  disseminated inflated metrics and would have paid a lower price for the video-advertising services

10  they did purchase.

11      61.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek equitable relief to prevent

12  the continued use of Facebook's unfair and fraudulent practices and to restore to the Class all money

13  Facebook may have acquired by means of its fraudulent and unfair business practices.

14  **SECOND CAUSE OF ACTION**
**(On behalf of the Class)**

15  **BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE**

16      62.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained

17  above.

18      63.     Plaintiffs and Class members contracted with Facebook to provide them with video-

19  advertising services.  They did so through one or more of Facebook's advertising interfaces, where

20  Class members can submit video advertisements for approval, set a daily advertising budget that can

21  be adjusted at any time, set or adjust their target audience, and set or adjust the placement of the

22  advertising.

23      64.     Plaintiffs and Class members met all or substantially all of their contractual

24  obligations, including submitting its advertising for Facebook's approval and paying for Facebook's

25  advertising services.

26      65.     There is not one integrated contract that spells out Facebook's obligations to the

27  Class, but those obligations can be determined by reference to Facebook's course of dealing with the

28  Class, industry practice, and from various webpages created by Facebook, including  Facebook's

1   Statement of Rights and Responsibilities (https://www.facebook.com/legal/terms); Facebook's Self-

2   Serve Ad Terms (https://www.facebook.com/legal/self_service_ads_terms); Facebook's Advertising

3   Guidelines (https://www.facebook.com/policies/ads); Facebook's Advertiser Help Center

4   (https://www.facebook.com/business/help); Facebook's Community Payments Terms

5   (https://www.facebook.com/payments_terms); and Facebook's ad-creation, editing, and management

6   interfaces, which may be accessed through Facebook's Ads Manager

7   (https://www.facebook.com/ads/manager/creation/), Facebook's Power Editor

8   (https://www.facebook.com/ads/manage/powereditor), Facebook's Ads Manager App, Facebook

9   Pages, and Facebook Ads API.

10          66.     One of Facebook's obligations is to provide Class Members with an advertising

11  interface: a central portal where Class Members can create, edit, and monitor advertisements for

12  placement on Facebook's websites.  This obligation is implied by Facebook's course of dealing with

13  the Class, industry practice, Facebook's Self-Serve Ad Terms, and Facebook's Advertising Help

14  Center.  For example, the Self-Serve Ad Terms were drafted by Facebook to "apply to [Class

15  members'] use of the self-service advertising interfaces and APIs … (collectively, the 'Self-Serve

16  Ad Interfaces')," and those terms state that "you can cancel your Order at any time through our

17  online portal"—the implication being that there would in fact be advertising interfaces for Class

18  members to use.  Facebook's Advertiser Help Center also refers to Facebook's advertising interfaces

19  on several occasions.

20          67.     Another of Facebook's obligations is to track the advertising it places for Plaintiffs

21  and Class members and report metrics by which Plaintiffs and Class members can evaluate the

22  performance of their advertisements.  This obligation is implied by Facebook's course of dealing

23  with the Class, industry practice, statements made by Facebook in the Advertiser Help Center and in

24  standardized communications with the Class.  For example, Facebook has stated in its Advertiser

25  Help Center: "You can always go to Ads Manager to see how your ads are performing," and "When

26  you create a Video Views campaign, we'll measure both impressions and engagement with your

27  videos."  And when Facebook approves an advertisement, it sends a standardized email that states:

28  "Your ad is approved and should begin delivering shortly.  Click the ad name below to manage it or

1   view its performance."

2       68.     Under California law, Facebook was required to perform its contractual obligations

3   competently and with reasonable care.  Facebook breached that duty by incorrectly measuring

4   viewer engagement with the advertising it placed for Plaintiffs and Class members; by including

5   inaccurate data in the advertising interface that it provided to Plaintiffs and Class members; and by

6   reporting inaccurate advertising-performance metrics to Plaintiffs and Class members.

7       69.     Had Facebook used reasonable care, it would have calculated the video-viewing

8   metrics correctly, it would have discovered any calculation errors through routine auditing and

9   verification, and it would not have used an incorrect formula for over two years.

10      70.     As a result of Facebook's failure to provide its agreed advertising services

11  competently and using reasonable care, Plaintiffs and Class members purchased advertising services

12  they would not otherwise have purchased and failed to receive the benefit of their bargain.  They are

13  entitled to damages in an amount to be proven at trial.

14      71.     On behalf of the proposed Class, Plaintiffs have notified Facebook that it is in breach

15  and given it an opportunity to remedy the harm suffered by the Class, but Facebook has refused.

16                          **THIRD CAUSE OF ACTION**
                                **(On behalf of the Class)**
17                      **QUASI-CONTRACT CLAIM FOR RESTITUTION**

18      72.     Plaintiffs re-allege and incorporate by reference herein all allegations contained

19  above, with the exception of those allegations included in Plaintiffs' Second Cause of Action.

20      73.     As an alternative to the Second Cause of Action, and in the event the parties'

21  agreements for video advertising services are found not to cover Facebook's provision of video-

22  advertising metrics, Plaintiffs seek restitution in quasi contract.

23      74.     Facebook's inflated metrics made its video-advertising appear more effective and

24  valuable than it really was—leading Plaintiffs and the Class to pay more money to Facebook for

25  video-advertising services than they otherwise would have paid.

