1  GIBBS LAW GROUP LLP
   Eric H. Gibbs (SBN 178658)
2  Dylan Hughes (SBN 209113)
   Aaron Blumenthal (SBN 310605)
3  505 14th Street, Ste. 1110
   Oakland, CA 94612
4  Telephone: 510-350-9700
   Facsimile: 510-350-9701
5
   COHEN MILSTEIN SELLERS & TOLL PLLC
6  Andrew N. Friedman (*Pro Hac Vice*)
   Geoffrey Graber (SBN 211547)
7  Eric Kafka (*Pro Hac Vice*)
   1100 New York Ave. NW., Fifth Floor
8  Washington, DC 20005
   Telephone: (202) 408-4600
9  Facsimile: (202) 408-4699

10 *Attorneys for Plaintiffs* QUIRKY, INC. and
   WINK, INC.
11
   [Additional Counsel on Signature Page]
12

EGLET PRINCE
ROBERT T. EGLET (*Pro Hac Vice*)
ROBERT M. ADAMS (*Pro Hac Vice*)
ERICA D. ENTSMINGER (*Pro Hac Vice*)
ARTEMUS W. HAM (*Pro Hac Vice*)
400 South Seventh Street, Ste. 400
Las Vegas, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451

*Attorneys for Plaintiffs* TOM LETIZIA et al.

13                **UNITED STATES DISTRICT COURT**

14              **NORTHERN DISTRICT OF CALIFORNIA**

15

16 THOMAS LETIZIA, GREG AGUSTIN,
   JR., TYLER BARNETT PR, LLC, THE
17 ABBI AGENCY, LLE ONE, LLC, d/b/a
   Crowd Siren and d/b/a Social Media
18 Models, QUIRKY, INC., and WINK, INC.
   n/k/a Wink Dissolution Corp., on behalf of
19 themselves and all others similarly situated

20                    Plaintiffs,

21          v.

22 FACEBOOK, INC.,

23                    Defendant.

24

Lead Case No. 3:16-cv-6232-TEH
Related Case No. 3:17-cv-0233-TEH

**PLAINTIFFS' OPPOSITION TO
FACEBOOK'S MOTION TO DISMISS
THE CONSOLIDATED COMPLAINT**

Date:         June 12, 2017
Time:         10:00 a.m.
Dept.:        Courtroom 2, 17th Floor

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ................................................................................2

    A.    The Importance of Online Video Advertising Analytics .........................2

    B.    Facebook's Viewership Metrics Are Provided Pursuant to Its Contractual Relationship With Advertisers ................................................4

    C.    Facebook's Inflated Viewership Metrics ..................................................5

    D.    Plaintiffs' Lawsuit....................................................................................6

III.  ARGUMENT ........................................................................................................7

    A.    Plaintiffs Have Alleged a Claim For Violation of the UCL .....................7

        1.    Plaintiffs Have Standing to Challenge Facebook's Conduct......................7

        2.    Plaintiffs' Fraud Allegations Satisfy Rule 9(b) .........................8

        3.    Plaintiffs Have Alleged That Facebook Engaged in Unfair Business Practices ......................................................................10

            a.    Plaintiffs Have Stated a Claim Under the Balancing Test............10

            b.    Plaintiffs Also State a Claim Under the Tethering Test ...............13

        4.    Plaintiffs Have Standing to Seek Injunctive Relief .................14

    B.    Plaintiffs Have Alleged a Claim for Breach of the Duty to Perform With Reasonable Care.............................................................15

        1.    Facebook's Integration Clause Does Not Insulate It From Liability for Failing to Use Reasonable Care In Disseminating Advertising Metrics .......................................................................................16

        2.    The Documents and Course of Performance Alleged in Plaintiffs' Complaint Support an Implied Duty to Use Reasonable Care in Disseminating Advertising Metrics ........................................18

        3.    Facebook Misstates California Law by Suggesting that the Duty of Reasonable Care Extends Only to Express Contractual Terms ................21

    C.    Plaintiffs Have Properly Alleged an Alternative Quasi-Contract Claim .............22

IV.   CONCLUSION....................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Specialty Health Grp., Inc. v. Healthways, Inc.*,
No. 11-CV-02819 BEN KSC, 2012 WL 4863779 (S.D. Cal. Oct. 12, 2012) ...........................13

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ...................................................................................................22

*Backus v. Gen. Mills, Inc.*,
122 F. Supp. 3d 909 (N.D. Cal. 2015) ....................................................................................10

*Ball v. Johanns*,
No. CIV. S-07-1190-LKK, 2008 WL 269069 (E.D. Cal. Jan. 29, 2008) ...............................23

*Baxter v. Intelius, Inc.*,
No. SACV09-1031 AG MLGX, 2010 WL 3791487 (C.D. Cal. Sept. 16, 2010) .....................12

*Brickman v. Fitbit, Inc.*,
No. 15-CV-02077-JD, 2016 WL 3844327 (N.D. Cal. July 15, 2016) .......................................8

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ....................................................................................................13, 14

*Chacanaca v. Quaker Oats Co.*,
752 F.Supp.2d 1111 (N.D. Cal. 2010) ......................................................................................9

*Chester v. TJX Companies, Inc.*,
No. 5:15-CV-01437-ODW, 2016 WL 4414768 (C.D. Cal. Aug. 18, 2016) ..............................9

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
No. 12-04000, 2013 WL 57861 (N.D. Cal. Jan. 3, 2013) .......................................................23

*Cohen v. Paramount Pictures Corp.*,
845 F.2d 851 (9th Cir. 1988) ...................................................................................................17

*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*,
4 Cal. App. 4th 963 (1992) .......................................................................................................15

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 .........................................................................................................................12

*Dodson v. Tempur-Sealy Int'l, Inc.*, 13-CV-04984-JST,
2014 WL 1493676 (N.D. Cal. Apr. 16, 2014) .........................................................................10

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016) ...................................................................................................11

*Ewert v. eBay, Inc.*,
2010 WL 4269259 (N.D.Cal.) ................................................................................................20

*Ferrington v. McAfee, Inc.*,
 No. 10-CV-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) .......................................13

*Figy v. Lifeway Foods, Inc.*,
 No. 13-CV-04828-TEH, 2016 WL 4364225 (N.D. Cal. Aug. 16, 2016) ....................................9

*Friedman v. AARP, Inc.*,
 No. 14-56765, 2017 WL 1657553 (9th Cir. May 3, 2017).................................................8, 11

*Gutierrez v. Wells Fargo Bank, N.A.*,
 730 F. Supp. 2d 1080 (N.D. Cal. 2010) .................................................................................11

*Hodsdon v. Mars, Inc.*,
 162 F. Supp. 3d 1016 (N.D. Cal. 2016) .................................................................................12

*Holguin v. DISH Network LLC*,
 229 Cal. App. 4th 1310 (2014) ...............................................................................18, 21, 22

*Humboldt Baykeepers v. Simpson Timber Co.*,
 2006 WL 3545014 (N.D. Cal., Dec. 8, 2006) .......................................................................20

*In re Adobe Sys., Inc. Privacy Litig.*,
 66 F. Supp. 3d 1197 (N.D. Cal. 2014) ..................................................................................13

*In re Anthem, Inc. Data Breach Litig.*,
 No. 15-MD-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016) .................................13

*In re Carrier IQ, Inc.*,
 78 F. Supp. 3d 1051 (N.D. Cal. 2015) ..................................................................................13

*In re Google AdWords Litig.*,
 No. C 08-03369 JW, 2011 WL 7109217 ..................................................................................8

*Janda v. T-Mobile, USA, Inc.*,
 No. C05-03729 JSW, 2009 WL 667206 (N.D. Cal. Mar. 13, 2009) ......................................12

*Johnson v. City of Shelby*,
 135 S. Ct. 346 (2014)............................................................................................................20

*Kabbash v. Jewelry Channel, Inc. USA*,
 No. 15-CV-4007-DMG, 2015 WL 6690236 (C.D. Cal. Nov. 2, 2015)......................................9

*Kanfer v. Pharmacare US, Inc.*,
 No. 15-CV-0120-H-JLB, 2015 WL 6742201 (S.D. Cal. Nov. 4, 2015)....................................9

*Kennecott Corp. v. Union Oil Co.*,
 196 Cal. App. 3d 1179 ...........................................................................................................19

*Kuitems v. Covell*,
 104 Cal. App. 2d 482 (1951) .................................................................................................22

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
 176 F. Supp. 3d 949 (E.D. Cal. 2016) ......................................................................16, 17, 19

*Lilly v. Jamba Juice Co.*,
 No. 13-CV-02998-JST, 2015 WL 1248027 (N.D. Cal. Mar. 18, 2015)..................................14

iii

*Masterson v. Sine*, 68 Cal.2d 222, 228 (1968),
    68 Cal.2d 222 (1968) ...........................................................................................17

