KEKER, VAN NEST & PETERS LLP
ASHOK RAMANI - # 200020
aramani@keker.com
PAVEN MALHOTRA - # 258429
pmalhotra@keker.com
ELIZABETH K. MCCLOSKEY - #268184
emccloskey@keker.com
IAN KANIG - # 295623
ikanig@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant
FACEBOOK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS LETIZIA, GREG AGUSTIN, JR., TYLER BARNETT PR, LLC, THE ABBI AGENCY, LLE ONE, LLC, d/b/a Crowd Siren and d/b/a Social Media Models, QUIRKY, INC., and WINK, INC. n/k/a Wink Dissolution Corp., on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>FACEBOOK, INC.,<br><br>          Defendant. | Lead Case No. 3:16-cv-06232-TEH<br>Related Case No. 3:17-cv-00233-TEH<br><br>**REPLY IN SUPPORT OF FACEBOOK'S MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**<br><br>**Pursuant to Fed. R. Civ. P. 12(b)(6) & 9(b)**<br><br>Judge:       Hon. Thelton E. Henderson<br><br>Date:        June 19, 2017<br>Time:        10:00 a.m.<br>Dept.:       Courtroom 2<br><br>Date Filed: October 27, 2016<br><br>Trial Date: None Set |

## I. INTRODUCTION

Plaintiffs acknowledge, as they must, that Facebook discovered the metrics errors at issue on its own, corrected them, and disclosed them to the public. Plaintiffs also acknowledge that Facebook does not take either metric into account when billing advertisers, and that Facebook ran all Plaintiffs' advertisements at the agreed time and in the agreed manner. These concessions show that this is a case about Plaintiffs seeking a windfall for a glitch that caused them no harm. It is thus no surprise that Plaintiffs' allegations are defective.

Plaintiffs agree that under the UCL, they must have seen the erroneous video metrics and *as a result* spent money on Facebook video advertisements. But Plaintiffs' complaint and opposition brief painstakingly avoid alleging that Plaintiffs actually saw the video metrics or continued to pay Facebook money for video advertisements as a result. And although Plaintiffs claim that they would not have continued to buy Facebook's advertisements had they known about the errors at issue, Facebook informed them, in writing, that such errors can arise.

Plaintiffs also contend—in an unprecedented attempt to expand the scope of the UCL—that Facebook's alleged failure to obtain a third-party audit of its metrics constitutes an unfair business practice under the UCL. This novel theory, if endorsed by the Court, could subject every technology company to frivolous class-action litigation each time a software bug is detected, because plaintiffs' attorneys can argue that the mere existence of a bug—including bugs that had no actual impact on the plaintiffs' actions or decisions—demonstrates that a company's internal controls are not sufficient. No prior decision supports Plaintiffs' attempt to stretch the UCL to the facts of this case.

Plaintiffs' argument in support of their claim for breach of the implied duty of reasonable care is equally unavailing. Facebook never contracted to provide Plaintiffs with video metrics. Instead, Plaintiffs attempt to transform Facebook's provision of video metrics into a contractual obligation of perfection in providing such metrics. That attempt fails, because California law does not impose such a duty.

Finally, Plaintiffs' opposition brief fails to rescue the "quasi-contract in restitution" claim. Such a claim exists only where (1) there is no enforceable agreement or (2) where one party

tortiously obtains a benefit from another. Plaintiffs do not here allege either condition. Nor could they; both parties agree that they entered into an express contract. Further, because the parties' contract unambiguously covers Facebook's provision of advertising services, Plaintiffs cannot plead this alternative theory.

The Court should grant Facebook's motion, and do so with prejudice as to Plaintiffs' causes of action for implied duty and quasi-contract.

## II.     ARGUMENT

### A.     Plaintiffs' complaint fails to plead a violation of the UCL.

#### 1.     Plaintiffs do not allege reliance, nor do they satisfy Rule 9(b).

The parties agree that Plaintiffs' UCL claim requires Plaintiffs to allege that they actually saw and relied upon a fraudulent representation from Facebook. Dkt. No. 54 ("Opp.") at 7:7-8:6; *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (in UCL cases, injured parties must allege they saw and relied upon a misrepresentation to their detriment). If true, this would be easy for Plaintiffs to allege.—*e.g.*: "In or about September 2015, Mr. Letizia saw that his 'Average Duration of Video Viewed' metric was 7 seconds. Because of that metric, he continued his advertising campaign with Facebook."

