Eric H. Gibbs (SBN 178658)
Dylan Hughes (SBN 209113)
David Stein (SBN 257465)
Aaron Blumenthal (SBN 310605)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com
ab@classlawgroup.com

Andrew N. Friedman (*pro hac vice*)
Geoffrey Graber (SBN 211547)
Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com

Robert T. Eglet (*pro hac vice*)
Robert M. Adams (*pro hac vice*)
Erica D. Entsminger (*pro hac vice*)
Artemus W. Ham (*pro hac vice*)
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegas, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

[Additional counsel on signature page]

*Counsel for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| ~~TYLER BARNETT PR, LLC,~~ LLE ONE, LLC, d/b/a Crowd Siren and d/b/a Social Media Models, and JONATHAN MURDOUGH, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>          Defendant. | Case Nos.: 4:16-cv-06232-JSW<br><br>~~THIRD~~ FOURTH AMENDED CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

1  ~~Plaintiffs Tyler Barnett PR, LLC, LLE One, LLC, d/b/a Crowd Siren and d/b/a Social Media~~

2  ~~Models, and Jonathan Murdough, on behalf of themselves and all others similarly situated, hereby~~

3  ~~file suit against Facebook, Inc., and allege the following:~~

4  **INTRODUCTION**

5  ~~1.     Facebook, Inc., ("Facebook") sells video advertising services. When Facebook sells~~

6  ~~these services, Facebooks sells a package of both video advertisements for its website and metrics~~

7  ~~that enable purchasers to monitor their video advertisements' performance.~~

8  1.     ~~This case concerns two of the~~ In September 2016, the Wall Street Journal revealed

9  that, for the past two years, Facebook had been overstating the average time its users spent watching

10 paid video advertisements.  Based on information from advertising agencies who had spoken with

11 Facebook, the Wall Street Journal reported that Facebook's metrics had been overstated by between

12 60 and 80%.

13 2.     In response to the media attention, Facebook admitted it made a mistake, but

14 emphasized that it had only discovered the mistake "about a month ago," and that "as soon as we

15 discovered [it], we fixed it."  When Plaintiffs filed this class action on behalf of advertisers, they had

16 no reason to believe Facebook was not telling the truth, and limited their claims to contract and

17 statutory claims, which have already been tested and found viable.

18 3.     Internal records recently produced in this litigation suggest, however, that Facebook's

19 action rises to the level of fraud and may warrant punitive damages.  ██████████████████

20 ████████████████████████████████████████████████████████

21 ██████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ██████ the "Average Duration of Video Viewed" and the "Average Percentage".

24 4.     In addition to Facebook ████████████████████████████████

25 ████████, Facebook's records also show that ██████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████

28 ████████████████.

1

5.   ██████████████████████████████████████████████████

█████████████████████████████████████████), it was only because of Facebook's

longstanding reckless indifference to the metrics' accuracy.  The wide disparity between the actual

average viewership and Facebook's reported metrics should have been corrected immediately.  But

Facebook ████████████████████████████████████████████████████

██████████████████████████████████████████████

████████   As the documents produced in this litigation show, █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

6.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

~~2.~~7.   Based on this newly discovered information, Plaintiffs ~~and putative class members~~

~~accordingly seek compensation and injunctive relief for violations~~are amending their complaint to

add a claim for fraud and are now seeking punitive damages.  Plaintiffs' additional allegations

appear in this Introduction, in a New Allegations section set that begins on page 14, and in their

Third Cause of Action and revised Prayer, which begins on page 24.  (They have also removed the

allegations pertaining to former plaintiff, Tyler Barnett PR, LLC.)  In all other respects this Fourth

Amended Complaint remains unchanged from the Third Amended Complaint, and Plaintiffs are

continuing to pursue their previously alleged claims for violation of California's Unfair Competition

Law and ~~for~~ breach of Facebook's ~~implied~~contractual duty to perform with reasonable care.

## **JURISDICTION**

~~3.~~8.   This Court has subject matter jurisdiction over this action under 28 U.S.C. §

1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value

~~THIRD~~FOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class of Plaintiffs is a citizen of a state different from a Defendant.

4.9.    This Court has personal jurisdiction over Defendant Facebook, Inc., because Facebook, Inc., is headquartered in California, and conducts business in the state of California.

5.10.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District. Venue is also proper because Facebook's terms of service require that claims are resolved "exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County…."[1]

## PARTIES

6.    Plaintiff Tyler Barnett PR, LLC, is a California limited liability company.

7.11.    Plaintiff LLE One, LLC, d/b/a Crowd Siren and d/b/a Social Media Models is a Nevada limited liability company.

8.12.    Plaintiff Jonathan Murdough is a citizen and resident of Pennsylvania.

9.13.    Defendant Facebook, Inc., is incorporated in Delaware, and its principal place of business is 1 Hacker Way, Menlo Park, CA 94025.

## FACTUAL ALLEGATIONS

10.14.  Facebook is a Fortune 500 company that operates social media services, including the www.facebook.com and www.instagram.com websites and the WhatsApp Messenger application.

11.15.  Facebook.com has 1.79 billion monthly active users.[2] Users do not pay Facebook to create a facebook.com account. Once a user opens a Facebook account, the account holder can, at no cost, create a profile page, post content (such as photographs, videos, and links to articles), make friends with other users, and view content posted by other users.

---

[1] Facebook, *Statement of Rights and Responsibilities*, https://www.facebook.com/terms (last accessed: Jan. 9, 2017).

[2] Facebook, *Company Info*, http://newsroom.fb.com/company-info/ (last accessed: Jan. 9, 2017).

THIRDFOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

12.16.  Instead of charging account holders to access facebook.com, Facebook earns most of its revenue by selling advertising services. For example, in 2015, Facebook's advertising revenue was over $17.0 billion, more than 95% of its overall revenue.[3]

13.17.  One type of advertising service Facebook sells is video advertisements, where advertisers can pay money to have video displayed to Facebook users.

14.18.  Facebook videos (including video ad products) autoplay by default though the audio remains off unless users actively turn it on.[4]  Facebook allows users to scroll past autoplaying videos (including video advertisements) without ever turning on the sound or watching more than a few seconds of the video.

15.19.  As part of Facebook's video advertising services, advertisers can choose to purchase advertisements with specific objectives, including maximizing "Brand awareness," "Video views," or "Conversions." Facebook says that a "Brand awareness" campaign will "[i]ncrease awareness for your brand," whereas a "Video views" campaign will "[g]et more people to view your video content," and a "Conversions" campaign will "[d]rive valuable actions on your website or app."

16.20.  Facebook video advertising services include marketing analytics, which enable purchasers to monitor and evaluate their video advertisements' performance.  Marketing analytics refers to the practice of measuring and analyzing the performance of an advertising or marketing campaign using data from a variety of metrics. One of the main selling points of online advertising is that it offers more detailed and closer to real time marketing analytics than traditional media (such as television or radio), and online advertisement sellers such as Facebook have promoted their marketing analytics as a prime reason that advertisers should purchase advertisements on their platforms.[5] Online advertisers do so because advertisers use these analytics to determine where to spend advertising dollars and the effectiveness of the dollars spent. As an article in the Harvard

[3] Facebook, Inc., Annual Report (Form 10-K) at 42 (Jan. 28, 2016).

[4] Eric Blattberg, *Like it or not, autoplay video won* (Apr. 21, 2015), http://digiday.com/publishers/autoplay-video-beat-regular-video-sorry-guys/.

[5] *See, e.g.*, Yahoo, *Yahoo! Gemini*, https://gemini.yahoo.com/advertiser/home ("Measure the impact of your campaigns and drive better results by accessing actionable insights . . .").

Business Review explains, analytics allows companies to make informed decisions about how to allocate their limited marketing budgets across different mediums (such as television, YouTube, or Facebook), to determine which advertising campaigns to "expand" and which to "kill," and to "readily adjust or allocate advertising in different markets on a monthly, weekly, or daily basis— and, online, even from one fraction of a second to the next."[6]   Accordingly, it has become a standard practice in the industry for online advertisers like Facebook to include marketing analytics as part of their advertising services, and online advertising purchasers expect that any advertising they purchase will include marketing analytics to evaluate the advertising's performance.

17.21.   The importance of analytics is apparent in the competitive online video advertising market. YouTube, LinkedIn, Twitter, and Facebook all have online video advertising offerings and all emphasize the value of their analytics platforms. When Facebook was first entering the online video advertising space, it knew that its analytics would be the key to its success. In a November 2013 private presentation to its advertising partners ("November 2013 Presentation"), Facebook provided talking points on how to convince potential customers to purchase Facebook video advertisements instead of other video advertisements, such as YouTube advertisements or television advertisements. The presentation acknowledged that one of the weaknesses of Facebook's video advertising platform was the relatively basic level of metrics it provided to video purchasers. The presentation stated, "Currently, we only report on video plays, which is a weakness compared to YouTube, which reports on video views, completed views, and average duration of view. We are working on building out our video insights to give advertisers a better sense for how videos are performing. New video insights target launch: Q1 2014."[7]

18.22.   In May 2014, Facebook began providing video advertising purchasers with more analytics, including video views, completed views, and average duration of view, as part of Facebook's video advertising services. Facebook told its users that the purpose of the new analytics

---

[6] *Id.*

[7] Josh Constine, *Leaked Facebook Video Ad Pitch Deck Reveals Plans To Steal TV and YouTube Dollars*, TechCrunch (Dec. 13, 2013), https://techcrunch.com/2013/12/13/facebook-vs-tv-and-youtube.

THIRDFOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

was to help video advertising purchasers "learn what's resonating with people and determine how to more effectively create and promote your videos on Facebook."[8] Facebook said its Audience Retention analytics in particular, such as Average Duration of Video Viewed, would assist video advertising purchasers in identifying underperforming videos and finding "the precise moment when most people lost interest and stopped watching."[9] Facebook knew and admitted that "having access to reliable metrics is important to the millions of partners who use our services to grow their businesses."

19.23.  "Average Duration of Video Viewed," which is the average amount of time that users watched a video, is one of the most important analytics used in evaluating video advertisements' performance.  Average Duration of Video Viewed is a measure of "retention," which advertisers care about because the longer people watch an advertisement, the greater the advertisement's impact on the viewer.[10] One study of video advertising campaigns on Facebook found that increasing retention of a viewer from the 3-second mark to the 10-second mark in a video resulted in a 57 percent increase in ad recall, a 103 percent increase in brand awareness, and a 64 percent increase in "purchase intent" (the intent to the purchase the advertised product).[11] And because advertisers place higher value upon video advertisements that are viewed for longer periods, they are willing to pay more for such advertisements.

20.24.  After Facebook announced and released its new video analytics platform in May 2014, Plaintiffs and putative class members purchased video advertising services from Facebook with the understanding that video advertising analytics were included in the purchased advertising services.

