Eric H. Gibbs (SBN 178658)
David Stein (SBN 257465)
Aaron Blumenthal (SBN 310605)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
ds@classlawgroup.com
ab@classlawgroup.com

Robert T. Eglet (*pro hac vice*)
Robert M. Adams (*pro hac vice*)
Erica D. Entsminger (*pro hac vice*)
Artemus W. Ham (*pro hac vice*)
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegas, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

Andrew N. Friedman (*pro hac vice*)
Geoffrey Graber (SBN 211547)
Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com

[Additional counsel on signature page]

*Counsel for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| LLE ONE, LLC, d/b/a Crowd Siren and d/b/a Social Media Models, and JONATHAN MURDOUGH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No.: 4:16-cv-06232-JSW<br><br>**PLAINTIFFS' OPPOSITION TO SEALING PORTIONS OF FOURTH AMENDED COMPLAINT**<br><br>Dept: Courtroom 5, 2nd Floor<br>Judge: Jeffrey S. White |

# INTRODUCTION

When the Wall Street Journal first reported that Facebook had overstated the average video view times it reported to advertisers, Facebook responded with an extensive and carefully orchestrated campaign to convince the public that the overstatement was the result of an honest mistake that Facebook had only just discovered, and that Facebook had corrected that mistake immediately. Now that Plaintiffs have uncovered internal documents showing that Facebook was not telling the truth—or at the very least, was not telling the complete story—Facebook wants its handling of the metrics error treated as if it were a trade secret and screened from public view.

Based on what they learned in discovery, Plaintiffs amended their complaint to allege a claim for fraud. They allege that Facebook engineers knew exactly how the company was calculating its averages but did nothing about it for over a year; that throughout 2015, Facebook ignored reports from advertisers of aberrant results caused by Facebook's method of calculation; and that Facebook severely understaffed the engineering team in charge of fixing calculation errors. (4th Am. Compl. [ECF No. 140-3], ¶¶ 3, 5, 57-62.) They further allege that even after Facebook finally got around to addressing the error, it delayed the fix for several more months while it developed a plan to "obfuscate the fact we screwed up the math," and that Facebook is still concealing the degree by which it overstated average view times: Facebook reported view times inflated by some 150 to 900%, not merely 60 to 80%, as had been reported. (*Id.*, ¶¶ 4, 6, 63-69.)

Facebook asks the Court to permanently seal these allegations, ensuring the public will never know the basis for Plaintiffs' fraud claim. But transparency is an indispensable element of our judicial system, particularly when the matters being adjudicated are of public significance, and Facebook has not overcome the "strong presumption" in favor of public access. Facebook cannot identify any trade secret that would be disclosed, as none of Plaintiffs' allegations reveal any highly technical or proprietary information. Nor can it specify how a competitor might use the information in Plaintiffs' complaint to gain an unfair advantage, particularly since Facebook has since changed its auditing and verification practices. If the disclosure of Plaintiffs' allegations hurt Facebook at all, it's only because they state a legitimate claim for fraud and reveal Facebook's prior public statements as dishonest. As the Ninth Circuit has emphasized, however, litigants have no right to

seal information related to the merits of a public proceeding just because that information may prove incriminating or embarrassing. This litigation concerns a matter of public importance—one that has affected over a million advertisers. Facebook's error was covered widely in the national media even before Plaintiffs filed suit, and Facebook itself has spoken publicly about its handling of the error on several occasions. Facebook has no legitimate reason for cutting off public access now.

## BACKGROUND

On September 22, 2016, the Wall Street Journal reported that, for the past two years, Facebook had overstated the average time its users spent watching paid video advertisements. (4th Am. Compl., ¶ 1.) Facebook quickly responded with a public statement that was covered by media outlets around the world. It emphasized that the inflated metrics were the result of an "error"; that Facebook only learned about that error "about a month ago"; and that "[a]s soon as we discovered the discrepancy, we fixed it." (4th Am. Compl., ¶ 2.)

