Eric H. Gibbs (SBN 178658)
David Stein (SBN 257465)
Aaron Blumenthal (SBN 310605)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
ds@classlawgroup.com
ab@classlawgroup.com

Robert T. Eglet (*pro hac vice*)
Robert M. Adams (*pro hac vice*)
Erica D. Entsminger (*pro hac vice*)
Artemus W. Ham (*pro hac vice*)
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegas, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

Andrew N. Friedman (*pro hac vice*)
Geoffrey Graber (SBN 211547)
Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com

[Additional counsel on signature page]

*Counsel for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| LLE ONE, LLC, *et al.*,<br><br>                         Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>                         Defendant. | Case No.: 4:16-cv-06232-JSW<br><br>**PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISMISS THIRD CAUSE OF ACTION**<br><br>Dept:    Courtroom 5, 2nd Floor<br>Judge:   Jeffrey S. White |

## I.      INTRODUCTION

When Plaintiffs initially brought this lawsuit, it appeared that Facebook had simply made a mistake — albeit a highly profitable one.  Facebook had miscalculated two metrics that advertisers use to assess how well their video ads are performing.  As a result, it appeared that Facebook users were spending a significant amount of time watching advertisers' video ads, when—in reality—the vast majority of users were scrolling right past the ads and scarcely watching at all.  The miscalculation persisted for well over a year — leading to undeserved profits for Facebook, because video advertisers wrongly believed the platform offered a higher level of viewer engagement than it really did, and accordingly allocated more of their marketing budget to Facebook.

After the Wall Street Journal first reported the inflated metrics, Facebook claimed it had made a good-faith mistake.  It told the press it had only just discovered the miscalculation, and that "as soon as we discovered the discrepancy, we fixed it." (4th Am. Compl., ¶¶ 2, 69.)  But a review of Facebook's internal records has shown otherwise.  Facebook engineers knew exactly how the company was calculating its metrics and yet did nothing to fix the error for more than a year.  (*Id.*, ¶¶ 3, 58.)  Even as advertisers reported aberrant results caused by the miscalculation, the metrics remained unchanged.  (*Id.*, ¶¶ 3, 59.)  And when Facebook finally decided to fix the problem, it delayed for several more months while it developed a "no PR" strategy to "obfuscate the fact that we screwed up the math." (*Id.*, ¶¶ 6, 63.)  Based on these newly discovered facts, Plaintiffs amended their complaint to allege that Facebook acted with scienter: it either intentionally reported inflated numbers to advertisers or it did so with reckless disregard for the metrics' accuracy.  (*Id.*, ¶¶ 7, 115.)  Facebook's conduct thus rises to the level of fraud and may warrant punitive damages.  (*Id.*, ¶¶ 3, 7.)

Facebook has moved to dismiss Plaintiffs' fraud claim, but it does not target the new scienter allegations.  Instead, Facebook questions whether Plaintiffs have adequately alleged reliance — even though Plaintiffs' reliance allegations have not changed.  In fact, Judge Henderson addressed the adequacy of Plaintiffs' reliance allegations back in July of 2017, in response to Facebook's first motion to dismiss.  After Plaintiffs revised their allegations to comply with Judge Henderson's ruling, Facebook dropped its reliance argument, focusing instead on other issues in its next two motions to dismiss.  By re-raising the issue of reliance now, in its fourth motion to dismiss,

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THIRD CAUSE OF ACTION
Case No. 4:16-cv-06232-JSW

Facebook has violated Rule 12(g)(2), which prohibits parties from moving to dismiss on grounds that could have been raised in prior motions.  Facebook's motion should be denied on that ground alone.  The Court should not have to expend resources assessing reliance allegations that have not changed over the span of multiple complaints.