26      75.     Facebook knew about, accepted, and benefited from Plaintiffs' and Class members'

27  purchase of these video-advertising services.

28      76.     Under the circumstances, it would be inequitable for Facebook to benefit from its

                                        17

1   inaccurate calculation of video-viewership metrics and failure to correct the error for more than two

2   years.

3       77.      To avoid injustice, Plaintiffs and the Class accordingly seeks restitution and/or

4   disgorgement of profits in an amount to be proven at trial.

5                       **PRAYER FOR RELIEF**

6       WHEREFORE, Plaintiffs Thomas Letizia, Greg Agustin, Jr., Tyler Barnett PR, LLC, The

7   Abbi Agency, LLE One, LLC, d/b/a Crowd Siren and d/b/a Social Media Models, Quirky, Inc., and

8   Wink, Inc. n/k/a Wink Dissolution Corp. on behalf of themselves and the Class, seek the following

9   relief:

10      A.      An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the

11  Class as requested herein, appointing Cohen Milstein Sellers & Toll PLLC, Gibbs Law Group LLP,

12  and Eglet Prince as Class Counsel, and finding that Plaintiffs are proper representatives of the Class

13  requested herein.

14      B.      Plaintiffs request injunctive relief.  Awarding injunctive and other equitable relief as

15  is necessary to protect the interests of the Class, including: (i) an order prohibiting Facebook from

16  engaging in the wrongful acts described herein; (ii) requiring Facebook to  engage third-party

17  auditors to conduct audits and evaluations of Facebook's advertising metrics on a periodic basis and

18  ordering them to promptly correct any problems or issues detected by these auditors, and (iii)

19  requiring Facebook to disclose any further inaccurate advertising metrics in a timely and accurate

20  manner.

21      C.      Plaintiffs also request damages, restitution, attorneys' fees, statutory costs, and such

22  other and further relief as is just and proper. Plaintiffs seek attorneys' fees under California Code of

23  Civil Procedure 1021.5.

24                       **JURY TRIAL DEMAND**

25      Plaintiffs hereby request a jury trial for all issues so triable.

26  DATED: March 6, 2017                Respectfully submitted,

27                                  By: /s/ Eric Gibbs

28

| | |
|---|---|
| 1 | ERIC GIBBS (SBN 178658) |
| 2 | ehg@classlawgroup.com<br>DYLAN HUGHES (SBN 209113) |
| 3 | dsh@classlawgroup.com<br>AARON BLUMENTHAL (SBN 310605) |
| 4 | ab@classlawgroup.com<br>**GIBBS LAW GROUP LLP** |
| 5 | 505 14th Street, Suite 1110<br>Oakland, CA 94612 |
| 6 | Telephone: (510) 350-9700 |
| 7 | Facsimile: (510) 350-9701 |
| 8 | By: /s/ Geoffrey Graber |
| 9 | ANDREW N. FRIEDMAN (*pro hac vice forthcoming*) |
| 10 | afriedman@cohenmilstein.com<br>GEOFFREY GRABER (SBN 211547) |
| 11 | ggraber@cohenmilstein.com<br>ERIC KAFKA (*pro hac vice*) |
| 12 | ekafka@cohenmilstein.com<br>**COHEN MILSTEIN SELLERS & TOLL PLLC** |
| 13 | 1100 New York Ave. NW, Fifth Floor |
| 14 | Washington, DC 20005<br>Telephone: (202) 408-4600 |
| 15 | Facsimile: (202) 408-4699 |
| 16 | MICHAEL EISENKRAFT (*pro hac vice*) |
| 17 | meisenkraft@cohenmilstein.com<br>**COHEN MILSTEIN SELLERS & TOLL PLLC** |
| 18 | 88 Pine Street, 14th Floor<br>New York, NY 10005 |
| 19 | Telephone: (212) 838-7797<br>Facsimile: (212) 838-7745 |
| 20 | |
| 21 | ROBERT T. EGLET (*pro hac vice*)<br>ROBERT M. ADAMS (*pro hac vice*) |
| 22 | ERICA D. ENTSMINGER (*pro hac vice*)<br>ARTEMUS W. HAM (*pro hac vice*) |
| 23 | **EGLET PRINCE**<br>400 South Seventh Street, Suite 400 |
| 24 | Las Vegs, NV 89101<br>Telephone: (702) 450-5400 |
| 25 | Facsimile: (702) 450-5451 |
| 26 | eservice@egletlaw.com |
| 27 | AISHA CHRISTIAN (*pro hac vice forthcoming*) |
| 28 | 129 West 27th Street, 11th Floor<br>New York, NY 10001 |

19

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH

1

Telephone: (646) 285-2029

2

CHARLES REICHMANN (SBN 206699)

3

charles.reichmann@gmail.com
**LAW OFFICES OF CHARLES REICHMANN**

4

16 Yale Circle
Kensington, CA 94708-1015

5

Telephone: (415) 373-8849

6

JOSEPH A. MOTTA (SBN 133531)

7

**RUEB & MOTTA**

8

1401 Willow Pass Road, Suite 880
Concord, CA 94520

9

Telephone: (925) 602-3400
Facsimile: (925) 602-0622

10

joe@rmmprolaw.com

11

*Counsel for Plaintiffs and Proposed Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case Nos.: 3:16-cv-06232-TEH and 3:17-cv-00233-TEH