*McKell v. Washington Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) ...........................................................................10

*Mullins v. Premier Nutrition Corp.*,
    178 F. Supp. 3d 867 (N.D. Cal. 2016) ...............................................................11

*N. Am. Chem. Co. v. Super Ct.*,
    59 Cal. App. 4th 764 (Cal. Second Div. 1997) ..................................................22

*Novell, Inc. v. Unicom Sales, Inc.*,
    2004 1839117 at *11 (N.D. Cal., Aug. 17, 2004) ..............................................18

*O'Connor v. Uber Techs., Inc.*,
    58 F. Supp. 3d 989 (N.D. Cal. 2014) ..................................................................23

*People v. Superior Court*,
    9 Cal. 3d 283 (1973) ...........................................................................................15

*Perry v. Robertson*,
    201 Cal. App. 3d 333 (1988) ..............................................................................22

*Pirozzi v. Apple, Inc.*,
    966 F. Supp. 2d 909 (N.D. Cal. 2013) ................................................................11

*Sicor Ltd. v. Cetus Corp.*,
    51 F.3d 848 (9th Cir. 1995) ...........................................................................16, 17

*Stevenson v. City of Seat Pleasant, Md.*,
    743 F.3d 411 (4th Cir. 2014) ..............................................................................20

*Strumlauf v. Starbucks Corp.*,
    192 F. Supp. 3d 1025 (N.D. Cal. 2016) ............................................................8, 9

*Troyk v. Farmers Grp., Inc.*,
    171 Cal. App. 4th 1305 (2009) ...........................................................................15

*Vedachalam v. Tata Consultancy Servs., Ltd.*, No. C,
    06-0963 CW, 2012 WL 1110004 (N.D. Cal. Apr. 2, 2012) ...............................20

*Vess v. Ciba–Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ..............................................................................8

**Statutes**

Cal. Civ. Proc. Code § 1856 .........................................................................................17, 19
Cal. Civ. Proc. Code § 1856(a) ..........................................................................................16
Cal. Civ. Proc. Code § 1856(c) ..........................................................................................19
Cal. Com. Code § 1303(a) .............................................................................................19, 20
Cal. Com. Code § 1303(b) .............................................................................................19, 20

**Rules**

Fed. R. Civ. P. 8(d)(3)........................................................................................23
Fed. R. Civ. P. 9(b)..........................................................................................8, 9

**Other Authorities**

Restatement (Second) of Contracts § 211(2) .................................................20

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
Case No. 3:16-cv-6232-TEH

1  **I.     INTRODUCTION**

2          For over two years, Facebook inflated its audience-retention metrics by 60 to 80% and

3  failed to verify or audit those overstated numbers before reporting them to advertisers.  As a

4  result, advertisers like Plaintiffs bought more video-advertising from Facebook than they

5  otherwise would have, and paid more for that advertising than they otherwise would have.

6  Facebook finally corrected its inflated metrics, which it says now accurately reflect how long

7  viewers actually watch video-advertising on Facebook.  But it's keeping the money.

8          In moving to dismiss Plaintiffs' complaint, Facebook argues that its inflated metrics did

9  not affect billing because it charged advertisers on a per-view basis.  But as Plaintiffs allege—and

10 as Facebook surely knows—the price-per-view Facebook charges advertisers depends on the

11 market's demand for its advertising services.  That demand was artificially driven up because

12 advertisers were led to believe that Facebook's video advertising performed better—and was

13 therefore more valuable—than it really was.  The price advertisers paid to place video

14 advertisements on Facebook was thus artificially inflated by Facebook's years-long practice of

15 misreporting audience-retention data—costing advertisers and enriching Facebook.

16         The reasons Facebook gives for dismissing Plaintiffs' UCL claim are also mistaken.

17 Facebook is wrong that "presumably … no Plaintiff ever viewed, let alone relied on, either of

18 these [audience-retention] metrics."  (Mot. at 2.)  Plaintiffs specifically alleged that Facebook's

19 misrepresentations induced them to purchase video advertising from Facebook that they would

20 not otherwise have purchased.  Facebook is also wrong to say that Plaintiffs have not stated "who,

21 what, when, where, why, and how," of their UCL claim, or that Plaintiffs failed to allege an unfair

22 business practice.  (*Id.*)  Plaintiffs' complaint informs Facebook exactly what it is alleged to have

23 done wrong, and Facebook certainly understood Plaintiffs' allegations well enough to file a

24 lengthy motion to dismiss.  And Plaintiffs' allegations that Facebook harmed consumers by

25 failing to use reasonable verification or auditing procedures are more than enough to state a claim

26 under the UCL's unfair prong.

27         Facebook's arguments regarding Plaintiffs' contract claims fare no better.  Plaintiffs

28 purchased their video advertisements pursuant to a contract that covers "Facebook's advertising

1

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
Case No. 3:16-cv-6232-TEH

1    products and services."  One of the advertising services that Facebook—like YouTube, LinkedIn,

2    and Twitter—provides is an analytics platform that measures the performance of its customers'

3    advertisements.  Yet Facebook now asserts that its advertising performance metrics were *not* part

4    of its contract with advertisers like Plaintiffs.  It says this even though the Self-Serve Ad Terms

5    governing Facebook's advertising services specifically reference the "advertising interfaces"

6    where Facebook displayed viewership metrics; when Facebook accepted individual advertising

7    orders, it confirmed that users could monitor their advertisement's performance; and throughout

8    the parties' course of dealing and performance, Facebook provided advertisers with viewership

9    metrics.  Facebook was, in other words, providing its advertising interfaces and the performance

10   metrics it displayed on those interfaces pursuant to a contractual relationship.  Under California

11   law it was required to exercise reasonable care in doing so—a duty Facebook failed to live up to

12   when it displayed inaccurate and unaudited audience-retention metrics on users' advertising

13   interfaces for more than two years.

14         Finally, Plaintiffs have properly alleged a claim in the alternative for unjust enrichment

15   (also referred to as a claim in quasi-contract).  Facebook contends that its performance metrics

16   were not the subject of the parties' contractual relationship, and if the Court ultimately accepts

17   Facebook's view, Plaintiffs would have a valid claim in quasi-contract.  Plaintiffs believe that

18   they are likely to prevail on their contract claim and that the quasi-contract theory will not be

19   needed, but they are entitled to plead in the alternative and protect advertisers' right to recover in

20   equity if Facebook's provision of viewership metrics is ultimately found to have been extra-

21   contractual.

22   **II.    FACTUAL BACKGROUND**

23         **A.    The Importance of Online Video Advertising Analytics**

24         One of the primary appeals of online advertising—as opposed to advertising on traditional

25   media like television or radio—is the ability to track an advertisement's performance in real-time.

26   (Compl. [ECF No. 34], ¶ 18.)  With online advertising, advertisers get up-to-the-minute analytics

27   that report, for example, how many people have viewed each advertisement and how long they

28   viewed the advertisement.  (*Id.*)  Advertisers can then adjust their advertisements' daily or weekly

budgets accordingly—allocating more of their marketing dollars to ads that are receiving high levels of viewer engagement, and less to ads that are receiving lower levels of viewer engagement.  (*Id*.)

The market for online video advertising is highly competitive, with YouTube, LinkedIn, Twitter, and Facebook all offering platforms that advertisers can use to place video advertisements on their websites.  (*Id.*, ¶ 19.)  Analytics are an essential part of these services: each platform includes metrics that track the performance of video ads and allows customers to adjust their advertising dollars accordingly.  (*Id.*)  Both because it is standard practice in the industry to provide these advertising analytics, and because the ability to assess the effectiveness of their ads is so important to advertisers, consumers of video advertising services expect that any video advertising they purchase will include viewership analytics.  (*Id.*, ¶ 18)

Like its competitors, Facebook offers an advertising interface: a central portal that advertisers regularly visit to monitor how their advertising is performing; increase or decrease the daily budget for each advertisement; and place new advertisements or cancel existing ones.  (*Id.*, ¶¶ 63, 66, 68.)  Two of the most important video-advertising metrics that appear on Facebook's interface are "Average Duration of Video Viewed" and "Average Percentage of Video Viewed."  (*Id.*, ¶ 21.)[1]  These metrics are measures of "audience retention," which advertisers care about because the longer people watch an advertisement, the greater the advertisement's impact on the viewer.  (*Id.*)  One study of video advertising campaigns on Facebook found that increasing a viewer's retention from a video's 3-second mark to its 10-second mark resulted in a 57 percent increase in ad recall, a 103 percent increase in brand awareness, and a 64 percent increase in "purchase intent."  (*Id.*)  Advertisers accordingly place a higher value on video advertisements that are viewed for longer periods, and are willing to pay more for those advertisements.  (*Id.*, ¶¶ 21, 35.)