Rather than assert a direct allegation of this kind, Plaintiffs instead tap-dance by alleging that unspecified Facebook "misrepresentations" indirectly induced Plaintiffs to buy, continue buying, or pay more for video advertisements. *See* Dkt. No. 34 ("Compl.") ¶¶ 36-38. The Consolidated Complaint refers to "misrepresentations" without ever identifying a single specific representation that allegedly caused Plaintiffs harm. Plaintiffs appear to home in on the "inflated metric" as the misrepresentation, Opp. at 7:10-8:6, but even then Plaintiffs avoid alleging that they actually saw *and* relied upon that metric, as they are required to do. Instead, Plaintiffs assert that, because the complaint alleges that Facebook's metrics "induced" them to purchase advertising, it either must be true or should be inferred that they saw and relied upon the metrics. Opp. at 7:24-8:6. But alleging a mere factual nexus with the purported misconduct is not sufficient. *Kane v. Chobani, Inc.*, 12-CV-02425, 2013 WL 5289253, at *8 (N.D. Cal. Sept. 19, 2013). Plaintiffs *must* allege facts showing that a specific misrepresentation was an immediate

cause of their harm. Dkt. No. 46 ("Mot.") at 7:9-28 (citing cases). Plaintiffs' conclusory allegations require dismissal of the UCL claim. *See In re Tobacco II Cases*, 46 Cal. 4th at 326.

Plaintiffs' failure to allege that they saw and relied upon a Facebook metric also dooms their UCL claim under Rule 9(b). Plaintiffs claim that they have identified the "who, what, when, where, and how," Opp. at 8:22-9:3, but the Consolidated Complaint and the opposition brief provide *zero* detail regarding *any* of the Plaintiffs *ever* having viewed the metrics at issue. That is also not enough, and separately requires dismissal. *See, e.g., In re Anthem Data Breach Litig.*, 162 F. Supp. 3d 953, 991 (N.D. Cal. 2016) (holding that plaintiffs must allege with particularity when and how they were actually deceived).

Plaintiffs contend that Facebook would have them "catalog every advertising campaign they placed with Facebook"—"an unrealistic degree of detail" not required under Rule 9(b). Opp. at 9:10-19. This overstates Facebook's point. Facebook merely asks that Plaintiffs allege *which* specific representations they viewed or relied on and *when* Plaintiffs viewed or relied on them; generalized allegations that Facebook induced Plaintiffs to purchase metrics are insufficient. Mot. at 9:12-14. Further, the case law on which Plaintiffs rely is irrelevant or actually supports Facebook. For example, in *Figy v. Lifeway Foods, Inc.*, plaintiff alleged that he wouldn't have bought defendant's yogurt drink had he known that the "evaporated cane juice" it contained was actually a form of added sugar. No. 13-CV-0428, 2016 WL 4364225 (N.D. Cal. Aug. 16, 2016). The court in *Figy* held that a plaintiff need not plead the specific date he purchased the yogurt drinks because his allegation that he purchased the drinks during the class period was adequate to satisfy Rule 9(b).  *Id.* at *5. *Figy* is irrelevant. Facebook is not seeking identification of the specific dates that Plaintiffs purchased advertising. And unlike the plaintiff in *Figy* who alleged that he read the "evaporated cane juice" ingredient on the yogurt label, *id.* at *1, Plaintiffs do not allege that they reviewed the duration metrics.  Thus, *Figy* cannot help Plaintiffs show that their allegations of reliance are sufficient. Similarly, in *Chester v. TJX Cos., Inc.*, the court held that plaintiffs did not need to provide detailed allegations regarding defendant's pricing, such as actual selling prices, but *did* have to plead with particularity how and why they were deceived. No. 5:15-CV-01437-ODW, 2016 WL 4414768, at *13 (C.D. Cal. Aug. 18, 2016). Here, Plaintiffs have

failed to meet the standard applied in *Chester*. Because they have not alleged how they were deceived, they have failed to satisfy Rule 9(b).