21.25.  Upon introducing the new video metrics in their analytics platform, Facebook didn't disclose that its new video metrics were not audited or accredited by the Media Rating Council, the

---

[8] Facebook, *Introducing Video Metrics* (May 5, 2014),
https://www.facebook.com/business/news/Coming-Soon-Video-Metrics.
[9] *Id.*
[10] Facebook Business, *The Value of Video for Brands* (Mar. 17, 2015),
https://www.facebook.com/business/news/value-of-video.
[11] *Id.*

marketing industry's standard-bearer for accurate measurements.

22.26.  As acknowledged by Facebook in its private November 2013 Presentation and public statements, Facebook created and disseminated the new video analytics platform and its video metrics to induce users to purchase Facebook's video advertising services.

23.27.  Among the new video metrics provided by Facebook were "Average Duration of Video Viewed" and the "Average Percentage of Video Viewed." Below is example of how these video advertising metrics would appear on a user's screen:

THIRDFOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

24.28.  Facebook told advertising purchasers that the "Average Duration of Video Viewed" was the "total time spent watching a video divided by the total number of people who have played the video"[12] (as a reasonable advertising purchaser would expect).  Figure 1, below, depicts how Facebook defined "Average Duration of Video Viewed."

**Figure 1: Formula for Facebook's "Definition" of "Average Duration of Video Viewed"**

$$Average\ Duration\ of\ Video\ Viewed = \frac{Total\ time\ spent\ watching\ the\ video\ by\ all\ users\ combined}{Total\ number\ of\ users\ who\ spent\ any\ time\ watching\ the\ video}$$

25.29.  In August 2016, Facebook disclosed in a post in its "Advertising Help Center" that its "Average Duration of Video Viewed" and "Average Percentage of Video Viewed" metrics had been improperly calculated. Facebook admitted that it had erroneously "*calculated* the Average Duration of Video Viewed as 'the total time spent watching a video divided by *only* the number of people who have viewed a video for three or more seconds'"[13]  The "Average % of Video Viewed" was also erroneous because Facebook calculated that metric by using the "Average Duration of Video Viewed" as a calculation input. Figure 2 below, depicts how Facebook erroneously calculated "Average Duration of Video Viewed."[14]

**Figure 2: Formula for How Facebook Actually Calculated "Average Duration of Video Viewed" from May 2014 to September 2016**

$$Average\ Duration\ of\ Video\ Viewed = \frac{Total\ time\ spent\ watching\ the\ video\ by\ all\ users\ combined}{Total\ number\ of\ users\ who\ spent\ three\ or\ more\ seconds\ watching\ the\ video}$$

26.30.  On or about September 23, 2016, David Fischer, Facebook's vice president of business and marketing partnerships, admitted that, due to Facebook's miscalculation, Facebook had

---

[12] Facebook, *How Is the "Average Duration of Video Viewed" Calculated?*, https://www.facebook.com/business/help/community/question/?id=10104227902985423 (late accessed: Jan. 9, 2017).

[13] *Id.*

[14] *Id.*

THIRDFOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

misrepresented its "Average Duration of Video Viewed" metric. He wrote that the "average duration of video viewed … metric should have reflected the total time spent watching a video divided by the total number of people who played the video. But it didn't – it reflected the total time spent watching a video divided by only the number of 'views' of a video (that is, when the video was watched for three or more seconds). And so the miscalculation overstated this metric."[15]

27.31.  Facebook's "Average Duration of Video Viewed" metric was inflated because when calculating the average, Facebook included the total time spent by under-3-second viewers in watching the video in the numerator of the fraction, but excluded these under-3-second views from the denominator of the fraction. Thus, Facebook's "Average Duration of Video Viewed" metric failed to align its criteria for eligible viewing time (the numerator) and its criteria for an eligible view (the denominator).

28.32.  The impact of the numerator-denominator mismatch can be seen through the following illustration.

**Figure 3: Example - How Duration Metric *Should Have Been Calculated*, According to Facebook's Definition, For Video Viewed By Four Users for 1, 2, 4, and 9 seconds respectively.**

$$\text{Average Duration} = \frac{1 \text{ sec.} + 2 \text{ secs.} + 4 \text{ secs.} + 9 \text{ secs.}}{4 \text{ total users who watched the video}} = \frac{16 \text{ seconds}}{4} = 4 \text{ seconds}$$

**Figure 4: Example - How Duration Metric *Was Actually Calculated*, From May 2014 to September 2016, For Video Viewed By Four Users for 1, 2, 4, and 9 seconds respectively.**

$$\text{Average Duration} = \frac{1 \text{ sec.} + 2 \text{ secs.} + 4 \text{ secs.} + 9 \text{ secs.}}{2 \text{ users who watched your video for 3 or more seconds}} = \frac{16 \text{ seconds}}{2} = 8 \text{ seconds}$$

29.33.  Figure 3 demonstrates how Facebook should have measured average duration of video viewed according to its definition. By using the correct method, all four viewers are included in the denominator, yielding an average duration of video viewed of 4 seconds in this hypothetical. Figure 4 demonstrates what Facebook actually did by excluding the video-watches under 3 seconds from the denominator. In this hypothetical, 2 of the 4 video-watches are dropped from the

---

[15] David Fischer, *Facebook Video Metrics Update*, Facebook.com (Sept. 23, 2016)
https://www.facebook.com/business/news/facebook-video-metrics-update.

THIRDFOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

1   denominator, causing the average duration of video viewed to incorrectly rise to 8 seconds.

2       30.34.  By including the time spent watching the videos by users who viewed the videos for

3   less than 3 seconds, while excluding those "under 3-second" users from the denominator, the

4   Average Duration of Video Viewed metric not only failed to reflect its stated definition, it also

5   created a highly misleading result that favored Facebook.