When Plaintiffs first filed this class action on behalf of advertisers who bought video ads on Facebook, they knew only what Facebook had said publicly and what news media like the Wall Street Journal had reported. Plaintiffs alleged that, even if Facebook's inflated metrics resulted from an honest mistake, it still should not be permitted to keep the advertising revenue that mistake generated. Both its contractual obligations to advertisers and principles of fair competition required that Facebook disgorge its unearned profits. (ECF No. 34.) In response, Facebook reiterated that it "inadvertently miscalculated" the metrics at issue, that it discovered this error "[l]ast fall" (2016), and that it had "proactively disclosed and fixed these bugs." (ECF No. 46 at 2.)

Plaintiffs have since gained access to Facebook's internal records and discovered that Facebook's inflation of average view times was far from an honest mistake. Based on what they learned, Plaintiffs amended their complaint to allege a claim for fraud and punitive damages. (4th Am. Compl., ¶¶ 1-7, 57-69, 113-118.) Facebook now wants the Court to shield the basis of the new fraud claim from public view. Among the material Facebook wants permanently sealed are:

(i) Allegations that Facebook did not discover its mistake a month before the Wall Street Journal article, as Facebook claimed publicly. Facebook engineers knew how Facebook was calculating average view time for over a year, and multiple advertisers had reported aberrant results

2

1 caused by that method of calculation (*Id.*, ¶¶ 3, 58-59.)

2       (ii)    Allegations that Facebook's average viewership metrics were not inflated by only 60-80%, as was widely reported and left uncorrected by Facebook. They were inflated by some 150 to 900%. Facebook knows that the vast majority of the video ads paced on its platform are viewed for an average of only a few seconds. (*Id.*, ¶¶ 4, 66-68.)

      (iii)   Allegations that Facebook displayed reckless indifference to the accuracy of its metrics by severely understaffing the engineering team in charge of correcting errors, not taking advertiser reports of anomalous results seriously, and failing to complete investigations in a timely manner. (*Id.*, ¶¶ 5, 58, 63.)

      (iv)   Allegations that Facebook did not fix the error as soon as it discovered it, as it has claimed repeatedly. Even once Facebook decided to change the way it calculated the average viewership metrics, it continued disseminating inflated metrics for months. Meanwhile, Facebook was developing a "no PR" approach that would allow it to quietly replace its erroneous metrics and obfuscate the fact they had been drastically inflated for well over a year. (*Id.*, ¶¶ 6, 63-65.)

## ARGUMENT

### A. Facebook Must Overcome A Strong Presumption In Favor of Public Access To Justify Keeping Plaintiffs' Allegations Secret

Documents filed in a judicial proceeding, like Plaintiffs' complaint, are "public documents almost by definition, and the public is entitled to access by default." *Kamakana v. City & Cty. of Honolulu,* 447 F.3d 1172, 1180 (9th Cir. 2006). This "strong presumption" in favor of public access is a fundamental part of our judicial system, which depends on transparency and public faith that justice is being administered fairly. *Ctr. for Auto Safety v. Chrysler Grp.,* 809 F.3d 1092, 1096 (9th Cir. 2016). The more entwined a filing is with the merits of a case, the more powerful the public interest in transparency. *See id.* at 1101. And where, as here, the filing at issue is a complaint, that interest is particularly strong. After all, a complaint is "the root, the foundation, the basis by which a suit arises and must be disposed of." *Heath v. Google Inc.*, No. 15-CV-01824-BLF, 2017 WL 3530593, at *2 (N.D. Cal. Aug. 14, 2017).

Because public access to records is the default, the Court need not make a detailed finding to justify a denial of Facebook's sealing request. *Kamakana*, 447 F.3d at 1182 ("It makes little sense

… to require the same specificity where the court is simply effectuating the presumption of public access by *unsealing* documents covered by a blanket protective order.") To justify permanently sealing portions of Plaintiffs' complaint, however, Facebook would need to overcome the strong presumption in favor of public access by proving that "compelling reasons" exist for keeping the allegations secret. *Id.* at 1178. In assessing Facebook's showing, the Court is not permitted to rely on hypothesis or conjecture, must balance any truly compelling reasons against the competing interests of the public, and must articulate the factual basis for any sealing that it might order. *Id.*

**B.   Facebook Has Not Presented Compelling Reasons For Sealing the Allegations**

**1.   Facebook Cannot Show That Allegations Relevant to Plaintiffs' Fraud Claims Are Being Used As A Vehicle For Improper Purposes**

"In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447 F.3d at 1179. However, the "mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.*