Even if the Court reaches the merits of Facebook's argument, the Court should reject it because Plaintiffs allege ample facts that demonstrate their reliance on Facebook's erroneous metrics.  The complaint explains why these metrics are so important to advertisers like Plaintiffs: advertisers place greater value on video advertisements that are viewed longer because they are more likely to be remembered and more likely to sway purchasing decisions.  (*See* Consol. Am. Compl. [ECF No. 34], ¶¶ 18-21, 35-39.)  Plaintiffs also explain that they personally viewed the metrics, found them to be important, and then relied on them in purchasing more video advertising than they otherwise would have.  (*See* 2nd Am. Compl. [ECF No. 70], ¶¶ 49-50; 3rd Am. Compl. [ECF No. 97], ¶¶ 69-70.)  These allegations satisfy California's reliance requirement, just as they did in Plaintiffs' second and third amended complaints.  Facebook's motion should accordingly be denied.

## II.     BACKGROUND

### A.      Facebook inflated key metrics used to assess the effectiveness of video ads.

In September 2016, the Wall Street Journal reported that for roughly two years, Facebook overstated the average time its users spent watching paid video ads.  (4th Am. Compl., ¶ 1.)  The error inflated the viewership metrics by some 150 to 900%.  (*Id.*, ¶¶ 4, 31-34, 66.)  In one typical example, users had been watching an ad for 2 seconds on average, but Facebook's metrics reported that the average was actually a whopping 17.5 seconds.  (*Id.*, ¶ 66.)

Facebook has tried to minimize the import of its error, saying that the affected metrics — "Average Duration of Video Viewed" and "Average Percentage of Video Viewed" — were only two of many and did not affect how much advertisers were billed.  (Mot. at 2.)  But in fact, the metrics provide crucial information used to decide whether to continue running an ad campaign, how much money to allocate to the campaign, and whether to run future campaigns on Facebook or another platform.  (4th Am. Compl., ¶¶ 20, 22-23.)

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THIRD CAUSE OF ACTION
Case No. 4:16-cv-06232-JSW

1    Research shows that the longer people watch a video advertisement, the greater the ad's

2 influence.  (*Id.*, ¶¶ 23, 37.)  Increasing viewership retention from 3 seconds to 10 seconds, for

3 example, leads to a 57% increase in ad recall, a 103% increase in brand awareness, and a 64%

4 increase in purchase intent.  (*Id.*, ¶ 23.)  Advertisers accordingly place higher values on video

5 advertisements with longer average view times.  (*Id.*)  They are more likely to continue running ads

6 with longer average view times and are more likely to terminate ads with shorter average view times;

7 they are willing to pay more and devote more of their advertising budget for ads with longer average

8 view times; and they are more likely to advertise on platforms that can deliver longer average view

9 times.

10    Facebook's exaggerated metrics thus created the impression for advertisers that video ads

11 placed on Facebook were performing much better than they really were.  (*Id.*, ¶ 35.)  The metrics

12 suggested that advertisers' target audiences were watching significant portions of the video ads, even

13 though Facebook users were barely watching them at all.  (*Id.*, ¶¶ 36, 39.)  As a result, advertisers

14 like Plaintiffs were induced to continue paying for campaigns they otherwise would have terminated

15 and to purchase additional video advertising on Facebook's platform.  (*Id.*, ¶ 39.)  They also were

16 willing to pay more for Facebook advertising, believing the platform offered better viewer

17 engagement than it actually did, and allocated more of their advertising budget to Facebook video

18 ads as a result.  (*Id.*, ¶ 40.)