---

[1] Facebook begins its motion by claiming these were only two of "dozens" of metrics it provides to advertisers.  (Mot. at 2.)  Facebook has previously said in the press that there are only fourteen. http://www.businessinsider.com/facebook-carolyn-everson-on-its-video-view-count-error-2016-9. While discovery will reveal whether it is dozens or fourteen, what matters is that the specific metrics at issue were particularly important to advertisers.

1

**B.      Facebook's Viewership Metrics Are Provided Pursuant to Its Contractual Relationship With Advertisers**

2

3      Facebook's motion refers repeatedly to an integration clause that appears in its Statement

4   of Rights and Responsibilities ("SRR").  (*See* Facebook's RJN, Ex. A, ¶ 19.2; Ex. B, ¶ 18.2.)

5   That integration clause applies to most non-paying users, who use Facebook only as a free social

6   network, and for whom the SRR makes up the "entire agreement."  (*Id.*)  For paying advertisers,

7   however, the SRR is far from the only document governing their contractual relationship with

8   Facebook.  As Facebook states elsewhere in its SRR, users who pay for "Services" (which

9   include purchasers of its advertising services like Plaintiffs), are asked to review and accept

10   supplemental terms:

11              Because Facebook provides a wide range of Services, we may ask
              you to review and accept supplemental terms that apply to your
12              interaction with a specific app, product, or service.  To the extent
              those supplemental terms conflict with this SRR, the supplemental
13              terms associated with the app, product or service govern with
              respect to your use of such app, product or service to the extent of
14              the conflict.

15   (*Id.* at 1 (preamble).)  Those supplemental terms trump the SRR, so for those users the SRR does

16   not in fact make up the entire agreement.  (*Id.*)

17      Facebook's Self-Serve Ad Terms include some of the supplemental terms that apply to

18   advertisers.  (Compl., ¶¶ 65; RJN, Ex. C-D.)  That document specifically refers to "Self-Serve Ad

19   Interfaces" where users can create advertisements, and it is on those interfaces that Facebook

20   displayed its audience-retention metrics.  (Compl., ¶ 66; RJN, Exs. C-D .)  Under the Self-Serve

21   Ad Terms, other terms are set when advertisers place "Orders" for advertising through the

22   advertising interfaces.  (*Id.*)  After Facebook reviews an initial Order, it sends a standardized

23   email informing the advertiser that the ad has been approved and that its performance can be

24   monitored through the users' advertising interface.  (Compl., ¶ 67.)  At all times, the advertiser

25   remains free to cancel the advertising or modify the Order, including by changing the daily or

26   weekly budget allocated to each advertisement.  (*Id.*, ¶¶ 63, 66; RJN, Exs. C-D, ¶ 8.)

27      In addition to the Self-Serve Ad Terms, Orders, Self-Serve Ad Interfaces, the parties'

28   contractual relationship also includes Facebook's Advertising Guidelines, Advertising Help

4

Center, and Community Payments Terms.  (Compl., ¶¶ 65.)  The Advertising Guidelines states that advertising customers may use Facebook's advertising data "on an aggregate and anonymous basis … to assess the performance and effectiveness of your Facebook advertising campaigns." (RJN, Exs. E-O, ¶ II.B.)  The Advertising Help Center states that advertisers "can always go to Ads Manager [one of the advertising interfaces] to see how your ads are performing," and that when advertisers create an advertising campaign on Facebook, "we'll measure both impressions and engagement with your videos."  (Compl., ¶ 67.)

### C.   Facebook's Inflated Viewership Metrics

In September 2016, Facebook admitted that the "Average Duration of Video Viewed" and "Average Percentage of Video Viewed" metrics listed on its users' advertising interfaces had been miscalculated.  (Compl., ¶28.)  For more than two years, Facebook failed to include video views lasting fewer than 3 seconds in the denominator of its calculations—even though the time from those views *was* included in the numerator.  (*Id.*, ¶¶ 28-29.)  For instance, Facebook calculated the average duration a video advertisement was viewed like this:

$$Avg.\,Duration = \frac{Total\;Time\;Spent\;By\;All\;Users}{Number\;of\;Users\;Who\;Viewed\;for > 3\;Seconds}$$

But it should have calculated it this way:

$$Avg.\,Duration = \frac{Total\;Time\;Spent\;By\;All\;Users}{Total\;Number\;of\;Users\;Who\;Viewed\;Video}$$

(*Id*, ¶ 30.)

This is a basic and obvious error—one that would have been quickly discovered by any reasonable verification procedure or through routine auditing.  (*Id.*, ¶¶ 58, 69.)  But Facebook did not submit its video metrics for auditing by the Media Rating Council, the marketing industry's standard-bearer for accurate measurements.  (*Id.*, ¶ 23.)  Nor did Facebook properly verify or audit its metrics internally.  (*Id.*, ¶ 57.)  Instead, Facebook took more than two years to correct the error—all the while benefiting from the inflated statistics it was reporting to advertisers.

The effect of Facebook's incorrect calculation was significant: it inflated the "Average Duration of Video Viewed" metric that Facebook reported to advertisers by between 60 and 80%. (*Id.*, ¶ 33.)  This made video advertising on Facebook appear to be performing much better that it really was, and in turn, made the advertising appear to be much more valuable than it really was. (*Id.*, ¶¶ 33, 56.)  Believing that Facebook's advertising was achieving higher levels of viewer-engagement, advertisers placed video ads on Facebook that they otherwise would not have placed.  (*Id.*, ¶ 36.)  They allocated higher daily or weekly budgets to Facebook advertisements than they otherwise would have allocated.  (*Id.*, ¶¶ 2, 37.)  They kept running advertisements on Facebook longer than they otherwise would have.  (*Id*.)  And they were willing to pay more for Facebook's video advertising than they otherwise would have been willing to pay.  (*Id.*, ¶ 38.)

Facebook claims that it only bills based on "views" and so its error was irrelevant, but as it knows, the price-per-view depends on the demand for Facebook advertising.  The more effective Facebook's video advertising is perceived to be at engaging viewers, enticing them to watch more of the video rather than quickly scrolling past, the more advertisers are willing to pay per view.  (*Id.*, ¶ 21.)  As Plaintiffs alleged, Facebook's inflated viewership metrics therefore distorted the market for Facebook's video advertising, artificially increasing the market price that consumers paid and the advertising profits that Facebook pocketed over the past two years.  (*Id.*, ¶ 39.)

### D.    Plaintiffs' Lawsuit

Facebook has now corrected its inflated metrics, but it has done nothing to compensate the advertisers who overpaid for Facebook advertising over the last two years.  Plaintiffs are six of those advertisers and seek to represent a class of advertisers who purchased video advertising from Facebook from May 4, 2014, to September 23, 2016.  (Compl., ¶¶ 6-11, 43.)  They contend that Facebook violated California's Unfair Competition Law (UCL) by disseminating inaccurate performance metrics and by failing to enlist reasonable auditing and verification practices; that by posting inaccurate metrics on its advertising interface, Facebook breached its duty to perform contractual services with reasonable care; and that Facebook would be unjustly enriched if it was permitted to keep the proceeds from its inaccurate calculations.  (*Id.*, ¶¶ 2, 54-77.)  Plaintiffs

1   request that that the Court require Facebook to disgorge the profits it made as a result of

2   disseminating inflated video-viewership metrics, and issue appropriate injunctive relief to prevent

3   Facebook from capitalizing on inaccurate metrics in the future.  (*Id.*, ¶¶ 61, 77, Prayer.)

4   **III.    ARGUMENT**

5          **A.    Plaintiffs Have Alleged a Claim For Violation of the UCL**

6                  **1.    Plaintiffs Have Standing to Challenge Facebook's Conduct**

7          Facebook first asks the Court to dismiss Plaintiffs' UCL claim for failure to adequately

8   allege reliance.  (Mot. at 6-9.)  It claims that "not a single plaintiff—let alone all of them—alleges

9   that he or it ever viewed either Average Duration Metric and then spent money on video ads

10  because of an alleged misrepresentation about those metrics."  (Mot. at 8.)  But Plaintiffs'

11  complaint contains several allegations establishing that, in fact, all of the Plaintiffs spent money

12  on video advertising due to Facebook's false metrics:

13          • Facebook's misrepresentations induced video advertising purchasers,
14            *including Plaintiffs*, to purchase video advertisements …

15          • Facebook's misrepresentations induced video advertising purchasers,
              *including Plaintiffs*, to continue purchasing video advertisements, and to
16            purchase additional video advertisements, advertisements, because
              purchasers believed that users were watching their videos, on average, for
              longer than users were actually watching their videos.
17

18          • Facebook's misrepresentations induced video advertising purchasers,
              *including Plaintiffs*, to pay more for Facebook video advertising than they
19            otherwise would have been willing to pay.