### 2. Plaintiffs fail to allege an unfair business practice.

Plaintiffs claim that Facebook's alleged failure to obtain a third-party audit of its metrics constitutes an unfair business practice under the UCL. This allegation, if accepted, constitutes an unprecedented attempt to expand the scope of the UCL. If Plaintiffs are allowed to proceed with this novel theory, every technology company will face litigation each time a software bug—no matter how trivial or relevant it is to the plaintiffs' actions—is detected, because plaintiffs' attorneys always can plead that the mere existence of the bug demonstrates that internal procedures were not up to snuff. Unsurprisingly, Plaintiffs cite no case—and Facebook has located none—even suggesting that the *failure to audit or verify metrics or even source code more generally* constitutes an unfair business practice. Thus, Plaintiffs' attempt to shoehorn their theory into the two predominant tests for identifying an unfair business practice fails.

#### a. Plaintiffs' allegations do not satisfy the public-policy tethering test.

The public-policy test provides that a business practice may be unfair within the meaning of the UCL if that practice "offends an established public policy" that is "'tethered' to *specific* constitutional, statutory, or regulatory provisions." *Scripps Clinic v. Super. Ct.*, 108 Cal. App. 4th 917, 939 (2003) (emphasis added). Plaintiffs appear to recognize that they can't meet this test because their very first argument is to run away from it. *See* Opp. at 13:8-9 ("[T]here is no need for the Court to evaluate whether Plaintiffs could also state a claim under the tethering test.").

Plaintiffs' attempt to distance themselves from this test is no surprise. The public policies to which Plaintiffs tether their claims are run-of-the-mill statutes that prohibit unfair practices in general—the Federal Trade Commission Act, the Consumer Legal Remedies Act, and the California False Advertising Law. As explained in Facebook's opening brief, Plaintiffs cannot bootstrap their unfair-prong claim onto a statute that prohibits unfair acts in general, because that would render the public-policy test meaningless. Mot. at 10:24-11:12 (citing cases).

Plaintiffs recognize this problem but argue that all that is required is tethering to another statute that is "comparable" to the unfair practice alleged. Opp. at 13:27-14:10. Even if that were

4

true, Plaintiffs cite no statutory provision requiring a company to undertake audits of metrics or audits of anything comparable, and their UCL unfair-prong claim thus fails the public-policy test.

### b. Plaintiffs do not satisfy the balancing test.

Because Plaintiffs' unfair-prong claim fails to meet the public-policy test, the claim cannot survive unless it satisfies the balancing test. Under that test, courts must examine "whether the alleged business practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," which requires a weighing of "the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010). While what is unfair may be a question of fact, dismissal is appropriate where, as here, Facebook expressly informed Plaintiffs in writing about the possibility of software bugs—such as the metrics errors here at issue—before the alleged injury occurred. *See, e.g., Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1170-71 (9th Cir. 2012) (no unfair business practice where Best Buy's disclosures warned that "other restrictions might apply" and the subsequent application process disclosed the annual fee); *Hodson v. Mars, Inc.*, 162 F. Supp. 3d 1016, 1027 (N.D. Cal. 2016) (no unfair business practice where Mars disclosed on its website the source of its cocoa beans).

Plaintiffs do not dispute that Facebook's contract with video advertisers includes a comprehensive "as is" disclaimer. Mot. at 11-12. Plaintiffs instead argue that Facebook's disclaimer is insufficient because it is "extremely general and susceptible to several interpretations." Opp. at 12:6-7. But the disclosure explains unambiguously that Facebook is provided "as is" without any guarantee or warranty:

> ***WE TRY TO KEEP FACEBOOK*** UP, ***BUG-FREE***, AND SAFE, ***BUT YOU USE IT AT YOUR OWN RISK***. ***WE ARE PROVIDING FACEBOOK AS IS*** WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. ***WE DO NOT GUARANTEE THAT FACEBOOK WILL ALWAYS BE*** SAFE, SECURE OR ***ERROR-FREE OR THAT FACEBOOK WILL ALWAYS FUNCTION WITHOUT*** DISRUPTIONS, DELAYS OR ***IMPERFECTIONS***.

Duffey Decl. ¶ 3, Exs. A-B (emphases added). There is only one reasonable interpretation of Facebook's disclosure: Facebook tries to keep its services bug-free, but cannot ensure that it will

always succeed.