6       31.35.  Facebook informed some of its advertisers that it inflated the "Average Duration of

7   Video Viewed" by between 60 and 80%.[16] The inflated metric thus made video advertisements

8   *appear* as if they were performing much better on Facebook than they actually were.

9       32.36.  The 60 to 80% inflation in the "Average Duration of Video Viewed" metric reveals

10  that many users watch Facebook video advertisements for less than 3 seconds. When users scroll

11  right past muted video advertisements, the users have, under Facebook's reported metric for

12  "Average Duration of Video Viewed," technically spent time watching the video advertisement.

13  Thus, many of the 1-2 second video-watches (that contributed to the numerator, but not the

14  denominator, of Average Duration of Video Viewed) reflect users quickly scrolling past muted auto-

15  playing video advertisements.

16      33.37.  Video advertising purchasers, including Plaintiffs, viewed the "Average Duration of

17  Video Viewed" and "Average % of Video Viewed" as important metrics because users are more

18  likely to remember a video advertisement and be affected by it if they watch a longer portion of the

19  advertisement.

20      34.38.  Facebook's misrepresentations induced video advertising purchasers, including

21  Plaintiffs, to purchase video advertisements because purchasers wanted accurate video advertising

22  metrics regarding "Average Duration of Video Viewed" and "Average % of Video Viewed" so that

23  they could monitor their video advertisements' performance.

24      35.39.  Facebook's misrepresentations induced video advertising purchasers, including

25  Plaintiffs, to continue purchasing video advertisements, and to purchase additional video

26

27  _____

28  [16] Suzanne Vranica and Jack Marshall, *Facebook Overestimated Key Video Metric for Two Years*,
    Wall Street Journal (Sept. 22, 2016, 7:29 PM), http://www.wsj.com/articles/facebook-overestimated-
    key-video-metric-for-two-years-1474586951

THIRDFOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

1    advertisements, because purchasers believed that users were watching their videos, on average, for

2    longer than users were actually watching their videos.

3        36.40.  Facebook's misrepresentations induced video advertising purchasers, including

4    Plaintiffs, to pay more for Facebook video advertising than they otherwise would have been willing

5    to pay.

6        37.41.  Facebook's misrepresentations thereby distorted the market price for its video

7    advertising by artificially increasing the price of Facebook video advertising, causing video

8    advertising purchasers, including Plaintiffs, to pay more than they otherwise would have paid.

9        38.42.  Facebook's misrepresentations provided Facebook with an unfair competitive

10   advantage over other online video advertising platforms, such as YouTube, LinkedIn, and Twitter.

11       39.43.  Facebook's misrepresentations interfered with Plaintiffs and other putative class

12   members' attempts to utilize Facebook's video advertising analytics, and to run effective video

13   advertising campaigns.

14       40.44.  Facebook's overstated audience retention metrics resulted directly from Facebook's

15   failure to properly audit and verify the accuracy of its video-advertising metrics before disseminating

16   them.

17       41.45.  Any reasonable audit or verification process would have alerted Facebook earlier that

18   its metrics for "Average Duration of Video Viewed" and "Average % of Video Viewed" were

19   inaccurate and inflated.

20       42.46.  Facebook's audit and verification failures have been systemic and continuous, and

21   Facebook has continually refused to reform its conduct.  By failing to adopt reasonably reliable

22   auditing or third party verification measures, Facebook has put Plaintiffs and other advertisers at

23   continued risk of being subjected to inaccurate analytics in the future and also made it so they will be

24   unable to rely on the accuracy of Facebook's analytics.

25       43.47.  In the months surrounding the announcement of the inflated and inaccurate "Average

26   Duration of Video Viewed" and "Average % of Video Viewed" metrics, Facebook's inadequate

27   audit and verification measures caused approximately eleven additional metrics errors.  The errors

28   have been so numerous and unabated that a major marketing publication posted a news article last

year to keep a running tab on the errors.[17] The article begins:

> To paraphrase J. Cole, Facebook messes up on its math one time; shame on Facebook. Facebook messes up on its math a second time; shame on those of us blindly trusting Facebook's math. Facebook messes up on its math a third time; time to make a list.
>
> To help myself and anyone else keep track of Facebook's measurement errors, here's an itemized list of each error Facebook has announced to date….

Each of the 12 reported errors was discovered within a period of just over one year (from September 2016 through November 2017).  The errors all pertain to the data and analytics that Facebook provides to advertisers about the efficacy of advertising on Facebook, including the reach of Facebook Page posts, video advertisement completion rate (which is a separate error from the one affecting the two video advertising metrics that are the subject of this Complaint), average time spent on Facebook Instant Articles, Facebook's "referrals" metric, and video carousel ad link click quantities.

44.48.  Many individuals with considerable experience and knowledge about advertising on Facebook have attributed the inflated and inaccurate "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics or the pattern of errors to Facebook's failure to conduct audits and verifications of its data and its advertising metrics.