Facebook claims that compelling reasons exist here because "Plaintiffs attempt … to use the complaint as a vehicle to publicly disclose their mischaracterizations of Facebook's confidential information." (Def. Br. at 2.) It cites two cases where courts found allegations were intended to gratify spite or promote scandal. (*Id.* at 4.) In *Cooksey v. Digital*, the court sealed allegations that the "defendant or its counsel destroyed evidence or violated legal or ethical standards," finding that the allegations were "plainly contradict[ed]" by the record, and therefore were "frivolous and could not affect the decisions in the case." No. 14-CV-7146, 2016 WL 316853, at *3 (S.D.N.Y. Jan. 26, 2016). And in *Accenture v. Sidhu*, the court sealed an allegation "which implies [Defendant] is in the United States illegally—a fact which is neither demonstrated by any evidence in the record nor relevant to any of the claims against [Defendant]." No. C10-2977 TEH, 2011 WL 6057597, at *3 (N.D. Cal. Dec. 6, 2011). But the court found that the bulk of the challenged allegations—which the defendant, like Facebook here, claimed were wrong, intended to cause reputational harm, and would result in unflattering media attention—fell into the category of embarrassment and thus

4

1 should not be sealed. *Id.* at *2.

2 The *Accenture* and *Cooksey* cases exemplify the rare instances where allegations in a complaint will be considered a "vehicle for improper purposes" and stricken from the public record. Only wholly irrelevant statements (such as questioning a litigant's immigration status) or patently false statements that could never figure in the Court's adjudication of the merits (such as frivolous accusations of evidence spoliation) are likely to qualify. The allegations of Plaintiffs' complaint are neither. Far from being "unrelated" to Plaintiffs' fraud claim, the allegations form the very factual basis for that claim. *Id.* at *3. Facebook has claimed publicly that it did not discover the inflated metrics until "about a month" before September 23, 2016, that the inflated metrics were the result of an honest mistake, and that as soon as Facebook found the error, it fixed it. Plaintiffs' fraud claim depends on showing that Facebook's public statements are false, and that it either knew that it was reporting inflated viewership metrics to advertisers or did so with reckless disregard for the truth. (4th Am. Compl., ¶ 115.) The fact that at least three Facebook engineers were aware of how Facebook was calculating its viewership metrics in early 2015 is thus highly relevant to Plaintiffs' claim. (*Id.*, ¶¶ 3, 59.) As is the fact that multiple advertisers reported aberrant results caused by Facebook's calculation throughout 2015, but Facebook still did nothing (*id.*, ¶¶ 3, 58); the fact that Facebook repeatedly displayed reckless indifference to the accuracy of its metrics by failing to investigate error reports, failing to follow-up on complaints for months at a time, and understaffing the team in charge of fixing errors (*id.*, ¶¶ 5, 60-62); and the fact that, even after Facebook resolved to correct its calculation, it continued reporting inflated numbers for months, while it developed and implemented a "no PR" plan intended to obfuscate what it had done (*id.*, ¶¶ 6, 63-69). The purpose of Plaintiffs' allegations, in other words, is entirely proper—they support a claim for fraud.

### 2. Facebook's Boilerplate Claims of Competitive Harm Are Insufficient

Courts also sometimes find compelling reasons for sealing documents when a defendant shows it will suffer competitive harm from the disclosure of trade secrets or other proprietary information. "[A]s a number of courts in this district have suggested," however, "'only documents of *exceptionally sensitive information*' will be kept from the public." *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC-2015 WL 355496, at *1 (N.D. Cal. Jan. 27, 2015) (emphasis in original).

5

Facebook contends that Plaintiffs' allegations fall into this category, and that it will suffer competitive harm if the allegations are made public. But "conclusory offerings" and "boilerplate references to competitive disadvantage" are not enough to overcome the strong presumption in favor of public access. *Kamakana*, 447 F.3d at 1182; *Welle v. Provident Life & Accident Ins. Co.*, No. 3:12-cv-3016 EMC, 2013 WL 6055369, at *2 (N.D. Cal. Nov. 14, 2013). Facebook "has failed to make a particularized showing regarding *what* the trade secret or intellectual property actually is"—it just says that Plaintiffs' allegations are drawn from confidential documents. *Ramirez v. Trans Union, LLC*, 2017 WL 1549330, at *2 (N.D. Cal. May 1, 2017). Nor does Facebook explain how competitors would be able to use this information to its detriment—Facebook just says they would. *See Hodges v. Apple*, No. 13-cv-01128-WHO, 2013 WL 6070408, at *2 (N.D. Cal. Nov. 18, 2013) ("[a]n unsupported assertion of unfair advantage to competitors without explaining how a competitor would use the information to obtain an unfair advantage is insufficient").