19    **B.    Facebook challenges Plaintiffs' reliance allegations.**

20    In response to Plaintiffs' initial complaint, Facebook moved to dismiss on the same grounds

21 it gives for this motion: it said Plaintiffs had failed to adequately allege they relied on Facebook's

22 inflated metrics.  (4/10/17 Mot. [ECF No. 46] at 1, 2, 4, 6-9.)  As Facebook put it, Plaintiffs had

23 alleged they "suffered injury by spending more money—either by continuing existing video-ad

24 campaigns or starting new ones — ***because of*** what the erroneous Average Duration Metrics told

25 them about their existing ad campaigns."  (Mot. at 8 (emphasis in original).)  But Facebook argued

26 that Plaintiffs' theory of causation would only work "if each Plaintiff ***actually saw*** an erroneous

27 Average Duration Metric and ***because of*** that metric decided to spend more money on Facebook

28 video ads."  (*Id.* (emphasis in original).)  Plaintiffs had not specifically alleged they saw the

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THIRD CAUSE OF ACTION
Case No. 4:16-cv-06232-JSW

1   erroneous metrics and spent more money as a result, and so Facebook argued that dismissal was

2   required.  (*Id.* at 2, 8.)

3         Judge Henderson agreed with Facebook.  He found that Plaintiffs were required to "satisfy

4   the actual-reliance requirement, which means the plaintiff must allege that he or she saw the specific

5   misrepresentation at issue and actually relied on it."  (7/14/17 Order [ECF No. 65] at 8.)  The Court

6   noted that during oral argument, Plaintiffs had represented the complaint could be amended to cure

7   that deficiency, and in all other respects the Court found that Plaintiffs had satisfied Rule 9(b)'s

8   heightened pleading standard.  (*Id.* at 9-10.)

9         **C.    Plaintiffs amend their reliance allegations and Facebook drops its challenge.**

10        Following the June 2017 hearing on Facebook's motion to dismiss, Plaintiffs amended their

11   reliance allegations to meet the standard set forth in the Court's order.  (2nd Am. Compl., [ECF No.

12   70], ¶¶ 40-56.)  Each of the named plaintiffs alleged that after placing their first video ads on

13   Facebook, they started viewing the "Average Duration of Video Viewed" and "Average % of Video

14   Viewed" metrics. (*Id.*, ¶¶ 43, 49, 55.) They also alleged that "[t]he inflated 'Average Duration of

15   Video Viewed' and 'Average % of Video Viewed' metrics were material to [them] and [they] relied

16   on the metrics, purchasing more video advertising services from Facebook than [they] otherwise

17   would have."  (*Id.*, ¶¶ 44, 50, 56.)

18        After Plaintiffs added those allegations, Facebook dropped its challenge to reliance.  It

19   moved to dismiss twice more, but neither time on the grounds that Plaintiffs had not adequately

20   alleged their reliance on its inflated metrics.  (*See* ECF Nos. 79, 110.)  After the Court ruled on the

21   last of these motions, Facebook answered the Third Amended Complaint.  (ECF No. 137.)

22        **D.    Plaintiffs' Fourth Amended Complaint includes the same reliance allegations
23              as the previous two complaints.**

24        Plaintiffs recently filed a Fourth Amended Complaint to add a claim for fraud and a request

25   for punitive damages.  The new substantive allegations pertain to Facebook's scienter — what

26   Facebook knew, when it knew it, and whether its metrics were intentionally or recklessly

27   misreported to advertisers.  (4th Am. Compl., ¶¶ 1-7, 57-69.)  Facebook had publicly professed that

28   its inflated metrics were the result of a good-faith mistake, and that as soon as it discovered the error,

4

it fixed it.  (*Id.*, ¶¶ 2, 69.)  Through discovery, however, Plaintiffs learned that Facebook engineers knew the company was using the wrong denominator to calculate average viewership, and that Facebook took no action for over a year, even as advertisers reported aberrant results caused by Facebook's faulty formula.  (*Id.*, ¶¶ 3, 58-59.)  Based on these newly discovered facts, Plaintiffs alleged that Facebook either knew that it was reporting drastically inflated metrics or, at a minimum, acted with reckless disregard for the truth.  (*Id.*, ¶ 115.)  In other words, Facebook did not just violate California's Unfair Competition Law (UCL) and implied contractual obligations by disseminating false and deceptive numbers to its advertising customers — as Plaintiffs had alleged in their prior pleadings.  Facebook also acted with scienter and thus was guilty of common law fraud and could be required to pay punitive damages to the class.  (*Id.*, ¶ 7.)