20          • Plaintiffs … lost money or property, including but not limited to money
              paid for Facebook video advertisements, as a result of Facebook's
21            fraudulent and unfair business practices.  Among other things, Plaintiffs
              would not have bought as much video-advertising services if Facebook
22            had not disseminated inflated metrics and would have paid a lower price
              for the video-advertising services they did purchase.

23  (Compl., ¶¶ 36-38, 60 (emphasis added).)

24          Facebook contends these allegations aren't good enough because Plaintiffs never

25  explicitly say they "saw" the inflated viewership metrics.  (Mot. at 7.)  But Plaintiffs do say that

26  Facebook's inflated metrics "induced" them to purchase video advertising that they otherwise

27  would not have purchased, and—as Facebook acknowledges—the only way that allegation can be

28  true is if Plaintiffs did in fact see and rely on the inflated metrics.  (Mot. at 8.)  All reasonable

7

1   inferences are to be drawn in favor of the plaintiffs on a motion to dismiss, and here the only

2   reasonable inference is that Plaintiffs saw and relied upon Facebook's inflated viewership

3   metrics.  *See In re Google AdWords Litig.*, No. C 08-03369 JW, 2011 WL 7109217, at *2-3

4   ("[v]iewed in the light most favorable to plaintiffs," allegation that "[a]s a result of Defendant's

5   conduct, Plaintiffs expended money on advertising they would not otherwise have spent,"

6   sufficiently establishes reliance).

7              **2.      Plaintiffs' Fraud Allegations Satisfy Rule 9(b)**

8              To state a claim under the UCL's fraudulent prong, Plaintiffs need only allege conduct

9   that is likely to deceive members of the public.  *Friedman v. AARP, Inc.*, No. 14-56765, 2017 WL

10  1657553, at *6 (9th Cir. May 3, 2017).  Facebook's dissemination of inaccurate audience-

11  retention metrics meets that standard, and Facebook does not argue otherwise.  Instead, Facebook

12  claims that Plaintiffs have not alleged the circumstances surrounding its misleading conduct with

13  enough particularity, and so are not in compliance with Rule 9(b) of the Federal Rules of Civil

14  Procedure.  (Mot. at 9.)

15             To satisfy Rule 9(b), Plaintiffs need not "present a detailed expose in their complaint."

16  *Brickman v. Fitbit, Inc.*, No. 15-CV-02077-JD, 2016 WL 3844327, at *2 (N.D. Cal. July 15,

17  2016).  They need only provide the "who, what, when, where, and how of the misconduct

18  charged," such that Facebook can prepare an adequate answer, and "not just deny that they have

19  done anything wrong."  *Strumlauf v. Starbucks Corp.*, 192 F. Supp. 3d 1025, 1034 (N.D. Cal.

20  2016) (quoting *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)); *see also In*

21  *re Google Adwords Litig.*, 2011 WL 7109217 at *3.  Plaintiffs' allegations meet that standard:

22      <u>Who</u>:  Facebook, Inc.  (Compl., ¶¶ 1-2.)

23      <u>What</u>:  Reported advertising viewership metrics—specifically, the "Average
        Duration of Video Viewed" metric and "Average Percentage of Video Viewed"
24      metric—that were inflated by an estimated 60 to 80% due to a systematic
        calculation error.  (*Id.*, ¶¶ 2, 27-34.)
25
        <u>When</u>: Between May 4, 2014, and September 23, 2016.  (*Id.*, ¶¶ 11, 20 & n.7, 28,
26      43.)

27      <u>Where</u>:  On the advertising platform that Facebook uses to apprise its video
        advertisers, including Plaintiffs, how their advertisements are performing (and
28      where advertisers can increase or decrease the budget for their advertisements).
        (*Id.*, ¶¶ 19-24.)

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
Case No. 3:16-cv-6232-TEH

<u>How</u>:  The reported video metrics were misleading because they made video advertisements placed with Facebook appear to receive a higher level of viewer engagement than they actually received.  (*Id.*, ¶¶ 33, 35-41, 56.)

The details included in Plaintiffs' complaint are more than enough to apprise Facebook of the nature of the claims against it.  *See Strumlauf,* 192 F. Supp. 3d at 1034 (finding similarly detailed allegations sufficient); *Chacanaca v. Quaker Oats Co.,* 752 F.Supp.2d 1111, 1126 (N.D. Cal. 2010) ("[P]laintiffs have identified the particular statements they allege are misleading, the basis for that contention, where those statements appear ..., and the relevant time period in which the statements were used. As such, they have satisfied the requisite who, what, when, where, and how of the misconduct charged.").

Although Facebook clearly understands Plaintiffs' allegations, and has had no difficulty mounting defenses in its current motion, it says Plaintiffs should be required to provide even more detail.  *See Kanfer v. Pharmacare US, Inc.,* No. 15-CV-0120-H-JLB, 2015 WL 6742201, at *9 (S.D. Cal. Nov. 4, 2015) (finding "Defendant's ample and pointed defense" evidenced that plaintiff had alleged his claims with sufficient particularity).  Facebook would require Plaintiffs to, in essence, catalog every advertising campaign they placed with Facebook between May 4, 2014, and September 23, 2016; the specific dates when Plaintiffs logged onto Facebook's advertising platform (where the metrics were displayed) and purchased advertising or maintained existing advertising; and the viewership data that Facebook's advertising platform was displaying for each advertising campaign when Plaintiffs logged on.  (*See* Mot. at 9.)

Rule 9(b) does not require such an unrealistic degree of detail.  Numerous courts in this district, for instance, have declined to require plaintiffs to allege a specific date of purchase.  *Figy v. Lifeway Foods, Inc.,* No. 13-CV-04828-TEH, 2016 WL 4364225, at *5 (N.D. Cal. Aug. 16, 2016) (citing cases and finding that alleging a plaintiff purchased "during the Class Period" is sufficient.  Likewise, courts have found that plaintiffs do not need to state every item they purchased to meet Rule 9(b)'s requirements, or catalog the particulars of each purchase.  *See Chester v. TJX Companies, Inc.*, No. 5:15-CV-01437-ODW, 2016 WL 4414768, at *13 (C.D. Cal. Aug. 18, 2016); *Kabbash v. Jewelry Channel, Inc. USA*, No. 15-CV-4007-DMG, 2015 WL 6690236, at *6 (C.D. Cal. Nov. 2, 2015).  Plaintiffs have provided sufficient detail to enable

Facebook to grasp the nature of the charges against it and prepare a detailed answer (or motion) in response.  Facebook also has extensive records of Plaintiffs' advertising in its possession, and will have ample opportunity to conduct discovery before Plaintiffs' claims are tried.  There is no need, in other words, for Plaintiffs to plead any more than the "who, what, when, where, and how" they have already set forth.

### 3.     Plaintiffs Have Alleged That Facebook Engaged in Unfair Business Practices

"In this circuit, in the consumer context, a practice may be deemed unfair if *either* (1) it is tethered to specific constitutional, statutory, or regulatory provision, *or* (2) its harm to consumers outweighs its utility."  *Dodson v. Tempur-Sealy Int'l, Inc.*, 13-CV-04984-JST, 2014 WL 1493676, at *8 (N.D. Cal. Apr. 16, 2014) (emphasis added).  Here, Plaintiffs satisfy both the "balancing test" and the "tethering test," either of which will suffice to state a claim under the UCL's unfair prong.

### a.     Plaintiffs Have Stated a Claim Under the Balancing Test

Under the balancing test, the determination of whether a given practice is unfair "is one of fact which requires a review of the evidence from both parties," and therefore typically cannot be resolved through a motion to dismiss.  *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006); *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015).  That is particularly true here, where Plaintiffs allege that Facebook's practice of foregoing reasonable auditing and verification procedures gave it an unfair competitive advantage over other video advertisers (who do use those procedures), and harmed consumers by making Facebook advertising appear more successful—and thus more valuable—than it really was.  (Compl., ¶¶ 23, 57-59.)

Facebook has not yet presented any justification for its failure to audit or accredit its video-advertising metrics, whether through the industry standard bearer, Media Rating Council, or through reasonable internal procedures.  Therefore, the Court is not yet in a position to assess the utility of its conduct, much less weigh that utility against the harm Facebook's practice caused consumers.  *See Backus,* 122 F. Supp. 3d at 930 (denying motion to dismiss unfair-prong claim

10

where the defendant had "not submitted a meritorious argument regarding the utility of the

practice"); *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013) (same).