Further, Facebook's disclaimer is not the type of "fine-print disclosure[]" that fails to eliminate a risk of harm to consumers. Opp. at 11:8-17. Instead, the disclaimer can't be missed, as it is the ***only*** text in ***all*** capital letters in an eight-page agreement. This is nothing like the ambiguous term buried in a 60-page, single-spaced contract that Plaintiffs point to in *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1123-24 (N.D. Cal. 2010), *aff'd in part, rev'd in part, and remanded by* 704 F.3d 712 (9th Cir. 2012). And whether the disclaimer also covers other aspects of Facebook's content is irrelevant because it ***does*** address the conduct alleged in this case. Facebook makes explicit to advertisers that they are subject to the SRR. The Self-Serve Ad Terms, which are incorporated into the SRR (as addressed below), provide: "[T]he SRR continues to apply to your use of the Self-Serve Ad Interfaces and any other use of Facebook." Dkt. No. 47 ("RJN"), Ex. C. Likewise, Facebook's Advertising Guidelines explain that the SRR "appl[ies] to all ads and commercial content ('ads') served by or appearing on Facebook." *Id.*, Ex. F(I). No company can specifically disclaim every issue that could possibly arise. Thus, Facebook's disclaimer is—and must be—sufficiently general to cover software bugs beyond the two specific video-ad metrics at issue here.

Courts have found disclaimers like Facebook's sufficient to defeat unfair-prong claims. *See, e.g., Hodson*, 162 F. Supp. 3d at 1027; *Janda v. T-Mobile, USA, Inc.*, No. C 05-03729, 2009 WL 667206, at*9 (N.D. Cal. Mar. 13, 2009); *Nolte v. Cedars-Sinai Med. Ctr.*, 236 Cal. App. 4th 1401,1408-09 (2015). Plaintiffs' case law is not to the contrary. For example, the Ninth Circuit explained in *Ebner v. Fresh, Inc.* that "*if* the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception." 838 F.3d 958, 966 (9th Cir. 2016) (emphasis in original); *see also Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 892 (N.D. Cal. 2016). But here, Plaintiffs have not alleged—nor could they allege—that Facebook made any deceptive statements about the accuracy of the metrics it voluntarily provides.

In short, Plaintiffs allege that they would have made different purchasing decisions had they known that the metrics at issue could be susceptible to software bugs. But Facebook

informed them in writing of that very possibility. Accordingly, Plaintiffs have failed to allege that Facebook's alleged failure to submit its video metrics to Plaintiffs' desired auditing and verification standards "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Drum*, 182 Cal. App. 4th at 257. Plaintiffs cannot satisfy the balancing test.

### 3. Plaintiffs lack standing to seek injunctive relief.

Plaintiffs concede that Facebook has corrected the two metric errors at issue in this case, Opp. at 6:20, but still contend that they are entitled to injunctive relief because, at some point in the future, some unidentified error *could* appear in Facebook's video metrics. Opp. at 14:12-22. But Plaintiffs nowhere allege that any of the Plaintiffs are still purchasing ads from Facebook. *Id.* That omission alone is sufficient to dismiss the injunctive-relief claim for lack of standing. *See City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983) (no standing to seek injunctive relief without any "real or immediate threat" of future harm).

Plaintiffs also argue that this Court should use its "inherent powers" to enter a permanent injunction requiring "Facebook to disclose any further inaccurate advertising metrics in a timely and accurate manner." Compl., Prayer (B)(iii). This request fails for three reasons. **First**, Plaintiffs cannot cite to any case law supporting this broad request, because none exists. **Second**, for the reasons set forth above, Plaintiffs lack standing to pursue this form of injunctive relief. *See City of L.A.*, 461 U.S. at 111. And ***third***, any dispute regarding future hypothetical errors in Facebook's video metrics is not ripe. *See Clinton v. Acequia, Inc.*, 94 F.3d 568, 572-73 (9th Cir. 1996). This court's "inherent powers" provide no basis for imposing on Facebook an indefinite and ill-defined duty to disclose to these Plaintiffs any metric inaccuracies it may later discover. *See* Opp. at 15:1-4 (citing *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1339 (2009)).

### B. Plaintiffs' complaint fails to plead a cause of action for breach of the implied duty to perform with care.

Plaintiffs purchased video ads from Facebook under a contract with Facebook. Compl. ¶ 63. Although no provision in that contract requires Facebook to provide video metrics, Plaintiffs contend that the metric error breached Facebook's *implied* duty to "perform its contractual obligations competently and with reasonable care." *Id.* ¶ 68. Plaintiffs' claim is unprecedented; no California court has *ever* held that an *implied* duty of care attaches to an *implied* contractual

7

obligation.