45.49.  Keith Weed, chief marketing officer of Unilever, said in an interview in 2015, that allowing tech companies to block third parties from measuring their platforms is equivalent to "letting them mark their own homework."[18]

46.50.  After the news first broke about the inflated and inaccurate "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics, Ad buying agency Publicis Media wrote: "This once again illuminates the absolute need to have 3rd party tagging and verification on

---

[17] Tim Peterson, *FAQ: Everything Facebook has admitted about its measurement errors*, Marketing Land (May 17, 2017 12:44 p.m.) https://marketingland.com/heres-itemized-list-facebooks-measurement-errors-date-200663

[18] Suzanne Vranica and Jack Marshall, *Facebook Overestimated Key Video Metric for Two Years*, Wall Street Journal (Sept. 22, 2016, 7:29 PM), http://www.wsj.com/articles/facebook-overestimated-key-video-metric-for-two-years-1474586951

Facebook's platform. Two years of reporting inflated performance numbers is unacceptable."[19]

47.51.  Also in reaction to the inflated and inaccurate "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics, Sir Martin Sorrell, the CEO of the world's biggest advertising group, WPP, said that the error underscored the need for a third party to oversee such metrics: "We have also been calling for a long time for media owners like Facebook … not to mark their own homework and release data to ComScore to enable independent evaluation.  The referee and player cannot be the same person."[20]

48.52.  The *New York Times* also reacted to the news of the error by writing, "Above all, it reinforces the importance of outside measurement when it comes to data from Facebook and other media companies."[21]

49.53.  Omnicom, another major advertising agency, had a similar response, saying: "This is why we and many others have been repeatedly saying that third-party verification is a fundamental requirement. Publishers should not 'grade their own homework.'"[22]

50.54.  Sarah Wood, co-chief executive of Unruly, the social marketing agency to video ad tech company that is owned by News Corp, said that the error would not only "raise questions about the effectiveness of Facebook as a video platform [but] it will raise more fundamental questions around trustworthiness and highlights just why third-party verification is so critical . . . it's time the walled gardens came crashing down."[23]

51.55.  Also in response to news of the error, *Fortune* quoted Shafqat Islam, co-founder of

---

[19] *Id.*

[20] Eric Oster, *Sir Martin Sorrell Has Harsh Words for Facebook's Fake Data in 'Overstategate'*, AgencySpy (Sept. 23, 2016 11:32 a.m.) http://www.adweek.com/agencyspy/sir-martin-sorrell-has-harsh-words-for-facebooks-fake-data-in-overstategate/117517

[21] John Herrman & Sapna Maheshwari, *Facebook Apologizes for Overstating Video Metrics* (Sept. 23, 2016) https://www.nytimes.com/2016/09/24/business/media/facebook-apologizes-for-overstating-video-metrics.html

[22] *Id.*

[23] Matthew Garrahan & Lauren Fedor, *Ad groups seize on Facebook's video measuring error*, Financial Times (Sept. 23, 2016)  https://www.ft.com/content/230ec388-8169-11e6-8e50-8ec15fb462f4

THIRDFOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

1  NewsCred: "Need 3rd party verification everywhere."[24]

2  52.56.  After Facebook continued to disclose additional errors, *The Wall Street Journal*

3  reported that "The lack of fully independent third-party ad verification was a major sticking point

4  following Facebook's recent video counting mishap…"[25]  In the same article, it was noted that

5  Facebook was resisting letting third parties use technology to evaluate advertising efficacy. GroupM,

6  which is the ad buying unit of WPP, was quoted as saying that a transition to "full third-party

7  measurement" remained "crucial."  And the article reports that the Association of National

8  Advertisers publicly advocated for an MRC audit.

9  **NEW ALLEGATIONS**

10  57.    Facebook's internal documents show ████████████████████

11  ████████████████████████████████████.

12  58.  ████████████████████████████████

13  ████████████████████████████████%.  As Facebook would put it later,

14  ██████████████████████████████████

15  █████ Other Facebook personnel acknowledged internally that ██████████████

16  ████████████████████████████

17  59.  ████████████████████████████████

18  ████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22  █████

23  60.  ████████████████████████████████████

24  ██████████████.  It has long been known that Facebook resisted outside help—such as

25

26

27  [24] Michelle Toh, *Why Facebook's Ad Buyers Are Not Happy Right Now* (Sept. 23, 2016)
http://fortune.com/2016/09/23/facebook-video-view-metric/

28  [25] Mike Shields, *Facebook Says It Found More Miscalculated Metrics* (Nov. 16, 2016 10:03
a.m.) https://www.wsj.com/articles/facebook-says-it-found-more-miscalculated-metrics-1479303984

14

1  through third party verification or auditing—to ensure the accuracy of the metrics, ████████

2  ████████████████████████████████████████████████

3  ████████

4       61.    Facebook's internal documents show the company ████████████████

5  ████████

6       62.    Facebook's management also ████████████████████

7  ████████████████████████████████████████████████

8  ████████

9       63.    ████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████

18       64.    In August 2016, ████████████████████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████

22       65.    ████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████

THIRD FOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

66. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████.

67. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

68. ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

69. ███████████████████████████████ in September 2016, when Facebook learned that the Wall Street Journal would be publishing an article about its inflated metrics. ███████████████████████████████████████████ The Journal quoted a Facebook statement claiming that Facebook had only "recently discovered an error in the way we calculate one of our video metrics." Facebook reiterated that notion in Mr. Fischer's September 23rd blog post, which stated that Facebook had discovered the error "[a]bout a month ago," and that "[a]s soon as we discovered the discrepancy, we fixed it."  And of course, Facebook █████████████████████████ ████████████████████████████████████

## PLAINTIFFS' EXPERIENCES

a.    *Tyler Barnett PR, LLC*

~~53.    Tyler Barnett PR, LLC, is a public relations and marketing agency that focuses on targeting the millennial generation.~~

16

54.   During the period between May 4, 2014, and September 23, 2016, when Facebook was providing inflated "Average Duration of Video Viewed" and "Average Percentage of Video Viewed" metrics, Tyler Barnett PR, LLC, purchased video advertising services from Facebook.

55.   Before Tyler Barnett PR, LLC, purchased video advertising services, Tyler Barnett PR, LLC, knew and expected that as part of the video advertising services, Facebook provides metrics designed to enable advertisers to monitor their video advertisements' performance.