Rather than identifying specific trade secrets or explaining exactly how competitors would use those supposed secrets to its detriment, Facebook's supporting declaration merely repeats the same generic reasons for every allegation it seeks to seal. Facebook claims that disclosure could "chill free and open discussions of issues in the future." (Mellon Decl., ¶¶ 3-8; *see also id.* ¶¶ 10-17 (incorporating reasons stated in ¶¶ 3-8).) But it cites no precedent for sealing documents on that basis, and it would seem to extend to almost any incriminatory statement revealed through internal company documents. Courts are not permitted to seal information based "on hypothesis or conjecture." *Ctr. for Auto Safety,* 809 F.3d at 1096. Consistent with that principle, courts faced with similar hypothetical forecasts that disclosure would deter candid discussion have rejected them as insufficient to overcome the strong presumption in favor of public access. *Kenny v. Pac. Inv. Mgmt. Co. LLC,* 2018 WL 3328224, at *3–4 (W.D. Wash. July 6, 2018) (rejecting sealing request where defendants failed to "submit sufficient evidence that public revelations of these documents would chill board discussions"); *Gregory v. City of Vallejo*, No. 2:13-CV-00320-KJM, 2014 WL 4187365, at *3 (E.D. Cal. Aug. 21, 2014) ("plaintiffs fail to articulate any support for, or point to any authority in support of, their remaining conclusory argument that '[p]ublic filing of these records would … remove the protections for officers to be candid'").

1    Facebook also repeats, for nearly every allegation that it seeks to seal, the conclusory
2 contention that the allegation "mischaracterizes the underlying information, and, if publicly
3 disclosed, would mislead its audience and could be used by Facebook's competitors to cause it
4 competitive harm." (Mellon Decl., ¶¶ 3-4, 6-9; ¶¶ 10-17 (incorporation reasons from ¶¶ 3-9).) It
5 similarly repeats throughout its brief the accusation that Plaintiffs "mischaracterized the underlying
6 information" and that disclosure "would mislead their audience." (Def. Br. at 1, 2, 4.) Yet
7 Facebook is again unable to cite any precedent for sealing information on this basis, and it appears
8 to be an argument that any defendant could make if it would guarantee secrecy. Like its "chilling"
9 argument, Facebook's "mischaracterization" argument is far too conclusory and speculative to
10 satisfy the compelling reasons standard. *See Kawakama*, 447 F.3d at 1182 (rejecting "conclusory
11 statements" that disclosure would cast defendant's officers "in a false light"). Nearly every litigant
12 believes the other side is mischaracterizing the facts. That's often the whole point of litigation: to
13 resolve which party's characterization of the evidence is more persuasive. And under Ninth Circuit
14 law, that dueling characterization of evidence is supposed to take place in full view of the public.
15    Notably, Facebook never explains how its internal documents *should* be characterized—
16 much less how mischaracterized information would be useful to its competitors. But if it is really
17 concerned that some unspecified "audience" will be misled, it is free to disclose the underlying
18 documents and state its position publicly. Facebook certainly has had no problem getting its
19 position into circulation: its prior public statements about inflated viewership metrics were carried
20 by the New York Times, USA Today, and dozens if not hundreds of other publications. *See, e.g.,*
21 John Herrman and Sapn Maheshwari, *Facebook Apologizes for Overstating Video Metrics*, N.Y.
22 Times, Sept. 23, 2016, https://nyti.ms/2d6mONn; Jessica Guynn, *Facebook Apologizes for Inflating*
23 *Video Numbers,* USA Today, Sept. 23, 2016, http://usat.ly/2dpszWR. And as Facebook has
24 frequently emphasized to the press, it has changed its business practices and now takes the accuracy
25 of its video metrics more seriously. *See, e.g.,* Steve Lohr and Sapna Maheshwari, *Facebook Acts to*
26 *Restore Trust After Overstating Video Views*, N.Y. Times, Nov. 16, 2016,
27 https://nyti.ms/2f1QBmW; Mike Shields, *Facebook Agrees to Audit of its Metrics Following Data*
28 *Controversy*, Wall St. J., Feb. 10, 2017, https://goo.gl/hyVvfb. It remains to be seen whether those