In moving to dismiss Plaintiffs' Fourth Amended Complaint, Facebook does not contest the adequacy of the new scienter allegations.  Instead, it claims that Plaintiffs have not adequately alleged they relied on Facebook's inflated metrics — an issue that was already litigated and resolved with regard to Plaintiffs' UCL claim.  (*See* Sections II.B-C, *supra*.)  The allegations that Facebook's inflated metrics were material and caused advertisers, including Plaintiffs, to spend more money on Facebook advertising, have remained unchanged since the Second Amended Complaint.  (*Compare* 4th Am. Compl., ¶¶ 20-23, 37-41, *with* 2nd Am. Compl., ¶¶ 16-19, 33-37.)  The allegations specific to Plaintiff LLE One, which indicate that LLE One saw the inflated metrics, considered them material, and purchased more Facebook advertising as a result, have likewise remained unchanged since the Second Amended Complaint.  (*Compare* 4th Am. Compl., ¶¶ 70-75, *with* 2nd Am. Compl., ¶¶ 46-51.)  And similar allegations for Plaintiff Jonathan Murdough have remained unchanged since the Third Amended Complaint, when Mr. Murdough first appeared as a named plaintiff and proposed class representative.  (*Compare* 4th Am. Compl., ¶¶ 76-82, *with* 3rd Am. Compl., ¶¶ 65-71.)  The new fraud cause of action added only a statement of ultimate fact, reiterating that Plaintiffs relied on the inflated metrics and purchased more video advertising as a result.  (4th Am. Compl., ¶ 117.)  But neither the substance of that ultimate fact nor the more detailed allegations upon which it is based are new.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THIRD CAUSE OF ACTION
Case No. 4:16-cv-06232-JSW

1
2
3

## III.    ARGUMENT

### A.    Facebook's motion is barred by Rule 12(g)(2) because it relies on an argument that could have been raised in prior motions.

4    Rule 12(g)(2) prohibits a party from filing a motion to dismiss that raises "a defense or

5    objection that was available to the party but omitted from [an] earlier motion."  That is exactly what

6    Facebook is doing here.  It challenged Plaintiffs' reliance allegations through its initial motion to

7    dismiss, obtained a ruling, and then dropped the argument after Plaintiffs amended their complaint to

8    comply with that ruling.  (*See* Sections II.B-C, *supra*.)  If Facebook believed Plaintiffs' reliance

9    allegations were still insufficient, it should have raised the issue when it moved to dismiss Plaintiffs'

10   Second Amended Complaint — when the issue could have been decided in conjunction with other

11   pleading issues then before the Court.  It chose not to do so and should not be permitted to revisit the

12   issue now.  *See Northstar Fin. Advisors Inc. v. Schwab Investments,* 135 F. Supp. 3d 1059, 1071

13   (N.D. Cal. 2015) ("Defendants may not re-assert in a successive motion to dismiss arguments that

14   Defendants abandoned in a prior motion to dismiss"), *aff'd in part, rev'd in part on other*

15   *grounds*, 904 F.3d 821 (9th Cir. 2018); *Herron v. Best Buy Stores, LP*, No. 12-CV-02103, 2013 WL

16   4432019, at *3-4 (E.D. Cal. Aug. 16, 2013) (denying motion where defendant failed to raise issue of

17   plaintiff's exposure to or reliance on representations in prior motion).

18   Facebook may argue that Plaintiffs' claim for fraud is new to the Fourth Amended Complaint

19   so it should be permitted to challenge that claim through a fourth motion to dismiss.  That would be

20   true if Facebook were contesting the adequacy of Plaintiffs' scienter allegations, or some other

21   aspect of the fraud claim that was introduced for the first time in the Fourth Amended Complaint.