Facebook argues that there is no need to receive evidence from both parties and engage in

a balancing of utility vs. harm because when users sign up for Facebook, they do so subject to

Terms and Conditions that say, "We try to keep Facebook up, bug-free, and safe, but you use it at

your own risk … We do not guarantee that Facebook will always be safe, secure or error-free or

that Facebook will always function without disruptions, delays or imperfections."  (Mot. at 5, 11-

12 (text changed from uppercase to sentence case for readability).)  Courts have found, however,

that fine-print disclosures are insufficient to eliminate the risk of harm to consumers.  *See, e.g.*,

*Ebner v. Fresh, Inc.*, 838 F.3d 958, 966 (9th Cir. 2016) ("Stated straightforwardly, *Williams*

stands for the proposition that *if* the defendant commits an act of deception, the presence of fine

print revealing the truth is insufficient to dispel that deception."); *Mullins v. Premier Nutrition*

*Corp.*, 178 F. Supp. 3d 867, 892 (N.D. Cal. 2016) ("courts cannot hold as a matter of law that

disclaimers vitiate claims for misleading representations"); *Gutierrez v. Wells Fargo Bank, N.A.*,

730 F. Supp. 2d 1080, 1124 (N.D. Cal. 2010) (finding fine-print warning "were too vague to warn

depositors" of unfair practice), *aff'd in part and rev'd in part on other grounds,* 704 F.3d 712 (9th

Cir. 2012).

Rather than ending the analysis, Facebook's Terms and Conditions only introduce

additional questions of fact, none of which are appropriately answered on a motion to dismiss:

How would a reasonable consumer interpret the "error-free" disclaimer in Facebook's terms and

conditions?  And based on that interpretation, would a reasonable consumer expect that Facebook

does not properly vet or regularly audit its advertising metrics, such that those statistics may be

systematically inflated for years on end?  *See Friedman*, 2017 WL 1657553 at *6 (likelihood of

deception under the unfair prong is assessed using the "reasonable consumer standard").  The

error-free disclaimer is included only in the terms given to all Facebook users, not in the terms

that apply solely to those who purchase advertising services, and so it is quite possible that a

reasonable consumer would interpret the error-free disclaimer to warn them about "fake news" or

other erroneous content that third parties might post on Facebook.  Or they may interpret the

1    warning to apply to computer bugs that might cause Facebook pages not to work properly from

2    time to time.  It would be highly unlikely, however, that a reasonable consumer would interpret

3    Facebook's generic disclaimer to mean that the advertising metrics it provides to paying

4    customers do not undergo standard verification or audition procedures, and that its viewership

5    statistics may be inflated by 60 to 80%.

6         Facebook's "error-free" disclosure is, in other words, extremely general and susceptible to

7    several interpretations.  The cases that Facebook relies upon, on the other hand, involved very

8    specific disclosures that warned plaintiffs of the precise business practice alleged to be unfair.

9    For instance, in *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152—the case that Facebook relies

10   upon most strongly—it was not simply that the defendant vaguely warned "other restrictions

11   might apply" that led the court to dismiss plaintiff's UCL claim (as Facebook suggests).  (Mot. at

12   11.)  The defendant went on to "clearly disclose" exactly what the plaintiff alleged it had unfairly

13   omitted—the fact that his credit card carried a $59 annual fee—and the plaintiff "had the

14   opportunity to cancel the account for a full refund within 90 days."  *Id.* at 1170.  Similarly, in

15   *Hodsdon v. Mars, Inc.,* 162 F. Supp. 3d 1016, 1027 (N.D. Cal. 2016), the information the

16   defendant allegedly failed to disclose was "in fact, readily available to consumers on

17   [defendant's] website"; in *Janda v. T-Mobile, USA, Inc.*, No. C05-03729 JSW, 2009 WL 667206,

18   at *6, 9 (N.D. Cal. Mar. 13, 2009), the defendant disclosed that it would charge the very fees

19   plaintiffs alleged to be unfair; and in *Baxter v. Intelius, Inc.*, No. SACV09-1031 AG MLGX,

20   2010 WL 3791487, at *6 (C.D. Cal. Sept. 16, 2010), the defendant made a "full disclosure" that if

21   plaintiff clicked the confirmation button, her account would be debited.

22        Here, unlike in the cases Facebook cites, Plaintiffs' UCL claim cannot be decided as a

23   matter of law.  Plaintiffs were not advised of the specific practice they allege to be unfair.  They

24   were not told that Facebook does not use standard verification and auditing procedures, and that

25   as a result the advertising metrics provided to paying advertisers may be inflated by 60 to 80%.

26   Whether that constitutes an unfair practice, and whether fine print warning that Facebook might

27   not always be safe, secure, and error-free was sufficient to warn advertising consumers of that

28   practice, are both issues that will involve a weighing of evidence and cannot be resolved on the

1    pleadings.  *See Am. Specialty Health Grp., Inc. v. Healthways, Inc.*, No. 11-CV-02819 BEN KSC,

2    2012 WL 4863779, at *5, 7 (S.D. Cal. Oct. 12, 2012) (question of fact whether disclaimers in

3    Terms and Conditions were sufficiently prominent and unambiguous to avoid liability under

4    UCL); *Ferrington v. McAfee, Inc.,* No. 10-CV-01455-LHK, 2010 WL 3910169, at *10 (N.D. Cal.

5    Oct. 5, 2010) ("fine-print disclosures regarding the transfer of billing information and subsequent

6    monthly charges may provide insufficient notice").

7                    **b.      Plaintiffs Also State a Claim Under the Tethering Test**

8            Because Plaintiffs have stated an unfair-prong claim under the balancing test, there is no

9    need for the Court to evaluate whether Plaintiffs could also state a claim under the tethering test.

10   *See In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *34

11   (N.D. Cal. May 27, 2016) (denying motion to dismiss UCL claim under the tethering test because

12   "Plaintiffs had sufficiently alleged an unfair prong violation *based on the balancing test alone*")

13   (emphasis in original).  Should the Court reach the question, however, Plaintiff have sufficiently

14   tethered their unfair business practices to legislatively-declared policies that seek to protect

15   consumers from misleading statements, as reflected by laws like the FTC Act, Consumers Legal

16   Remedies Act (CLRA), and California False Advertising Law (FAL).  (Compl., ¶ 57.)

17           Facebook claims that the U.S. Congress and California Legislature chose not to extend

18   those statutes to require verification and auditing of video advertising metrics, and so Facebook's

19   advertising practices cannot be unlawful.  The unfair prong is meant to be distinct from the

20   unlawful prong, however.  It is intentionally sweeping in scope—extending beyond what is

21   already permitted by law—"to enable judicial tribunals to deal with the innumerable new schemes

22   which the fertility of man's invention would contrive."  *Cel-Tech Commc'ns, Inc. v. Los Angeles*

23   *Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999) (internal quotation marks omitted); *see also In re*

24   *Carrier IQ, Inc.,* 78 F. Supp. 3d 1051, 1115–17 (N.D. Cal. 2015) ("an act can be 'unfair' even if

25   not unlawful").  It therefore does not matter that Facebook's failure to employ standard

26   verification and auditing procedures is not specifically prohibited by the FTC Act, CLRA, or

27   FAL.  What matters is whether the effects of Facebook's conduct are "comparable" to the

28   violation of the law, or "otherwise significantly threaten[ ] or harm[ ] competition."  *In re Adobe*

1   *Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1227 (N.D. Cal. 2014) (quoting *Cel-Tech*, 20 Cal.

2   4th at 187).  Plaintiffs have alleged that they are, and that they do.  The effects of Facebook's

3   practices are comparable to the effects of the consumer deception prohibited by the FTC Act,

4   CLRA, and FAL: consumers were deceived by Facebook's inflated advertising metrics, and as a

5   result they purchased services they otherwise would not have purchased and paid more for those

6   services.  (Compl., ¶¶ 36-41, ¶ 56.)  And Facebook's practices harm competition by giving

7   Facebook an unfair competitive advantage: Facebook is able to provide video-advertising services

8   at a lower cost than competitors who regularly audit their metrics (often through a third-party

9   accreditor like the Media Rating Council), and Facebook's inflated metrics wrongly make its

10   advertising appear to be more effective than its competitors' advertising.  (*Id.*, ¶ 59.)