Try as they might, Plaintiffs cannot convert Facebook's provision of complimentary metrics into a contractual obligation to provide those metrics under an implied standard of care. No statute or common law imposes such a duty. Businesses can offer complimentary services— even those that enhance the products they sell—without becoming contractually obligated to provide those services according to an implied standard created by Plaintiffs. Likewise, implying an amorphous "reasonable care" duty with respect to complimentary services would provide a disincentive for Facebook and other companies to offer complimentary services. California law does not constrict companies in this way.

Plaintiffs offer three arguments for implying a duty of care into the parties' contract. ***First***, Plaintiffs claim that there is no integrated contract, and that the Court therefore can consider extrinsic evidence in determining whether Facebook had an implied duty to provide video metrics with care. Opp. at 16:2-18:8. ***Second***, Plaintiffs argue that extrinsic evidence—here, course of performance, course of dealing, and industry custom—all prove that Facebook provided metrics pursuant to the parties' contract. Opp. at 18:9-21:4. ***Third***, Plaintiffs argue that the duty to perform with reasonable care can apply to implied duties. Opp. at 21:5-22:21. As explained below, each argument fails.

### 1. The parties' integrated contract bars Plaintiffs' implied-duty-of-care claim.

Plaintiffs concede the existence of an express contract between the parties but contend that the Court should use extrinsic evidence to add to the contract an implied duty for Facebook to provide video metrics with reasonable care. This argument fails. Because the parties' express contract is integrated[1] and contains no duty to provide metrics, extrinsic evidence cannot impose such an implied duty.

The express contract is composed of the Statement of Rights and Responsibilities ("SRR") and the documents that it incorporates, including the Self-Serve Ad Terms, the Advertising

---

[1] As set forth in Facebook's moving papers, Facebook's Statement of Rights and Responsibilities contains an integration clause providing that "[t]his Statement makes up the entire agreement between the parties regarding Facebook, and supersedes any prior agreements." RJN, Ex. A ¶ 19(2); Ex. B ¶ 18(2).

Guidelines, and the Community Payment Terms.[2] *See* RJN, Exs. A-T. Plaintiffs cite nothing in the SRR or its component parts requiring Facebook to provide advertisers with metrics; and the SRR reserves to Facebook any rights not explicitly provided to the people it serves, including the Plaintiffs. Instead, Plaintiffs contend that the SRR is not integrated because it "does not specify in substantial detail the full range of the parties' obligations with respect to Facebook's advertising services." Opp. at 17:4-6 (citations and quotation marks omitted). But the terms and conditions that apply to Facebook's advertising services—including those that Plaintiffs identify in their opposition brief (at 17:6-9)—are included in the SRR and the documents it incorporates.[3] RJN, Exs. C ¶ 1 & D ¶ 1; *see also id.*, Ex. B ¶ 10. Further, the Self-Serve Ad Terms explicitly limit the terms relating to advertising services to those included in either the SRR or in the Ad Terms themselves. *See* RJN, Ex. D ("[T]he SRR continues to apply to your use of the Self-Serve Ad Interfaces and any other use of Facebook."). Plaintiffs cite no authority suggesting that the SRR's explicit incorporation of additional terms renders the SRR susceptible to amendment by ***all*** other statements that Facebook makes (including, as Plaintiffs contend, emails that Facebook sends to customers with information about using its services).

Plaintiffs next assert that Facebook's reservation-of-rights clause cannot "override California law, which requires the admission of evidence regarding course of performance and course of dealing, in addition to consistent, supplemental terms." Opp. at 17:23-25 (citing Cal. Code Civ. Proc. § 1856). But this misses the point. The reservation-of-rights clause does not purport to limit the kinds of ***evidence*** that can be used to ***interpret*** the contractual rights to which the parties agreed. Rather, it limits the ***scope*** of the rights themselves. The parties' express

---

[2] The SRR validly incorporates by reference the Self-Serve Ad Terms, Advertising Guidelines, and Community Payment Terms. *See, e.g., Uptown Drug Co., Inc. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172, 1183 (N.D. Cal. 2013) ("Under California law, for one document to incorporate another document by reference, [t]he reference to the incorporated document must be clear and unequivocal and the terms of the incorporated document must be known or easily available to the contracting parties.") (internal quotations omitted). Here, the SRR explicitly references the Self-Serve Ad Terms, Advertising Guidelines, and Community Payment Terms, and also includes a hyperlink to those documents. SRR ¶¶ 7, 10.