56.   After first purchasing video advertising services, Tyler Barnett PR, LLC, began viewing the video metrics provided by Facebook, including the "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics.

57.   The inflated "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics were material to Tyler Barnett PR, LLC, and Tyler Barnett PR, LLC, relied on the metrics, purchasing more video advertising services from Facebook than it otherwise would have.

58.   Since September 23, 2016, Tyler Barnett PR, LLC, has continued to purchase Facebook video advertising services and it intends to continue purchasing Facebook video advertising services.

b.a.   *LLE One, LLC*

59.70.   LLE One, LLC, is a social media marketing agency.

60.71.   During the period between May 4, 2014, and September 23, 2016, when Facebook was providing inflated "Average Duration of Video Viewed" and "Average Percentage of Video Viewed" metrics, LLE One, LLC, purchased video advertising services from Facebook.

61.72.   Before LLE One, LLC, purchased video advertising services, LLE One, LLC, knew and expected that as part of the video advertising services, Facebook provides metrics designed to enable advertisers to monitor their video advertisements' performance.

62.73.   After first purchasing video advertising services, LLE One, LLC, began viewing the video metrics provided by Facebook, including the "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics.

63.74.   The inflated "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics were material to LLE One, LLC, and LLE One, LLC, relied on the metrics,

17

1    purchasing more video advertising services from Facebook than it otherwise would have.

2         64.75.  Since September 23, 2016, LLE One, LLC, has continued to purchase Facebook

3    video advertising services and it intends to continue purchasing Facebook video advertising services.

4         *e*b.    *Jonathan Murdough*

5         65.76.  Jonathan Murdough ("Murdough") is a citizen and resident of Pennsylvania.

6         66.77.  During the period between May 4, 2014, and September 23, 2016, when Facebook

7    was providing inflated "Average Duration of Video Viewed" and "Average Percentage of Video

8    Viewed" metrics, Murdough purchased video advertising services from Facebook.

9         67.78.  Before Murdough purchased video advertising services for himself, he viewed video

10   metrics provided by Facebook to a company that he worked for, including the "Average Duration of

11   Video Viewed" and "Average % of Video Viewed" metrics.

12        68.79.  Before Murdough purchased video advertising services, Murdough knew and

13   expected that as part of the video advertising services, Facebook provides metrics designed to enable

14   advertisers to monitor their video advertisements' performance.

15        69.80.  After purchasing video advertising services for himself, Murdough viewed video

16   metrics provided by Facebook, including the "Average Duration of Video Viewed" and "Average %

17   of Video Viewed" metrics.

18        70.81.  The inflated "Average Duration of Video Viewed" and "Average % of Video

19   Viewed" metrics were material to Murdough, and Murdough relied on the metrics, purchasing more

20   video advertising services from Facebook than he otherwise would have.

21        71.82.  Murdough intends to continue purchasing Facebook video advertising services.

22

23                           **CLASS ALLEGATIONS**

24        72.83.  Plaintiffs re-allege and incorporate by reference herein all of the allegations contained

25   above.

26        73.84.  Pursuant to the Federal Rule of Civil P. 23(b)(3), Plaintiffs assert claims on behalf of

27   the following "Class": All persons or entities who, from May 4, 2014, to September 23, 2016 ("Class

28   Period"), had an account with Facebook, Inc., and who paid for placement of video advertisements

                                   18

on a Facebook-owned website.  Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

74.85.  This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3). Plaintiffs seek to represent an ascertainable Class, as determining inclusion in the class can be done through Facebook's own records.

75.86.  Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

76.87.  Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiffs believe, and on that basis allege, that the proposed Class is so numerous that joinder of all members would be impracticable as Facebook sells millions of advertisements annually, and a significant portion of those advertisements are video advertisements.

77.88.  Questions of law and fact common to the putative Class exist that predominate over questions affecting only individual members, including inter alia:

    a.   Whether Facebook made material misrepresentations about its video advertising services, including misrepresenting the "Average Duration of Video Viewed" and "Average % of Video Viewed" metrics;

    b.   Whether Facebook's use of inaccurate, unaudited, and unverified video metrics was likely to deceive members of the public and thus constituted a fraudulent business practice under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200);

    c.   Whether Facebook's failure to properly audit and verify its video metrics was unethical, unscrupulous, or substantially injurious to video advertising purchasers and thus constituted an unfair business practice under California's Unfair Competition

19

Law; and

    d.   Whether Facebook breached its contractual duty to perform competently and with reasonable care by reporting erroneous video metrics.

78.89.  Plaintiffs are members of the putative Class. The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

79.90.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests are coincident with, not antagonistic to, the other members of the Class.

80.91.  Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiffs' counsel specifically has experience litigating some of the largest and most complex consumer class actions, including numerous consumer class actions in the Northern District of California.

81.92.  Certification of the Class is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

82.93.  A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

83.94.  In the alternative, the Class should be certified because:

    a.   The prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible

20

1   standards of conduct for Facebook;

2       b.   The prosecution of individual actions could result in adjudications, which as a

3           practical matter, would be dispositive of the interests of non-party class members or

4           which would substantially impair their ability to protect their interests; and

5       c.   Facebook has acted or refused to act on grounds generally applicable to the proposed

6           Class, thereby making appropriate final and injunctive relief with respect to the

7           members of the proposed Class as a whole.