changes are enough, but by Facebook's own account, the specifics alleged in Plaintiffs' complaint are stale and no longer reflect how it does business. *See Ramirez*, 2017 WL 1549330 at *3, 6 (denying motion to seal where information was stale and no longer of potential use to competitors); *Kenny*, 2018 WL 3328224 at *2 ("whatever confidential analysis [the internal document] is stale and no longer likely to offer a completive advantage to [defendant's] competitors").

### 3. Facebook Has Not Shown 3rd Party Privacy Concerns Are Implicated

Facebook also claims that two portions of Plaintiffs' complaint should be sealed because they would disclose third parties' confidential information. (Def. Br. at 5.) These portions, found in Paragraphs 4 and 66 of Plaintiffs' complaint, allege that Facebook's average viewership metrics were not inflated by only 60 to 80%—they were inflated by some 150 to 900%. For example, when Facebook summarized the impact of the miscalculation internally, it presented two typical cases: in the first, Facebook had inflated Average Duration of Video Viewed from 2.0 seconds to 17.5 seconds (an increase of 775%); in the other, Facebook had inflated Average Duration of Video Viewed from 2.4 seconds to 17.3 seconds (an increase of 621%). (4th Am. Compl., ¶ 66.)

None of these allegations contain any identifying information, which is the critical fact courts consider when deciding whether and how much of a third party's private information should be sealed. *See O'Connor*, 2015 WL 355496 at *2 (non-party's interest "can be appropriately balanced with the public's right to access by redacting personal identifying information"). Facebook has not explained how disclosure of only aggregate data and representative samples could possibly cause harm to third parties, and Plaintiffs' counsel—who have a responsibility to safeguard the interest of absent class members—can see none. Disclosure "would not injure [any] third parties but would reveal only [Facebook's] actions"—namely, that it inflated the average viewership times it reported to the putative class by some 150 to 900%. *Foltz,* 331 F.3d at 1137.

In addition, the allegations go to the very heart of the case, as they show not only that Facebook was indeed overstating the average viewership time it reported to advertisers, but that it was overstating it by many multitudes. *Contrast G&C Auto Body Inc v. Geico Gen. Ins. Co.*, No. C06-04898 MJJ, 2008 WL 687372, at *2 (N.D. Cal. Mar. 11, 2008) (ordering third-party information redacted that was "of little or no relevance to the issues that were raised"). The actual

degree by which Facebook overstated its viewership metrics further supports Plaintiffs' claim that it was not an honest mistake, but rather the result of knowing or reckless indifference to the accuracy of its metrics. The fact that Facebook concealed the extent to which it had inflated viewership metrics, even while it was loudly and publicly pledging a renewed commitment to transparency in the wake of the Wall Street Journal report, also supports Plaintiffs' claim of fraud.

### C. Even if Facebook's Reasons For Requesting Secrecy Were Compelling, The Public's Interest in Disclosure Is More Compelling

For the reasons discussed above, Facebook has not provided the detailed facts necessary to justify sealing Plaintiffs' allegations under the stringent compelling-reasons standard. Even if it had, however, the Court would then need to "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Ctr. for Auto Safety,* 809 F.3d at 1096. Facebook contends that the public's interest is disclosure is "markedly weak" because the "small number of allegations" it seeks to seal are not needed to understand the complaint. (Def. Br. at 2.) But those "small number of allegations" comprise almost every fact Plaintiffs have added to support their new claim for fraud, and are quite necessary for both absent class members and the public at large to understand why Plaintiffs contend Facebook inflated metrics constitute fraud—not an honest mistake as Facebook has repeatedly told the world.