22   But Plaintiffs' reliance allegations are not new.  (*See* Section II.D, *supra*.)  Plaintiffs have always

23   alleged a claim for violation of the UCL's fraudulent prong, and that claim imposes the same

24   reliance requirement on named plaintiffs as common-law fraud.  *In re Tobacco II Cases,* 46 Cal. 4th

25   298, 326-28 (2009) (deriving the reliance standard for the UCL's fraudulent prong from common

26   law fraud cases).  This is therefore not Facebook's first opportunity to challenge Plaintiffs' reliance

27   allegations, and Facebook should be prohibited from using new scienter allegations as an excuse to

28   resurrect old reliance arguments.  *See Bush v. Liberty Life Assurance Co. of Boston,* 130 F. Supp. 3d

6

1320, 1326 (N.D. Cal. 2015) (denying motion pursuant to Rule 12(g)(2) where the grounds for dismissing a new claim could have been raised with respect to an existing claim).

Facebook may also argue that the Court can exercise its discretion to consider Facebook's renewed reliance argument, even though Rule 12(g)(2) is framed in mandatory terms — a party "must not" raise an objection that could have been raised through a prior motion.  *See In re Apple Iphone Antitrust Litig.,* 846 F.3d 313, 319 (9th Cir. 2017), *cert. granted on another issue*, 138 S. Ct. 2647 (2018).  When courts have exercised that discretion, however, it is generally because to do so was "in the interests of judicial economy."  *Id.* (quoting *Banko v. Apple, Inc*., No. 13–02977, 2013 WL 6623913, at *2 (N.D. Cal. Dec. 16, 2013)).  But here the issue of reliance has already been addressed in response to Facebook's first motion to dismiss.  Under the circumstances of this case — where Facebook raised reliance arguments, then dropped them, and now are seeking to raise them again — judicial economy would not be served by evaluating Facebook's renewed reliance arguments.  Discovery is now well-underway; class certification is nearing; and Plaintiffs' first two claims, including their UCL fraud claim, are past the pleading stage.  Re-opening the issue of reliance now would not further the interests of judicial efficiency.

The Court should instead deny Facebook's motion under Rule 12(g)(2).  *See Bush*, 130 F. Supp. 3d at 1326 (declining "in light of the procedural history of this case," to exercise its discretion to ignore Rule 12(g)(2) and consider defendant's arguments); *In re Packaged Seafood Prod. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1174 (S.D. Cal. 2017) ("in a case as broad as this, where there are many claims and many potential arguments to be made, to refuse to enforce Rule 12(g)(2)'s clear command on such a foundational argument as the one Defendants here urge … would set a dangerous precedent regarding the ability to continually hamstring a plaintiff with wave after wave of motions to dismiss").

**B.** **Plaintiffs have adequately pled reliance since the Second Amended Complaint.**

If the Court elects to consider Facebook's arguments, a review of the Fourth Amended Complaint will confirm that Plaintiffs adequately allege they relied on Facebook's inflated metrics. As Judge Henderson observed in his order on Facebook's first motion to dismiss, to satisfy the reliance requirement, the plaintiff must allege that it "saw the specific misrepresentation at issue and

7

actually relied on it." (7/14/17 Order at 8.) Other cases are in accord. *See, e.g., Brickman v. Fitbit, Inc.*, No. 15-CV-02077, 2016 WL 3844327, at *2 (N.D. Cal. July 15, 2016) (finding Rule 9(b) satisfied with "allege[d] pre-purchase notice and reliance on [defendant's] statements"); *Samet v. Procter & Gamble Co.*, No. 5:12-CV-01891-PSG, 2013 WL 6491143, at *4 (N.D. Cal. Dec. 10, 2013) (finding plaintiffs' allegations "sufficient" where plaintiffs alleged they "read the front of the package" and "relied on that representation").