11                 **4.     Plaintiffs Have Standing to Seek Injunctive Relief**

12          Facebook next says that Plaintiffs lack standing to seek injunctive relief because it has

13   corrected the error in its average-duration metrics, and so there is no risk that the challenged

14   conduct will continue.  (Mot. at 11-12.)   While Facebook may have corrected the average-

15   duration error, the faulty auditing and verification practices that allowed the error to persist for

16   more than two years have yet to be remedied.  (Compl., ¶¶ 58-59.)  Without thorough and regular

17   audits of Facebook's advertising metrics, Plaintiffs and class members will not be able to rely

18   with confidence on those metrics and will remain at risk of inflated figures that overstate the

19   value and effectiveness of Facebook's advertising.  *See Lilly v. Jamba Juice Co.*, No. 13-CV-

20   02998-JST, 2015 WL 1248027, at *5 (N.D. Cal. Mar. 18, 2015) (finding Article III standing

21   where "[w]ithout injunctive relief, [plaintiff] could never rely with confidence on product labeling

22   when considering whether to purchase Defendants' product").

23          Facebook also argues that Plaintiffs lack statutory standing to require Facebook to

24   disclose any additional inaccuracies it might discover in its advertising metrics (through proper

25   audits or otherwise).  (Mot. at 13.)  It reasons that because "Plaintiffs do not allege that Facebook

26   has engaged in an unfair business practice based on a failure to disclose known metric errors,"

27   and because the UCL only authorizes injunctions that enjoin the use of practices that are alleged

28   to be unfair, the Court could not require Facebook to disclose known metric errors.  (*Id.*)  The

                                                    14

1   UCL is not so limited, however.  A court granting equitable relief under the UCL "may exercise

2   the full range of its inherent powers in order to accomplish complete justice between the parties,

3   restoring if necessary the *status quo ante* as nearly as may be achieved."  *Troyk v. Farmers Grp.,*

4   *Inc.*, 171 Cal. App. 4th 1305, 1339 (2009) (quoting *People v. Superior Court*, 9 Cal. 3d 283, 286

5   (1973)).  This relief may include remedial disclosures, particularly if the Court finds it necessary

6   to remedy the consequence of Facebook's past misrepresentations.  *Consumers Union of U.S.,*

7   *Inc. v. Alta-Dena Certified Dairy*, 4 Cal. App. 4th 963, 973 (1992) ("an injunction against future

8   violations … is only a partial remedy since it does not correct the consequences of past conduct").

9   The ultimate parameters of any equitable relief will, of course, be up to the Court, and mandatory

10  disclosures may or may not ultimately be a component of that relief.  But there is no reason,

11  particularly at this early stage in the litigation, to limit the scope of the Court's equitable

12  authority.

13  **B.      Plaintiffs Have Alleged a Claim for Breach of the Duty to Perform With**
            **Reasonable Care**

14

15         In its motion, Facebook acknowledges that Plaintiffs purchased their advertisements

16  pursuant to a contract with Facebook.  (Mot. at 14.)  The contract, which defines "Facebook" as

17  all "features and services [Facebook] make[s] available," includes "Facebook's advertising

18  products and services." (RJN at Ex. A-B, ¶ 18.1; RJN at Ex. J-O, ¶ 1.)  Facebook does not dispute

19  that it provides a standardized email to all video advertising services purchasers, which promises

20  them that that they can "[c]lick the ad name below to manage it or view its performance."

21  (Compl. ¶ 67.)  Nor does Facebook dispute that it offers advertising metrics as one of its

22  advertising services.

23         Nevertheless, Facebook now asserts that its contract does not apply to the advertising

24  services at issue here: metrics that track the performance of advertisements.  In particular,

25  Facebook argues that its "Statement of Rights and Responsibilities" contains an integration clause

26  that does not mention the two advertising metrics Facebook inflated.  Facebook further argues

27  that, even if its contract covers the metrics, it has no duty to act with reasonable care in providing

28  those metrics.

1    Facebook's argument is wrong on both the law and the facts.

2        **1.    Facebook's Integration Clause Does Not Insulate It From Liability for
           Failing to Use Reasonable Care In Disseminating Advertising Metrics**

3

4    Facebook argues that Plaintiffs are subject to a "single, fully integrated contract with

5    Facebook," that therefore "cannot be supplemented."  (Opp. at 14-15.)  It is true that Facebook's

6    Statement of Rights and Responsibilities (SRR) says, "*This Statement* makes up the entire

7    agreement between the parties regarding Facebook, and supersedes any prior agreements."  (RJN,

8    Ex. B, ¶ 18.2 (emphasis added).)  But the Statement also contemplates the possibility that it might

9    *not* make up the entire agreement, and that it *could* be supplemented.  It says, "[w]e *may* ask you

10   to review and accept supplemental terms that apply to your interaction with a specific app,

11   product, or service," and in that event, "those supplemental terms … govern with respect to your

12   use of such app, product or service to the extent of [any] conflict."  (*Id.*, Ex. B at 1 (emphasis

13   added).)  In other words, *if* Facebook asks the user to accept supplemental terms for a particular

14   service, those supplemental terms trump the integration clause (which would otherwise prohibit

15   supplemental terms).  That is exactly what happened in Plaintiffs case, when they signed up for

16   Facebook's Advertising services and Facebook asked them to accept the Self-Service Ad

17   Terms—which in turn, depends upon advertisement Orders, Self-Serve Ad Interfaces,

18   Advertising Guidelines, the Advertising Help Center, and Community Payments Terms.

19   (Compl., ¶¶ 65-66; RJN, Exs. C-D.)

20       Even if the SRR did not—by its own terms—allow additional terms to override the

21   integration clause, Facebook still could not keep the Court from considering supplemental

22   evidence.  First, "course of performance evidence [is] admissible to explain or supplement . . . the

23   terms of an integrated contact, even when the written terms are unambiguous."  *Lennar Mare

24   Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949 (E.D. Cal. 2016) (citing Cal. Civ. Proc.

25   Code § 1856(a)).  Second, a court considers several factors when determining whether an

26   agreement is fully integrated, and the "inclusion of an integration clause in the written contract is

27   but one factor in this analysis." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995).  The

28   other factors are: "the contract's language and apparent completeness or incompleteness;" the

                                          16

1  supplemental terms and whether they contradict those of the written contract; and whether the

2  additional terms would naturally be made as a separate agreement." *Lennar,* 176 F. Supp. 3d at

3  962-963.

4      Here, the SRR's language demonstrates a lack of integration because it "does not specify

5  in substantial detail the full range of the parties' obligations" with respect to Facebook's

6  advertising services. *Sicor*, 51 F.3d at 859.  For example, the SRR does not state the type of

7  advertising that a customer is purchasing (e.g., video advertising services), the amount of

8  advertising that a customer is purchasing, or the consideration that a customer will pay for the

9  advertising.  (RJN, Ex. B.)  Nor do the Self-Serve Ad Terms that Facebook would incorporate

10  into the SRR.  (*Id.*, Exs. C-D.)  These details are all left to customers' orders, which are placed

11  and can be modified at any time from Facebook's advertising interfaces.  In addition, the

12  supplemental evidence in question—such as Facebook's promise that "we'll measure both

13  impressions and engagement with your videos," or that advertisers can "[c]lick the ad name

14  below to manage it or view its performance"— do not contradict anything in the SRR (or in any

15  other of Facebook's terms).  (Compl., ¶ 67.)  Rather, Facebook's promises regarding performance

16  metrics are perfectly consistent with, and in fact, complete the obligations set forth in the

17  documents cited by Facebook.  Finally, it is entirely natural that documents discussing specific

18  performance metrics would not be included within a "master" form document like the SRR.  *See*

19  *Masterson v. Sine,* 68 Cal.2d 222, 228 (1968) (finding collateral agreement "might naturally be

20  made as a separate agreement" to master deed).

21      In an apparent effort to bolster its integration clause, Facebook argues that it can somehow

22  exclude contractual terms outside the SRR by virtue of its "reservation of rights" clause.  This is

23  incorrect.  A party cannot use a "reservation of rights" clause to override California law, which

24  requires the admission of evidence regarding course of performance and course of dealing, in

25  addition to consistent, supplemental terms.  *See* Cal. Civ. Proc. Code § 1856.  Moreover, the cases

26  cited by Facebook addressing the reservation of rights in a licensing agreement do not support its

27  argument.  *See Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854-55 (9th Cir. 1988)

28  (construing reservation of rights language in licensing agreement in manner consistent with

1    policy of the Copyright Act); *Novell, Inc. v. Unicom Sales, Inc.*, 2004 1839117 at *11 (N.D. Cal.,

2    Aug. 17, 2004) (construing software license).  Facebook cannot seriously contend that these cases

3    support its sweeping position.