[3] Plaintiffs contend that the factors articulated in *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995) demonstrate that the parties' contract is not here integrated. However, because Plaintiffs have not alleged that there was any contemporaneous, collateral agreement, their reliance on *Sicor* is misplaced. *Id.* at 859.

1167429

agreement does not obligate Facebook to provide metrics; and the reservation-of-rights clause forecloses any attempt to foist upon Facebook additional obligations not bargained for. In any event, Plaintiffs fail to explain how the reservation clause "override[s] California law."

### 2. Facebook has no implied contractual obligation to provide metrics.

The terms of the express agreement are sufficient to insulate Facebook from Plaintiffs' implied-duty-of-care claim, so Plaintiffs contend that Facebook acquired an *implied* duty to provide metrics with reasonable care through course of performance, course of dealing, and industry custom. Each of those arguments fails.

#### a. Course of performance cannot create a new term in the parties' integrated contract.

Plaintiffs contend that the parties' course of performance—specifically, Facebook's provision of complimentary video metrics—gave rise to an implied duty under the parties' contractual agreement for Facebook to use reasonable care in providing those metrics. Opp. at 18:11-19:5. But because course of performance is only used to explain or supplement an express term in an integrated contract, and nothing in the parties' integrated contract requires Facebook to provide metrics to advertisers, course of performance is here irrelevant.

Course of performance is a sequence of conduct between parties to a transaction that exists if: "(1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." *See* Cal. Com. Code § 1303(a). Course of performance "may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." *Id.* at § 1303(d).

Course of performance cannot justify implying a duty of reasonable care here, for two reasons. ***First***, as Plaintiffs concede, the Consolidated Complaint never once mentions "course of performance" or alleges facts sufficient to support such a claim.[4] Opp. at 20 n.2. Plaintiffs cannot amend their complaint through an opposition to a motion to dismiss, and for this reason this

---

[4] This failure to mention course of performance by Plaintiffs is why Facebook did not address it specifically in its opening brief.

1167429

argument fails at the outset. *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1145 (N.D. Cal. 2010).

***Second***, California contract law only allows admission of extrinsic evidence, such as course of performance, to resolve an obviously ambiguous term or to reveal a latent ambiguity in a contract (even an integrated one). *WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1710 (1996); *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37 (1968); *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 972 (E.D. Cal. 2016) ("[C]ourse of performance evidence [is] admissible to explain or supplement but not to contradict the terms of an integrated agreement"). "This rule must be restricted to its stated bounds; it does no more than allow extrinsic evidence of the parties' understanding and intended meaning of the *words used in their written agreement*." *Brawthen v. H & R Block, Inc.*, 28 Cal. App. 3d 131, 136 (1972) (emphasis in original).

Here, Plaintiffs want to use course of performance to ***add*** a brand-new term to the contract, not to "explain or supplement" an existing term in the contract. But they cannot and do not point to any law that permits a party to use course of performance to create a new term about which the contract at issue is silent. There is no term in the parties' integrated contract that requires Facebook to provide metrics to advertisers. Accordingly, there is nothing for the parties' course of performance to explain or supplement.

### b. The parties' course of dealing did not give rise to an implied duty to provide metrics with reasonable care.

Plaintiffs next turn to course of dealing—a sequence of conduct between the parties to a transaction "that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Cal. Com. Code § 1303(b).

Plaintiffs contend that the parties' course of dealing, including statements in Facebook's Advertising Help Center and in its advertising order-confirmation email, gave rise to Facebook's implied duty to provide metrics to advertisers. Opp. at 2, 17, 19-20. Facebook's motion explained that Plaintiffs cannot rely on those statements, not only because they are not set forth in the parties' integrated contract,[5] but also because Plaintiffs never allege that they saw the statements.

---

[5] *See In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 456 (N.D. Cal. 2012) (finding that Facebook's Help Center is not part of its contract with advertisers).

If Plaintiffs never saw them, then they could not have formed part of Plaintiffs' understanding of their advertising contracts with Facebook.