8

9

10

11

12

13                          **FIRST CAUSE OF ACTION**
                            **(On behalf of the Class)[26]**
14                  **CALIFORNIA UNFAIR COMPETITION LAW,**
                    **CAL. BUS. & PROF. CODE § 17200,** *et seq.*

15   ~~84.~~95.  Plaintiffs re-allege and incorporate by reference herein all of the allegations contained

16   above.

17   ~~85.~~96.  Facebook violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof.

18   Code §17200 et seq., by engaging in the fraudulent and unfair business acts and practices alleged

19   previously, and as further specified below.

20   ~~86.~~97.  Facebook's dissemination of inaccurate and inflated video-advertising metrics

21   constitutes a fraudulent practice under the UCL, as it is likely to deceive Class members into

22   believing that their video advertisements were viewed, on an average, for a longer duration than they

23   actually were viewed.

24   ~~87.~~98.  Facebook's failure to properly audit and verify the accuracy of its video-advertising

25   metrics before disseminating them to Class members is unethical, unscrupulous, and substantially

26

27   ───────────────
     [26] Pursuant to Facebook's terms of service, the laws of the State of California govern "any claim"
     that arises between Facebook and its users, "without regard to conflict of law provisions." Facebook,
28   *Statement of Rights and Responsibilities*, https://www.facebook.com/terms (last accessed: Jan. 9,
     2017).

~~THIRD~~FOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

injurious to video-advertising purchasers, and thus constitutes an unfair practice under the UCL. Facebook's practice was also contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by laws like the Federal Trade Commission Act (15 U.S.C. § 45), Consumers Legal Remedies Act (Cal. Civ. Code § 1750 et seq.), and California False Advertising Law (Cal Bus. & Prof. Code § 17500). The harm these practices caused to Plaintiffs and the Class members outweigh their utility, if any.

88.99.  Facebook should have known that its metrics for "Average Duration of Video Viewed" and "Average % of Video Viewed" were inaccurate and inflated, and had Facebook properly audited and verified its video-advertising metrics it would have known that those metrics were inaccurate and inflated.  The calculation errors that Facebook allowed to persist for over two years were obvious errors that would have been discovered by a reasonable auditing and verification process.

89.100.      Facebook's failure to employ reasonable auditing and verification procedures gave it an unfair competitive advantage, as it allowed Facebook to provide video-advertising services at a lower cost and made those advertising services appear to be more effective than they were.

90.101.      Plaintiffs have standing to bring these claims under the UCL because they were injured and lost money or property, including but not limited to money paid for Facebook video advertisements, as a result of Facebook's fraudulent and unfair business practices.  Among other things, Plaintiffs would not have bought as much video-advertising services if Facebook had not disseminated inflated metrics and would have paid a lower price for the video-advertising services they did purchase.

91.102.      Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek equitable relief to prevent the continued use of Facebook's unfair and fraudulent practices and to restore to the Class all money Facebook may have acquired by means of its fraudulent and unfair business practices.

**SECOND CAUSE OF ACTION**
**(On behalf of the Class)**
**BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE**

92.103.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

93.104.    Plaintiffs and Class members contracted with Facebook to provide them with video-advertising services.  They did so through one or more of Facebook's advertising interfaces, where Class members can submit video advertisements for approval, set a daily advertising budget that can be adjusted at any time, set or adjust their target audience, and set or adjust the placement of the advertising.

94.105.    Plaintiffs and Class members met all or substantially all of their contractual obligations, including submitting their advertising for Facebook's approval and paying for Facebook's advertising services.

95.106.    There is not one integrated contract that spells out Facebook's obligations to the Class, but those obligations can be determined by reference to Facebook's course of dealing with the Class, industry practice, and from various webpages created by Facebook, including  Facebook's Statement of Rights and Responsibilities (https://www.facebook.com/legal/terms); Facebook's Self-Serve Ad Terms (https://www.facebook.com/legal/self_service_ads_terms); Facebook's Advertising Guidelines (https://www.facebook.com/policies/ads); Facebook's Advertiser Help Center (https://www.facebook.com/business/help); Facebook's Community Payments Terms (https://www.facebook.com/payments_terms); and Facebook's ad-creation, editing, and management interfaces, which may be accessed through Facebook's Ads Manager (https://www.facebook.com/ads/manager/creation/), Facebook's Power Editor (https://www.facebook.com/ads/manage/powereditor), Facebook's Ads Manager App, Facebook Pages, and Facebook Ads API.

96.107.    One of Facebook's obligations is to provide Class members with an advertising interface: a central portal where Class members can create, edit, and monitor advertisements for placement on Facebook's websites.  This obligation is implied by Facebook's course of dealing with the Class, industry practice, Facebook's Self-Serve Ad Terms, and Facebook's Advertising Help Center.  For example, the Self-Serve Ad Terms were drafted by Facebook to "apply to [Class members'] use of the self-service advertising interfaces and APIs …

23

(collectively, the 'Self-Serve Ad Interfaces')," and those terms state that "you can cancel your Order at any time through our online portal"—the implication being that there would in fact be advertising interfaces for Class members to use.  Facebook's Advertiser Help Center also refers to Facebook's advertising interfaces on several occasions.

97.108.        Another of Facebook's obligations is to track the advertising it places for Plaintiffs and Class members and report metrics by which Plaintiffs and Class members can evaluate the performance of their advertisements.  This obligation is implied by Facebook's course of dealing with the Class, industry practice, statements made by Facebook in the Advertiser Help Center and in standardized communications with the Class.  For example, Facebook has stated in its Advertiser Help Center: "You can always go to Ads Manager to see how your ads are performing," and "When you create a Video Views campaign, we'll measure both impressions and engagement with your videos."  And when Facebook approves an advertisement, it sends a standardized email that states: "Your ad is approved and should begin delivering shortly.  Click the ad name below to manage it or view its performance."