Moreover, when Facebook complains that its behavior is "subject to significant public scrutiny," it is making an argument in favor of disclosure—not against. (Def. Br. at 5.) "[T]he interest in access to court proceedings in general may be asserted *more* forcefully when the litigation involves matters of significant public concern." *Cohen v. Trump*, No. 10-CV-0940-GPC-WVG, 2016 WL 3036302, at *6 (S.D. Cal. May 27, 2016) (emphasis added); *see also Kamakama*, 447 F.3d at 1179 (disclosure ensures public understanding of "significant public events"); *Shane Grp., Inc. v. BCBS of Mich.,* No. 15-1544, 2016 WL 3163073, at *3-4 (6th Cir. June 7, 2016) ("the greater the public interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access"). That is true not only because the public has a strong interest in the subject matter of this lawsuit—as demonstrated by the Wall Street Journal's report and extensive press coverage that followed—but because this case is being brought on behalf of members of the public. *See Shane,* 825 F.3d at 305 ("in class actions—where by definition 'some

9
PLAINTIFFS' OPPOSITION TO SEALING PORTIONS OF FOURTH AMENDED COMPLAINT
Case No.: 4:16-cv-06232-JSW

members of the public are also parties to the [case]'—the standards for denying public access to the record 'should be applied ... with particular strictness'") (quoting *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001)). With Facebook designating 92% of its documents as "Attorneys' Eyes Only," not even the named plaintiffs, much less the million or so advertisers who comprise the class, are currently permitted to see the allegations that underlie the fraud claims against Facebook. Major litigation on behalf of so many should not be conducted in secret.

Ironically, it was not too long ago that Facebook was actively courting the press. After the Wall Street Journal reported on its inflated metrics, Facebook launched a highly rehearsed communication plan in an effort to shape public opinion. That communications plan included a prominent public statement that was covered by dozens of major media outlets, along with appearances on CBS This Morning and CNBC, among others—each time spreading the false message that the metrics issue was the result of an honest mistake that Facebook promptly fixed. *See, e.g.,* Herrman and Maheshwari, *supra*; Guynn, *supra*; *CNBC Transcript: Facebook COO Sherly Sandberg Speaks with CNBC's Julia Boorstin on "Squawk Alley" Today* (Sept. 27, 2016), https://cnb.cx/2xYhq7o; *Sheryl Sandberg on leveling filed for women, Facebook video metrics,* CBS This Morning, Sept. 27, 2016, https://youtu.be/w4N6SQVOpXg?t=7m7s. So while Facebook expresses concern that future press coverage "threatens to reach potential jurors" (Def. Br. at 6), it knows that its own publicity campaign has already done just that. Due to the strong public interest in the subject matter of this case, some degree of press coverage is inevitable. The only question is whether Facebook, having already spoken loudly and widely in its own defense, should be permitted to force Plaintiffs to present their side of the case behind closed doors.

## **CONCLUSION**

In light of the strong presumption in favor of public access, the importance of this litigation to absent class members and to the public, and Facebook's failure to provide anything beyond boilerplate assertions that disclosure would cause it competitive harm, Plaintiffs respectfully request that the Court deny Facebook's sealing requests. Plaintiffs' complaint should be ordered filed in the public record so that class members and the public can understand the basis for Plaintiffs' claim that Facebook's inflation of viewership metrics was not merely an honest mistake, but fraud.

| | | |
|---|---|---|
| 1 | DATED: September 27, 2018 | Respectfully submitted, |
| 2 | | By: /s/ Eric Gibbs |

Eric Gibbs
Dylan Hughes
David Stein
Aaron Blumenthal
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com
ds@classlawgroup.com
ab@classlawgroup.com

Andrew N. Friedman
Geoffrey Graber
Eric Kafka
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com

Michael Eisenkraft
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
meisenkraft@cohenmilstein.com

Robert T. Eglet
Robert M. Adams
Erica D. Entsminger
Artemus W. Ham
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegs, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

Aisha Christian
129 West 27th Street, 11th Floor
New York, NY 10001
Telephone: (646) 285-2029

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
charles.reichmann@gmail.com

Joseph A. Motta (SBN 133531)
**RUEB & MOTTA**
1401 Willow Pass Road, Suite 880
Concord, CA 94520
Telephone: (925) 602-3400
Facsimile: (925) 602-0622
joe@rmmprolaw.com

*Counsel for Plaintiffs and Proposed Class*