Plaintiffs' allegations meet that standard. Each of the two named plaintiffs allege (i) that they viewed the two metrics alleged to be misleading, (ii) that those metrics were material to them, and (iii) that they relied on those metrics in purchasing more Facebook video advertising than they otherwise would have. (4th Am. Compl., ¶¶ 73-74, 80-81.) Elsewhere in the complaint, Plaintiffs also allege that Facebook's inflated metrics induced them to purchase video advertising because they believed users were watching their videos longer than they really were, and they confirmed they would not have spent as much on Facebook's video advertising if Facebook had disseminated accurate metrics. (*Id.*, ¶¶ 39-40, 101, 117.)

In addition, Plaintiffs have alleged *why* the average viewership metrics that Facebook falsely reported are considered material by advertisers like Plaintiffs. They allege that real-time analytics are one of the major reasons that advertisers choose to advertise through online platforms like Facebook, as they allow advertisers to make informed decisions about how their marketing budgets are allocated and to adjust that allocation on a monthly, weekly, or daily basis. (*Id.*, ¶ 20.) Of the online analytics that video advertisers like Plaintiffs follow, those that measure average view length are particularly important. (*Id.*, ¶ 23.) They indicate whether a given video advertisement is actually capturing the target audience's attention, or whether most users are simply scrolling past the ad and barely watching. (*Id.*, ¶¶ 23, 36.) The longer potential customers watch a video ad, the more likely the ad is to influence their behavior in the future—which is ultimately what advertisers care most about. (*Id.*, ¶¶ 23, 37.) For example, one study found that increasing viewer retention from 3 seconds to 10 seconds resulted in a 57% increase in ad recall, 103% increase in brand awareness, and 64% increase in purchase intent. (*Id.*, ¶ 23.) Advertisers thus value average viewership metrics

1   as an important indicator of their advertising's effectiveness and use those metrics when deciding

2   how to allocate their marketing budget.  (*Id.*, ¶¶ 20, 23, 37, 39-40.)

3          These materiality allegations are significant because, under California law, "a presumption,

4   or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was

5   material." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 976-77 (1997).  To adequately

6   plead reliance, Plaintiffs therefore "need only make a showing that the misrepresentations were

7   material, and that therefore a reasonable trier of fact could infer reliance from the

8   misrepresentations." *Id.*  Plaintiffs have done so—not only by alleging the vital role that average

9   viewership metrics play in the allocation of marketing dollars, but by illustrating the dramatic impact

10  that Facebook's miscalculation had on the numbers it reported.  (*See*, 4th Am. Compl., ¶¶ 34-36, 66.)

11
          **C.     Unlike here, in the cases Facebook relies upon, the plaintiffs never saw
12                  misleading representations.**

13         Facebook argues that Plaintiffs' reliance allegations are conclusory and likens them to two

14  cases in this district that found other reliance allegations lacking: *Baltazar v. Apple, Inc.*, No. CV-10-

15  3231, 2011 WL 588209, at *3 (N.D. Cal. Feb. 10, 2011), and *McKinney v. Google, Inc.*, No. 5:10-

16  CV-01177, 2011 WL 3862120, at *1-2 (N.D. Cal. Aug. 30, 2011).  Facebook is only able to make

17  this argument by ignoring all of the reliance allegations discussed in the previous section.  It focuses

18  only on the statement of ultimate fact included in Plaintiffs' third cause of action (4th Am. Compl., ¶

19  117), and ignores the numerous other allegations that support that statement (*id.*, ¶¶ 20-23, 34-41,

20  70-82; *see also* ¶ 113.)