4         All of these factors demonstrate that Facebook's SRR is not the "complete and exclusive"

5    agreement between the parties regarding advertising products and services.  The Court is free to

6    consider extrinsic evidence—including all of the evidence set forth in Plaintiffs' complaint—to

7    assess whether Facebook had a contractual duty to use reasonable care in disseminating audience-

8    retention metrics to advertisers

9                    **2.    The Documents and Course of Performance Alleged in Plaintiffs'**
                          **Complaint Support an Implied Duty to Use Reasonable Care in**
10                         **Disseminating Advertising Metrics**

11        In evaluating the allegations in Plaintiffs' complaint, the question is not whether Facebook

12   explicitly promised to use reasonable care when reporting advertising metrics.  The question is

13   whether that obligation can fairly be implied.  Under California law, the obligation to perform

14   using reasonable care "is of universal application as to all persons who by contract undertake

15   professional or other business engagements requiring the exercise of care, skill and knowledge;

16   the obligation is implied by law and need not be stated in the agreement."  *Holguin v. DISH*

17   *Network LLC*, 229 Cal. App. 4th 1310, 1324 (2014).

18        The evidence alleged by Plaintiffs all support the inference that Facebook was providing

19   an advertising interface with performance metrics to Plaintiffs pursuant to the parties' contractual

20   relationship.   Accordingly, it had an implied obligation under California law to exercise

21   reasonable care in doing so.  Facebook's Self-Service Ad Terms specifically references "use of

22   the self-service advertising interfaces," that display Facebook's advertising metrics.  (Compl.

23   ¶ 66; RJN, Ex. D.)  It also references the "Order[s]" used to start advertising campaigns, which

24   were initiated by advertisers through the advertising interfaces but were not effective until

25   Facebook sent a standardized email that stated:  "Your ad is approved and should begin delivering

26   shortly. Click the ad name below to manage it or view its performance." (Compl., ¶ 67; *see also*

27   RJN, Exs. C-D, ¶ 1.)  In addition, Facebook's Advertising Guidelines stated that customers could

28   use "Facebook advertising data …  on an aggregate and anonymous basis … to assess the

1   performance and effectiveness of your Facebook advertising campaigns." (RJN, Ex. E-O, ¶ II.B.)

2   And Facebook's Advertising Help Center states that advertisers "can always go to Ads Manager

3   [one of the advertising interfaces] to see how your ads are performing," and that when advertisers

4   create an advertising campaign on Facebook, "we'll measure both impressions and engagement

5   with your videos."  (Compl., ¶ 67.)

6          If the documents cited in Plaintiffs' complaint are not, by themselves, enough to

7   demonstrate that Facebook provided advertising metrics pursuant to the parties' contractual

8   relationship, Plaintiffs can also rely upon course of dealing, course of performance, and usage of

9   trade.  Under California law, course of dealing, course of performance and usage of trade are not

10  parol evidence and are admissible regardless of any integration clause.  *See* Cal. Civ. Proc. Code

11  § 1856(c); *see also Lennar*, 176 F. Supp. 3d at 964-66.  A 'course of dealing' is "a sequence of

12  conduct concerning previous transactions between the parties to a particular transaction that is

13  fairly to be regarded as establishing a common basis of understanding for interpreting their

14  expressions and other conduct."  Cal. Com. Code § 1303(b).  A 'course of performance' is a

15  sequence of conduct after or under an agreement, where "(1) the parties' agreement 'involves

16  repeated occasions for performance' by one of them and (2) the other has 'knowledge of the

17  nature of the performance and opportunity for objection to it' but 'accepts the performance or

18  acquiesces in it without objection.'"  *Lennar Mare Island*, 176 F. Supp. 3d at 964 (quoting Cal.

19  Com. Code § 1303(a)).  "[T]he course of actual performance by the parties is considered the best

20  indication of what the parties intended the writing to mean."  Cal. Civ. Proc. Code § 1856, Law

21  Rev. Comm's Cmt.; *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189 ("the most

22  reliable evidence of the parties' intentions" is their course of performance after the contract is

23  signed).

24         There can be no doubt as to course of dealing and course of performance because

25  Facebook admittedly offered and provided advertising metrics—including the audience-retention

26  metrics at issue—as part of its advertising services.  The Complaint clearly alleges a course of

27  dealing and performance through which Facebook offered and delivered advertising products and

28  services that tracked and monitored the performance of advertisements.  (*See, e.g.,* Compl., ¶¶ 18,

20, 22, 24-26; 63-64.)[2]  Plaintiffs also allege that it was a standard and expected practice in the online advertising industry for providers to include analytics as part of their services.  (*Id.*, ¶ 18.) Had Facebook not provided these services, as expected, advertisers were free to cancel their Order at any time or to refrain from placing additional Orders for future advertisements.  (*Id.*, ¶¶ 66, Exs. C-D.)  In sum, Facebook's own undisputed course of dealing and performance—the regular provision of advertising metrics to advertisers like Plaintiffs—proves the obligations from which Facebook is now seeking to escape.

Facebook also claims that Plaintiffs' course-of-dealing argument fails because Plaintiffs cannot demonstrate that Plaintiffs viewed certain statements. (Mot. at 17.)  Facebook offers no authority to support this proposition; nor can it.  A "course of dealing" is a "sequence of *conduct*", and thus whether specific statements were read is irrelevant.  Cal. Com. Code § 1303(b).  Similarly, California defines "course of performance" in terms of "conduct" and there is no requirement of reliance upon written statements.  Cal. Com. Code § 1303(a).  Moreover, it is axiomatic that when there is a form contract at issue, as there is here, "the agreement 'is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.'" *Ewert v. eBay, Inc.*, 2010 WL 4269259, at *7 (N.D.Cal.) (quoting Restatement (Second) of Contracts § 211(2)). "'[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it.' " *Id.* (quoting Restatement (Second) of Contracts § 211(2), at Comment e) (formatting in original); *Vedachalam v. Tata Consultancy Servs., Ltd.,* No. C 06-0963 CW, 2012 WL 1110004, at *9 (N.D. Cal. Apr. 2, 2012) (citing *Ewert*

---

[2]  Facebook's motion does not address Plaintiffs' allegations regarding course of performance, only "course of dealing."  To the extent Facebook might argue that Plaintiffs are foreclosed from pointing to the allegations of performance under the contract because the Complaint does not specifically state "course of performance," the Court should reject that argument.  *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curium) (Federal Rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411 (4th Cir. 2014) (finding that plaintiffs "were not required to use any precise or magical words in their pleadings" to satisfy Rule 8, and citing cases holding same); *Humboldt Baykeepers v. Simpson Timber Co*., 2006 WL 3545014 (N.D. Cal., Dec. 8, 2006) (denying motion to dismiss fraud claims and noting that "magic words are unnecessary;" "[i]t is enough for pleading purposes that the complaint set forth facts from which a reasonable jury could find that [defendant] acted with knowledge."). The Complaint clearly alleges facts concerning the course of performance under the contract.

1   and stating, "in construing the form contract between Defendants and class members, the Court

2   need not delve into the actual knowledge of individual class members).  In sum, there is no basis

3   to vary Facebook's obligations under its form contracts depending on what each individual

4   advertiser read.

5            **3.    Facebook Misstates California Law by Suggesting that the Duty of**
             **Reasonable Care Extends Only to Express Contractual Terms**
6

7            Facebook next argues that Plaintiffs' contract claims only relate to "implied" duties, and

8   case law addressing the duty to perform with reasonable care "has only been applied to duties that

9   arose out of the express terms of a contact."  (Mot. at 15.)

10           First, Facebook incorrectly characterizes Plaintiffs' claim as only relating to "implied"

11  terms.  In fact, Facebook's Self-Serve Ad Terms incorporate the "Orders" that customers place

12  through Facebook's online advertising portal.[3]  Those Orders required acceptance, and when

13  Facebook accepted advertisers' terms it also promised that they could "[c]lick the ad name below

14  to manage it *or view its performance.*" (Compl. ¶ 67 (emphasis added).) Furthermore, during the

15  entire class period, the Advertising Guidelines (which are also incorporated into the Self-Serve

16  Ad Terms) stated that customers could not use "Facebook advertising data for any purpose …

17  except on an aggregate and anonymous basis … *to assess the performance and effectiveness of*

18  *your Facebook advertising campaigns.*"  (*See* RJN, Ex. E-O, ¶ II.B (emphasis added).)

19           Second, Facebook is incorrect that "[c]ourts that have found a breach of the implied duty

20  of care in performance have relied on an express term to anchor the existence of the duty."  (Mot.

21  at 16.) To the contrary, none of the cases cited by Facebook hold that a breach of the duty to use

22  reasonable case requires the violation of an express contractual term.  In fact, several of the cases

23  hold otherwise.