In response, Plaintiffs contend that course of dealing only refers to "conduct," not "statements," and thus whether Plaintiffs viewed Facebook's statements is irrelevant. Opp. at 20:8-13. Not so. If Plaintiffs did not see Facebook's statements in its Advertising Help Center and order-confirmation email, then those statements cannot establish a "common basis of understanding" between the parties. Cal. Com. Code § 1303(b).

### c. Plaintiffs have abandoned their industry-custom argument.

Although Plaintiffs' opposition brief makes a single, passing reference to "industry custom," it fails to respond to Facebook's argument (and thus it concedes) that trade usage cannot imply a term unless it was intended but omitted. Mot. at 17 (citing *Varni Bros. Corp. v. Wine World, Inc.*, 35 Cal. App. 4th 880, 889 (1995)). Plaintiffs' complaint does not allege any facts showing that the parties intended to include in their contract a term regarding video metrics. Plaintiffs' belated claim that they expected Facebook to provide metrics, even though they never communicated that expectation, is legally insufficient. *See, e.g., Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 948 (N.D. Cal. 2009) (unspoken expectations, even if reasonable, do not become part of a written contract, even if it is a contract of adhesion); *Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*, 184 Cal. App. 3d 1479, 1486 (1986), *dismissed, remanded, and ordered published*, 737 P.2d 358 (Cal. 1987) ("The court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there."); Cal. Code Civ. Proc. § 1858 ("In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted[.]").

### 3. There is no implied duty of care with respect to implied-in-fact terms.

Even if Plaintiffs could allege that Facebook had an implied duty to provide video metrics, they still could not state a claim for breach of the implied duty of reasonable care.[6] As set forth

---

[6] Plaintiffs claim that there was an express metrics term in the contract, but Facebook has already

above, California law does not attach an implied duty of care to an implied contractual term.

Plaintiffs mistakenly argue that *Holguin v. DISH Network LLC* shows that the implied duty of reasonable care should be applied to two terms in the parties' contract: (1) a reference to "Orders" that customers can place through the online advertising portal; and (2) Facebook's statement that its customers can use advertising data "to assess the performance and effectiveness of [] advertising campaigns." Opp. at 21:10-18. But *Holguin* applied an implied duty to an ***express*** contractual term—unlike the two terms Plaintiffs here cite. In *Holguin*, defendants were found liable at trial for improperly installing satellite television and then failing to repair the damage they caused. 229 Cal. App. 4th at 1323. They challenged the jury instructions on the basis that there is no implied duty of reasonable care. *Id.* at 1324. The court disagreed and found that the implied duty had attached to the defendants' ***express duty*** to perform repair work. *Id.* at 1324-25 ("The Residential Customer Agreement notes that '[y]ou shall notify us promptly of any defect in, damage to, or accident involving your leased Equipment. All maintenance and repair of such Equipment shall be performed by us or our designee(s).'"). Similarly, *Kuitems v. Covell*—another case cited by Plaintiffs—involved the breach of an express term. There, defendants, who had an express duty to install a roof, breached the implied duty of reasonable care in installing that roof when they used "material and slabs insufficient and not of proper type for a flat roof[.]" 104 Cal. App. 2d 482, 482, 485 (1951). And in *North American Chemical Company v. Superior Court*, the court explained that the "common-law duty to perform with care" attaches only to "the thing agreed to be done." 59 Cal. App. 4th 764, 774 (1997). "[T]he obligation [of reasonable care] is implied by law and need not be stated in the agreement," but there still needs to be an express term to which the implied duty attaches. *Id.*

Because California law does not apply the implied duty of reasonable care to implied contract terms, this Court should dismiss Plaintiffs' cause of action for breach of the implied duty of reasonable care.

**C.**     **Plaintiffs cannot state a claim for restitution in quasi-contract.**

The parties agree about the scope of California law concerning quasi-contract claims for

---

addressed this argument above. *See infra* at 7-8.

restitution: an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter. Opp. at 23:10-13. Plaintiffs argue, however, that dismissal of their quasi-contract claim is inappropriate here because there are material disagreements about whether their contracts with Facebook cover the provision of metrics. According to Plaintiffs, "if the factfinder determines that Facebook's contracts do not cover its provision of advertising metrics, then Plaintiffs will be eligible to recover in quasi-contract." *Id*. at 23:23-25.