98.109.        Under California law, Facebook was required to perform its contractual obligations competently and with reasonable care.  Facebook breached that duty by incorrectly measuring viewer engagement with the advertising it placed for Plaintiffs and Class members; by including inaccurate data in the advertising interface that it provided to Plaintiffs and Class members; and by reporting inaccurate advertising-performance metrics to Plaintiffs and Class members.

99.110.        Had Facebook used reasonable care, it would have calculated the video-viewing metrics correctly, it would have discovered any calculation errors through routine auditing and verification, and it would not have used an incorrect formula for over two years.

100.111.        As a result of Facebook's failure to provide its agreed advertising services competently and using reasonable care, Plaintiffs and Class members purchased advertising services they would not otherwise have purchased and failed to receive the benefit of their bargain.  They are entitled to damages in an amount to be proven at trial.

101.112.        On behalf of the proposed Class, Plaintiffs have notified Facebook that it is in

24

1    breach and given it an opportunity to remedy the harm suffered by the Class, but Facebook has

2    refused.

3                                    **THIRD CAUSE OF ACTION**
                                        **(On behalf of the Class)**
4                                              **FRAUD**

5           113.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained

6    above.

7           114.    Facebook falsely represented the average time that Facebook users spent watching

8    Plaintiffs' and Class members' video advertisements.  The Average Duration of Video Viewed and

9    Average Percentage of Video Viewed metrics that Facebook reported to Plaintiffs and Class

10   members was typically inflated by ███████████████████

11          115.    Facebook either knew that the average viewership metrics it was reporting to

12   Plaintiffs and Class members was false or reported those metrics recklessly and without regard for

13   their truth. ████████████████████████████████████████████

14   ██████████████████████████████████████████████████████

15   ██████████████████████████████████.  And even after Facebook ultimately

16   decided to correct its metrics, it █████████████████████████████

17   █████████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   █████████████████████████████████████████and refused to allow

20   third-party verification of its metrics.

21          116.    Facebook intended that Plaintiffs and Class members rely on its average viewership

22   metrics.  Facebook promoted the metrics to users as useful tools to identify which video

23   advertisements were effective; Facebook knew that the average viewership metrics were considered

24   key metrics by advertisers: ████████████████████████████████

25   ██████████████████████████████████████████████████████

26   ██████████

27          117.    Plaintiffs and Class members did rely on Facebook's inflated viewership metrics

28   when deciding whether and how to purchase video advertising from Facebook.  As a result of the

                                                25

1 inflated metrics, Plaintiffs and Class members purchased more video advertising from Facebook

2 than they otherwise would have and paid a higher price than they otherwise would have.

3      118.   Plaintiffs seek an award of compensatory and punitive damages.  Facebook's conduct

4 as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by

5 Facebook's officers.

6                          **PRAYER FOR RELIEF**

7      WHEREFORE, Plaintiffs ~~Tyler Barnett PR, LLC,~~ LLE One, LLC, d/b/a Crowd Siren and

8 d/b/a Social Media Models, and Jonathan Murdough, on behalf of themselves and the Class, seek the

9 following relief:

10      A.   An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the

11 Class as requested herein, appointing Cohen Milstein Sellers & Toll PLLC, Gibbs Law Group LLP,

12 and Eglet Prince as Class Counsel, and finding that Plaintiffs are proper representatives of the Class

13 requested herein.

14      B.   Plaintiffs request injunctive relief.  Awarding injunctive and other equitable relief as

15 is necessary to protect the interests of the Class, including: (i) an order prohibiting Facebook from

16 engaging in the wrongful acts described herein; (ii) requiring Facebook to  engage third-party

17 auditors to conduct audits and evaluations of Facebook's advertising metrics on a periodic basis and

18 ordering them to promptly correct any problems or issues detected by these auditors, and (iii)

19 requiring Facebook to disclose any further inaccurate advertising metrics in a timely and accurate

20 manner.

21      C.   Plaintiffs also request damages~~,~~ (including punitive damages), restitution, attorneys'

22 fees, statutory costs, and such other and further relief as is just and proper. Plaintiffs seek attorneys'

23 fees under California Code of Civil Procedure 1021.5.

24                          **JURY TRIAL DEMAND**

25      Plaintiffs hereby request a jury trial for all issues so triable.

26

27 DATED: August 3, 2018                    Respectfully submitted,

28                                By: /s/ Eric Gibbs

26

~~THIRD~~FOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

Eric Gibbs
Dylan Hughes
David Stein
Aaron Blumenthal
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com
ds@classlawgroup.com
ab@classlawgroup.com

Andrew N. Friedman
Geoffrey Graber
Eric Kafka
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com

Michael Eisenkraft
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
meisenkraft@cohenmilstein.com

Robert T. Eglet
Robert M. Adams
Erica D. Entsminger
Artemus W. Ham
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegs, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

Aisha Christian (*pro hac vice forthcoming*)

~~THIRD~~FOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW

129 West 27th Street, 11th Floor
New York, NY 10001
Telephone: (646) 285-2029

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
charles.reichmann@gmail.com

Joseph A. Motta (SBN 133531)
**RUEB & MOTTA**
1401 Willow Pass Road, Suite 880
Concord, CA 94520
Telephone: (925) 602-3400
Facsimile: (925) 602-0622
joe@rmmprolaw.com

*Counsel for Plaintiffs and Proposed Class*

~~THIRD~~FOURTH AMENDED CLASS ACTION COMPLAINT
Case No.: 4:16-cv-06232-JSW