21         In *Baltazar* and *McKinney*, the plaintiffs could not allege a plausible connection between

22  their purchase of the defendants' product and any actionable misrepresentations—either because

23  they hadn't seen the defendants' statements or because the statements they did see were not actually

24  deceptive.  For instance, the *Baltazar* plaintiffs complained that Apple's first iPad overheats when

25  used outdoors, even within the "acceptable ambient temperature," as that term was defined in the

26  product specifications.  *Baltazar*, 2011 WL 588209 at *1.  But none of the plaintiffs could allege

27  they actually saw those product specifications.  *Id.* at *3.  And what the plaintiffs did see—a

28  commercial showing people using the iPad outdoors—was not deceptive because it did not suggest

9

1   the iPads would operate in direct sunlight for prolonged periods and so could not form a basis for

2   justifiable reliance.  *Id.*, 2011 WL 3795013, at *5 (Aug. 26, 2011) (2nd dismissal); 2011 WL

3   6747884, at *4 (Dec. 22, 2011) (3rd dismissal).  The *McKinney* plaintiff likewise could not connect

4   her claimed injury with any conduct by the defendants.  She complained that her Nexus One mobile

5   phone failed to maintain consistent 3G connectivity, but she could not identify any representation

6   that even mentioned 3G connectivity.  *McKinney*, 2011 WL 3862120 at *5.

7   Plaintiffs' reliance allegations do not suffer from those infirmities.  The *Baltazar* plaintiffs

8   could not allege they saw Apple's product specifications and the *McKinney* plaintiff could not allege

9   she saw a representation regarding 3G connectivity, but Plaintiffs do allege they saw the Average

10  Duration of Video Viewed and Average % of Video Viewed metrics.  (4th Am. Compl., ¶¶ 73, 78,

11  80.)  Likewise, whereas the *Baltazar* plaintiffs could not show that the commercial they did see was

12  false, there is no dispute that Facebook's metrics were wrong.  (*Id.*, ¶¶ 29-30; Def. Mem. at 1.)

13  Moreover, Plaintiffs have alleged why the metrics were wrong and why it mattered to advertisers

14  like Plaintiffs, who use Facebook's average viewership metrics to evaluate their advertisings' impact

15  and to decide how to allocate their marketing dollars.  (4th Am. Compl., ¶¶ 20-23, 31-41.)

16  Plaintiffs' allegations are thus far more robust than those in *Baltazar* or *McKinney*, and offer more

17  than enough detail to substantiate a plausible connection between Facebook's false metrics and

18  Plaintiffs' expenditures on Facebook video advertising.

19  **IV.    CONCLUSION**

20  Plaintiffs respectfully request that the Court deny Facebook's motion to dismiss their fraud

21  claim, both because Facebook failed to raise its reliance argument in two prior motions to dismiss

22  and because Plaintiffs have properly alleged that they saw and relied upon the inflated viewership

23  metrics at issue in this case.

24

25  DATED: November 2, 2018                    Respectfully submitted,

26                                             By: /s/ David Stein

27                                             Eric Gibbs
28                                             Dylan Hughes

                                               10

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THIRD CAUSE OF ACTION
Case No. 4:16-cv-06232-JSW

David Stein
Aaron Blumenthal
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com
ds@classlawgroup.com
ab@classlawgroup.com

Andrew N. Friedman
Geoffrey Graber
Eric Kafka
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com

Michael Eisenkraft
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
meisenkraft@cohenmilstein.com

Robert T. Eglet
Robert M. Adams
Erica D. Entsminger
Artemus W. Ham
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegs, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

Aisha Christian
129 West 27th Street, 11th Floor
New York, NY 10001
Telephone: (646) 285-2029

11

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
charles.reichmann@gmail.com

Joseph A. Motta (SBN 133531)
**RUEB & MOTTA**
1401 Willow Pass Road, Suite 880
Concord, CA 94520
Telephone: (925) 602-3400
Facsimile: (925) 602-0622
joe@rmmprolaw.com

*Counsel for Plaintiffs and Proposed Class*

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THIRD CAUSE OF ACTION
Case No. 4:16-cv-06232-JSW