24           For example, DISH Network unsuccessfully made the same argument in *Holguin*,

25  "contending that [its] Residential Customer Agreement did not deal with installation," and so it

26  _____
    [3] The "Orders" placed by customers were incorporated throughout the class period, although the
27  location in Facebook's contract where the Orders were incorporated moved. Prior to January 30,
    2015, the SRR stated that advertisers could buy ads through Facebook's "online advertising portal
    ('Order')." *See* RJN, Ex. A at ¶ 11. Beginning in January 30, 2015, the Self-Serve Ad Terms
28  stated that customers could buy ads through the Self-Serve Ad Interfaces ("Order"). RJN, Ex. C-
    D.

**PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS**
**Case No. 3:16-cv-6232-TEH**

would not be proper to find that it was obligated to exercise reasonable care when it installed plaintiffs' satellite equipment. *Holguin*, 229 Cal. App. 4th at 1317. The court concluded, however, that the various documents the plaintiffs were provided by DISH "contemplated installation of satellite television equipment," even if DISH never expressly promised any installation. *Id.* at 1324. Based on that implied obligation, the Court further implied that DISH was required to exercise reasonable care in performing its installation obligations—i.e., "that such equipment be properly installed." *Id.* at 1324-25. In *Kuitems v. Covell*, another case cited by Facebook, the defendant argued that its written contract to install a roof was integrated and that it did not require the roofing material to be "sufficient to withstand the pressure of static water." 104 Cal. App. 2d 482, 483, 485 (1951). The court rejected this argument, finding that "the statement in the written contract that it contains the entire agreement of the parties cannot furnish the [defendant] an avenue of escape from the entirely reasonable obligation implied" in the contract. *Id.* at 485; *see also Perry v. Robertson*, 201 Cal. App. 3d 333, 340 (1988) ("where a contract gives rise to a duty of care, negligence in the performance of the duty may give rise to a cause of action for breach of contract.").[4]

Here, by providing inaccurate metrics as part of its advertising services, Facebook failed to exercise reasonable care in the performance of its contractual obligations. Even if metrics are not an explicit part of Facebook's contract for advertising services, they were contemplated by the parties' contractual relationship—just as satellite installation was an implied obligation in *Holguin*. And under California law, a party owes a duty to exercise reasonable care in performing all its contractual obligations, whether expressly stated or implied.

**C.     Plaintiffs Have Properly Alleged an Alternative Quasi-Contract Claim**

In order to plead a claim for quasi-contract, plaintiff need only allege that (1) the defendant caused the plaintiff to confer a benefit through "mistake, fraud, coercion, or request," and (2) that the defendant was "unjustly enriched" as a result. *Astiana v. Hain Celestial Grp.*,

---

[4] Facebook's reliance upon *N. Am. Chem. Co. v. Super Ct.*, 59 Cal. App. 4th 764, 774 (Cal. Second Div. 1997) is also misplaced. In *N. Am. Chem. Co.*, the court only used the phrase "express terms of the contract" to explain that duty to perform with reasonable care is broader than a claim that "amounts to nothing more than a failure to perform the express terms of the contract." 59 Cal. App. 4th at 774.

*Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).  Here, Plaintiffs have adequately alleged that Facebook's inflated metrics (which were, at best, a mistake) caused Plaintiffs to pay more money to Facebook (Compl. ¶ 74), and that Facebook unjustly accepted that benefit (*Id.*, ¶¶ 75-76).

Facebook only makes one argument against Plaintiffs' quasi-contract claim, that the claim is barred because "an express contract governs the subject matter at issue." Mot. at 18. However, Facebook contends in opposition to Plaintiffs' claim for breach of duty to perform with reasonable care that, "Facebook has no contractual duty to provide the two metrics at issue here…" Mot. at 13.  Both cannot be true.  Even if there is a contract between Plaintiffs and Facebook, it will not foreclose Plaintiffs' quasi-contract claim unless it covers the two metrics at issue here.  As stated in Defendants' Opposition, "'[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract *covering the same subject matter*."  (Mot. at 18 (citing *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 999-1000 (N.D. Cal. 2014) (emphasis added)).

Facebook is incorrect that Plaintiffs cannot plead both a breach of contract claim and quasi-contract claim.  (Mot. at 18, fn. 7.)  When there is a general issue of material fact as to whether a contract governed the matter at-issue, a court should not dismiss claims for quasi-contract. *Circle Click Media LLC v. Regus Mgmt. Grp. LLC,* No. 12-04000, 2013 WL 57861, at *13 (N.D. Cal. Jan. 3, 2013) (denying motion to dismiss where "the scope of the … Agreements at issue here remains unclear and is subject to dispute"); *Ball v. Johanns*, No. CIV. S-07-1190-LKK, 2008 WL 269069, at *3 (E.D. Cal. Jan. 29, 2008) ("Plaintiff's claim for unjust enrichment should not be barred despite the simultaneous claim for breach of contract.").  If Plaintiffs are ultimately able to prevail on their contract theory, they will be barred from also recovering in quasi-contract for unjust enrichment. *Ball*, 2008 WL at *3.  But if the factfinder determines that Facebook's contracts do not cover its provision of advertising metrics, then Plaintiffs will be eligible to recover in quasi-contract, on the theory that it would be inequitable for Facebook to retain funds that it gained by virtue of misreporting data for over two years. *Id.*  That is precisely the reason that the Federal Rules of Civil Procedure expressly permit a party to plead alternative, inconsistent theories. Fed. R. Civ. P. 8(d)(3).  And it is the reason that neither Plaintiffs' contract

23

1   claim nor their quasi-contract claim should be dismissed.

2   **IV.      CONCLUSION**

3            For the reasons stated above, Plaintiffs respectfully request that the Court deny

4   Facebook's motion to dismiss their complaint in its entirety.

5

6   DATED: May 15, 2017                        Respectfully submitted,

7

8                                              By: */s/ Eric Gibbs*
                                                   _____

9                                              ERIC GIBBS (SBN 178658)
                                               ehg@classlawgroup.com
10                                             DYLAN HUGHES (SBN 209113)
                                               dsh@classlawgroup.com
11                                             AARON BLUMENTHAL (SBN 310605)
                                               ab@classlawgroup.com
12                                             **GIBBS LAW GROUP LLP**
13                                             505 14th Street, Suite 1110
                                               Oakland, CA 94612
14                                             Telephone:    (510) 350-9700
                                               Facsimile:    (510) 350-9701
15

16                                             ANDREW N. FRIEDMAN (*pro hac vice*)
                                               afriedman@cohenmilstein.com
17                                             GEOFFREY GRABER (SBN 211547)
                                               ggraber@cohenmilstein.com
18                                             ERIC KAFKA (*pro hac vice*)
                                               ekafka@cohenmilstein.com
19                                             **COHEN MILSTEIN SELLERS & TOLL PLLC**
20                                             1100 New York Ave. NW, Fifth Floor
                                               Washington, DC 20005
21                                             Telephone:    (202) 408-4600
                                               Facsimile:    (202) 408-4699
22

23                                             MICHAEL EISENKRAFT (*pro hac vice*)
                                               meisenkraft@cohenmilstein.com
24                                             **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                               88 Pine Street, 14th Floor
25                                             New York, NY 10005
                                               Telephone:    (212) 838-7797
26                                             Facsimile:    (212) 838-7745

27                                             AISHA CHRISTIAN (*pro hac vice forthcoming*)
28                                             129 West 27th Street, 11th Floor
                                               New York, NY 10001

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
Case No. 3:16-cv-6232-TEH

1    Telephone:    (646) 285-2029

2    CHARLES REICHMANN (SBN 206699)

3    charles.reichmann@gmail.com
     **LAW OFFICES OF CHARLES REICHMANN**

4    16 Yale Circle
     Kensington, CA 94708-1015

5    Telephone:    (415) 373-8849

6    *Attorneys for Plaintiffs Quirky, Inc., and Wink, Inc.*

7

8    ROBERT T. EGLET (*pro hac vice*)
     ROBERT M. ADAMS (*pro hac vice*)

9    ERICA D. ENTSMINGER (*pro hac vice*)
     ARTEMUS W. HAM (*pro hac vice*)

10   **EGLET PRINCE**
     400 South Seventh Street, Suite 400

11   Las Vegas, NV  89101

12   Telephone:  (702) 450-5400
     Facsimile:   (702) 450-5451

13   eservice@egletwall.com

14   JOSEPH A. MOTTA (SBN 133531)

15   **RUEB & MOTTA**
     1401 Willow Pass Road, Suite 880

16   Concord, CA 94520
     Telephone:  (925) 602-3400

17   Facsimile:    (925) 602-0622
     joe@rmmprolaw.com

18

19   *Attorneys for Plaintiff Letizia, et al.*

20

21

22

23

24

25

26

27

28

25

**PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS**
Case No. 3:16-cv-6232-TEH