This argument fails for three reasons. ***First***, even Plaintiffs concede that there ***is*** a contract that governs the provision of advertising services. Their entire second cause of action is premised on the existence of a contract and the alleged breach of an implied duty read into that contract. Indeed, that contract is subject to judicial notice—something Plaintiffs do not contest. Thus, there is no disagreement about whether Plaintiffs' contracts with Facebook cover video advertising.

***Second***, the fact that the contract does not obligate Facebook to provide metrics is not a sign there is no express contract covering the "same subject matter." Rather, it is a sign the parties simply decided there would be no contractual obligation for Facebook as part of its provision of advertising services to provide metrics in the first place. To find otherwise would enable a disappointed party to secure through a court proceeding what it was not able to secure through contract negotiations.[7]

***Finally***, that Plaintiffs allege their quasi-contract claim in the alternative does nothing to save it. As flexible as Rule 8 may be in permitting parties to plead inconsistent causes of action, even it has limits. As other courts in this district have acknowledged, Rule 8 cannot overcome the California state-law doctrine barring quasi-contract claims in the face of an express contract. *Smith v. Allmax Nutrition, Inc*., No. 1:15-cv-00744, 2015 WL 9434768, at *9 (E.D. Cal. Dec. 24, 2015); *Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004). Moreover, district courts do not accept as true "allegations that contradict matters properly subject to judicial

---

[7] Plaintiffs mistakenly argue that Facebook is trying to have it both ways: they say that it cannot be true that Facebook has no duty to provide video metrics ***and*** that a contract governs the subject matter at issue. Opp. at 23:4-14. That is senseless: as explained in Section II.B above and in Facebook's opening brief, the parties entered into an integrated contract that does not require Facebook to provide video metrics.

notice[.]" *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). Here, Plaintiffs do not contest that their express contract with Facebook is subject to judicial notice. Dkt. No. 55 at 1. Accordingly, Plaintiffs cannot assert that there was no such contract, even in the alternative. This bars their quasi-contract claim. *See O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 999-1000 (N.D. Cal. 2014) (internal citations and quotations omitted) (judicially-noticed express contract covering the same subject matter precluded the quasi-contract claim).[8]

### D. Plaintiffs do not dispute that their second and third causes of action, if dismissed, should be dismissed with prejudice.

Facebook seeks dismissal with prejudice as to Plaintiffs' causes of action for implied breach of contract and quasi-contract. Mot. at 18–19. While Plaintiffs contest the propriety of dismissal on the merits, they do not contest that, if the Court dismisses either cause of action, it should do so with prejudice. The Court should dismiss both with prejudice.

### III. CONCLUSION

Plaintiffs have not suffered any cognizable harm from a technical glitch that Facebook discovered and disclosed to its advertisers. Thus, Plaintiffs have not adequately pled the actual reliance required by its UCL cause of action; they contort themselves to find an implied duty of reasonable care where none exists; and they assert a quasi-contract theory when both parties agree that they entered into an express contract. The Court should grant Facebook's motion and dismiss all causes of action, with prejudice as to the implied-duty and quasi-contract causes of action.

---

[8] Plaintiffs identified only two cases in support of their argument, but they are immediately distinguishable because neither involves an express contract subject to judicial notice. *See* Opp. at 23:17-23 (citing *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-04000, 2013 WL 57861, at *13 (N.D. Cal. Jan. 3, 2013) and *Ball v. Johanns*, No. CIV. S-07-1190, 2008 WL 269069, at *3 (E.D. Cal. Jan. 29, 2008)). Additionally, *Circle Click* was decided under New York law. 2013 WL 57861, at *13. And although *Ball* was purportedly decided under California law, it actually relied upon Court of Appeals decisions decided under New York and Delaware law. *See* 2008 WL 269069, at *3 (citing *Van Gemert v. Boeing Co.,* 590 F.2d 433 (2d Cir.1978) (dissenting) (applying New York law) and *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.,* 339 F.3d 1087, 1090 (9th Cir. 2003) (applying Delaware law)).

| | |
|---|---|
| Dated: June 6, 2017 | KEKER, VAN NEST & PETERS LLP |
| | By: */s/ Ashok Ramani* |
| | ASHOK RAMANI |
| | PAVEN MALHOTRA |
| | ELIZABETH K. MCCLOSKEY |
| | IAN KANIG |
| | Attorney for Defendant Facebook, Inc. |